## UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| FAIRHOLME FUNDS, INC., *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> )   No. 13-465C <br> )   (Chief Judge Sweeney) <br> ) <br> ) <br> ) <br> ) <br> ) |
| JOSEPH CACCIAPALLE, *et al*., <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES, <br><br> Defendant. | ) <br> ) <br> ) <br> ) <br> )   No. 13-466C <br> )   (Chief Judge Sweeney) <br> ) <br> ) <br> ) <br> ) |

*Additional Plaintiffs on following pages*

### PLAINTIFFS' OMNIBUS RESPONSE TO DEFENDANT'S MOTION TO DISMISS

Hamish P.M. Hume
*Attorney of Record*

*Of Counsel:*
Stacey K. Grigsby
Jonathan M. Shaw
James A. Kraehenbuehl
BOIES SCHILLER FLEXNER LLP
1401 New York Ave., N.W.
Washington, D.C. 20005
(202) 237-2727
(202) 237-6131 (fax)
hhume@bsfllp.com
sgrigsby@bsfllp.com
jshaw@bsfllp.com
jkraehenbuehl@bsfllp.com

*Counsel for Cacciapalle Plaintiffs*

Charles J. Cooper
*Attorney of Record*

*Of Counsel*:
David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)
ccooper@cooperkirk.com
vcolatriano@cooperkirk.com
dthompson@cooperkirk.com
ppatterson@cooperkirk.com
bbarnes@cooperkirk.com

*Counsel for Fairholme Plaintiffs*

*Additional Counsel Listed Inside Cover*

| | |
|---|---|
| BRYNDON FISHER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 13-608C |
| v. | ) (Chief Judge Sweeney) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| ARROWOOD INDEMNITY | ) |
| COMPANY, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) No. 13-698C |
| | ) (Chief Judge Sweeney) |
| v. | ) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| BRUCE REID, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 14-152C |
| v. | ) (Chief Judge Sweeney) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| LOUISE RAFTER, *et al.*, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 14-740C |
| v. | ) (Chief Judge Sweeney) |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |

*Additional Counsel:*

| | |
|---|---|
| Eric L. Zagar | Charles J. Piven |
| Lee D. Rudy | BROWER PIVEN |
| Grant D. Goodhart | A PROFESSIONAL CORPORATION |
| KESSLER TOPAZ MELTZER & CHECK LLP | 1925 Old Valley Road |
| 280 King of Prussia Rd. | Stevenson, MD 21153 |
| Radnor, PA 19087 | (410) 332-0030 |
| (610) 667-7706 | (410) 685-1300 (fax) |
| (610) 667-7056 (fax) | piven@browerpiven.com |
| ezagar@ktmc.com | |
| lrudy@ktmc.com | Michael J. Barry |
| ggoodhart@ktmc.com | GRANT & EISENHOFER P.A. |
| | 123 Justison Street |
| Jeremy A. Lieberman | Wilmington, DE 19801 |
| POMERANTZ LLP | (302) 622-7000 |
| 600 Third Avenue, 20th Floor | (302) 622-7100 (fax) |
| New York, New York 10016 | mbarry@gelaw.com |
| (212) 661-1100 | |
| (212) 661-8665 (fax) | |
| jalieberman@pomlaw.com | |
| | |
| Patrick V. Dahlstrom | |
| Ten South LaSalle Street, Suite 3505 | |
| Chicago, Illinois 60603 | |
| (312) 377-1181 | |
| (312) 377-1184 (fax) | |
| pdahlstrom@pomlaw.com | |

**Of Counsel for Cacciapalle Plaintiffs**

| | |
|---|---|
| Robert C. Schubert | |
| *Attorney of Record* | |
| | |
| *Of Counsel*: | *Of Counsel*: |
| Noah M. Schubert | Edward F. Haber |
| Miranda P. Kolbe | SHAPIRO HABER & URMY LLP |
| SCHUBERT JONCKHEER & KOLBE LLP | 53 State Street |
| Three Embarcadero Ctr Ste 1650 | Boston, MA 02109 |
| San Francisco, CA 94111-4018 | (617) 439-3939 |
| (415) 788-4220 | (617) 439-0134 (fax) |
| (415) 788-0161 (fax) | ehaber@shulaw.com |
| rschubert@sjk.law | |
| nschubert@sjk.law | |
| mkolbe@sjk.law | |

**Counsel for Fisher and Reid Plaintiffs**

Gregory P. Joseph
*Attorney of Record*

*Of Counsel:*
Mara Leventhal
Sandra M. Lipsman
Christopher J. Stanley
Roman Asudulayev
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200
(212) 407-1280 (fax)
gjoseph@jha.com
mleventhal@jha.com
slipsman@jha.com
cstanley@jha.com
rasudulayev@jha.com

**Counsel for Rafter Plaintiffs**

Michael H. Barr
*Attorney of Record*

*Of Counsel:*
Richard M. Zuckerman
Sandra Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700
(212) 768-6800 (fax)
1900 K Street, NW
michael.barr@dentons.com
richard.zuckerman@dentons.com
sandra.hauser@dentons.com

Drew W. Marrocco
1900 K Street, N.W.
Washington, DC 20006
(202) 408-6400
(202) 408-6399 (fax)
drew.marrocco@dentons.com

**Counsel for Arrowood Plaintiffs**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................... iv

GLOSSARY ...................................................................... xi

INTRODUCTION ................................................................... 1

STATEMENT OF THE CASE ....................................................... 4

    A.    Fannie and Freddie ...................................................... 4

    B.    FHFA Forces the Companies into Conservatorship. ............................. 5

    C.    Unwarranted Accounting Decisions Artificially Increased the Companies' Draws from Treasury, Yet the Companies Returned to Sustained Profitability ...... 6

    D.    The Government Imposes the Net Worth Sweep. ............................... 8

ARGUMENT ..................................................................... 10

I.    This Court Has Jurisdiction to Decide Whether the Government Is Liable for Nationalizing the Companies. ............................................... 10

    A.    Claims Against Treasury Are Against the United States. ....................... 10

    B.    A Federal Conservator Is the United States When It Expropriates Its Ward's Assets for the Benefit of the Government. ................................... 10

    C.    The Conservator Acted as an Agent of the Government and Was Coerced by the Government to Approve the Net Worth Sweep. ......................... 13

            1.    FHFA Approved the Net Worth Sweep as the Government's Agent. ........ 13

            2.    The Government Coerced the Approval of the Net Worth Sweep. ........... 15

    D.    The Net Worth Sweep Is Attributable to the Government Because the Companies Are Government Instrumentalities. .............................. 19

    E.    28 U.S.C. § 1500 Does Not Divest this Court of Jurisdiction. ................. 21

II.    Plaintiffs Are Entitled to Pursue Both Direct and Derivative Claims. ............. 21

    A.    Plaintiffs Have Sufficiently Pleaded Direct Claims. .......................... 21

B.    Plaintiffs May Pursue Derivative Suits on Behalf of the Companies Because FHFA Faces a Manifest Conflict of Interest.................................................25

    1.    Precedent Dictates that the HERA Succession Clause Does Not Preclude a Derivative Suit Where a Manifest Conflict of Interest Exists................25

    2.    The Court May Not Interpret HERA to Preclude Judicial Review of Plaintiffs' Takings and Illegal Exaction Claims. ......................................28

    3.    There Is No Basis to Distinguish *First Hartford*. .....................................29

    4.    FHFA Faces a Manifest Conflict of Interest..............................................31

C.    Issue Preclusion Does Not Require This Court to Disregard Binding Precedent....................................................................................................31

III.    Plaintiffs Who Purchased the Companies' Shares After the Date of the Net Worth Sweep Have Standing. ........................................................................................34

IV.    Plaintiffs Have Alleged Viable Takings Claims. .................................................41

A.    Plaintiffs' Takings Claims Do Not Sound in Tort. ..................................41

B.    Allegations of Unauthorized Conduct Do Not Defeat Takings Claims...............42

C.    Plaintiffs Have Cognizable Property Rights. ...........................................44

    1.    Derivative Plaintiffs Have a Cognizable Property Interest.......................44

    2.    Direct Plaintiffs Have a Cognizable Property Interest..............................44

D.    Plaintiffs Adequately Allege a *Per Se* Taking. .......................................48

E.    Plaintiffs Adequately Allege a Regulatory Taking ...............................50

    1.    Plaintiffs Adequately Allege a Categorical Regulatory Taking. ..............50

    2.    Plaintiffs Adequately Allege a Regulatory Taking Under *Penn Central*. .52

V.    Plaintiffs Have Alleged Viable Illegal Exaction Claims. ...................................56

A.    The Complaints Expressly Plead Exaction of Money and Economic Interests.....56

    1.    The Derivative Claims Plead an Exaction of Billions in Cash. .................56

    2.    The Direct Claims Adequately Plead an Exaction of Shareholders' Economic Interests....................................................................................57

B.    The Exactions Effected by the Net Worth Sweep Are Illegal. ..............................58

1.      FHFA Exceeded Its Statutory Authority Under HERA............................59

2.      Treasury Exceeded Its Statutory Authority Under HERA........................62

3.      The Exaction Claims Are Supported By Other Violations........................64

      a.      The Net Worth Sweep Violated FHFA's Regulations..................65

      b.      The Net Worth Sweep Violated the Constitution. .........................66

C.      This Court Has Jurisdiction Over Plaintiffs' Exaction Claims..............................66

D.      Plaintiffs' Illegal Exaction Claims Do Not Sound in Tort....................................69

VI.      Plaintiffs Have Alleged Viable Claims for Breach of Fiduciary Duty. ............................69

A.      This Court Has Jurisdiction Over Plaintiffs' Fiduciary Duty Claims...................69

B.      Through FHFA's Conservatorship, the Government Undertook Fiduciary Duties to the Companies and Their Shareholders....................................................70

C.      Through Treasury's Investment, the Government Undertook Fiduciary Duties to the Companies and Their Shareholders. ...........................................................73

D.      HERA Does Not Preempt Plaintiffs' Fiduciary Duty Claims. .............................75

CONCLUSION....................................................................................................................75

# TABLE OF AUTHORITIES

**Cases**                                                                    **Page**

*A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142 (Fed. Cir. 2014)...13, 15, 17, 18, 19, 44, 49

*Acadia Tech., Inc. v. United States*, 458 F.3d 1327 (Fed. Cir. 2006) ...........................................43

*Acceptance Ins. Cos., Inc. v. United States*, 84 Fed. Cl. 111 (2008) ...........................................47

*Aerolineas Argentinas v. United States*, 77 F.3d 1564 (Fed. Cir. 1996) ..............56, 57, 58, 67, 69

*Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080 (9th Cir. 2007)....................32, 33

*AmBase Corp. v. United States*, 100 Fed. Cl. 548 (2011).............................................................24

*Anchor Sav. Bank v. United States*, 121 Fed. Cl. 296 (2015) .................................................16, 17

*Arduini v. Hart*, 774 F.3d 622 (9th Cir. 2014).............................................................................34

*Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23 (2012) .................................35, 39

*Armstrong v. United States*, 364 U.S. 40 (1960) ..........................................................................48

*Auction Co. of America v. FDIC*, 132 Fed. Cl. 746 (D.C. Cir. 1997)...........................................11, 12

*Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268 (2012)...................................................67

*B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293 (2015) ...........................................33

*B&G Enters., Ltd. v. United States*, 220 F.3d 1318 (Fed. Cir. 2000) ...........................................14

*Bailey v. United States*, 78 Fed. Cl. 239 (2007)............................................................36, 37, 38, 40

*Bailey v. United States*, 116 Fed. Cl. 310 (2014)...............................................................36, 37, 39

*Bank One, Texas, NA v. Taylor*, 970 F.2d 16 (5th Cir. 1992)........................................................11

*Banks v. United States*, 88 Fed. Cl. 665 (2009) ...........................................................................40

*Bartlett v. Bowen*, 816 F.2d 695 (D.C. Cir. 1987) ...................................................................3, 28

*Battista v. FDIC*, 195 F.3d 1113 (9th Cir. 1999).........................................................................11

*Bhatti v. FHFA*, No. 17-2185 (D. Minn. Nov. 16, 2017) .............................................................15

*Bobby v. Bies*, 556 U.S. 825 (2009)............................................................................................33

*Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41 (1986)....................44, 62

*Bowman v. United States*, 35 Fed. Cl. 397 (1996) .......................................................................67

*Bowsher v. Synar*, 478 U.S. 714 (1986).......................................................................................35

*Branch v. FDIC*, 825 F. Supp. 384 (D. Mass. 1993) .......................................................26, 27, 28

*Brown v. Legal Found. of Wash.*, 538 U.S. 216 (2003).........................................................48, 49

*Burich v. United States*, 366 F.2d 984 (Ct. Cl. 1966) ..................................................................38

*California Housing Securities, Inc. v. United States*, 959 F.2d 955 (Fed. Cir. 1992) .......45, 46, 47

*Camellia Apartments, Inc. v. United States*, 167 Ct. Cl. 224 (1964)............................................58

*Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276 (Fed. Cir. 2008)...........................49, 50

*Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) .........................................................14

*Chicago Truck Drivers, Helpers & Warehouse Union Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526 (7th Cir. 1997) ..............................................32, 33

*Cienega Gardens v. United States*, 331 F.3d 1319 (Fed. Cir. 2003) ................................44, 47, 49

*Citizens Cent. Bancorp, Inc. v. United States*, No. 15-1539 (Fed. Cl. Sept. 7, 2017) ..................11

*Clapp v. United States*, 117 F. Supp. 576 (Ct. Cl. 1954)...............................................................69

*Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561 (1989).........................62

*Collins v. Mnuchin*, 896 F.3d 640 (5th Cir. 2018).............................................................2, 59, 66

*CRV Enterprises, Inc. v. United States*, 626 F.3d 1241 (Fed. Cir. 2010) .....................................39

*Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067 (Del. Ch. July 13, 2005)..................................................................23

*Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358 (Fed. Cir. 1998)...............42, 43

*Delta Sav. Bank v. United States*, 265 F.3d 1017 (9th Cir. 2001) ...........................................26, 30

*Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620 (Fed. Cir. 2015) ...........................33

*Eastport S.S. Corp. v. United States*, 372 F.2d 1002 (Ct. Cl. 1967)............................................67

*Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Co.*, 485 U.S. 568 (1988) ....................29

*Elmco Props. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914 (4th Cir. 1996) ...............................29

*El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346 (Fed. Cir. 2004)............................42

*Eyherabide v. United States*, 345 F.2d 565 (Ct. Cl. 1965) ..........................................................38

*FAG Italia S.p.A. v. United States*, 291 F.3d 806 (Fed. Cir. 2002) ..............................................59

*Fairholme Funds, Inc. v. FHFA*, 2018 WL 4680197 (D.D.C. Sept. 28, 2018) .....40, 41, 54, 59, 75

*FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120 (2000) ............................................59

*FDIC v. Hartford Ins. Co.*, 877 F.2d 590 (7th Cir. 1989).............................................................12

*FDIC v. Meyer*, 510 U.S. 471 (1994) ..........................................................................................11

*FHFA v. Royal Bank of Scotland Grp. PLC*, 2012 WL 3580522 (D. Conn. Aug. 17, 2012)........12

*Figueroa v. United States*, 57 Fed. Cl. 488 (2003) ..........................................................43, 66, 67

*Fireman v. United States*, 44 Fed. Cl. 528 (1999) .......................................................................58

*First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304 (1987)...........................................................................................28, 29, 37

*First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279 (Fed. Cir. 1999)...........................................................................26, 29, 30, 45

*Franklin Savings Corp. v. United States*, 46 Fed. Cl. 533 (2000) ................................................42

*Fredericks v. United States*, 125 Fed. Cl. 404 (2016)..................................................................70

*Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552 (D.N.J. 1984) ...................................33

*Golden Pacific Bancorp v. FDIC*, 375 F.3d 196 (2d Cir. 2004).................................................72

*Golden Pacific Bancorp v. United States*, 25 Cl. Ct. 768 (1992) ...........................................42, 44

*Golden Pacific Bancorp v. United States*, 15 F.3d 1066 (Fed. Cir. 1994) ......................45, 46, 47

*Grady v. United States*, 2013 WL 4957344 (Fed. Cl. July 31, 2013)....................................69, 70

*Greene v. United States*, 124 Fed. Cl. 636 (2015) .................................................................68

*Hatter v. United States*, 203 F.3d 795 (Fed. Cir. 2000).........................................................38

*Hendler v. United States*, 952 F.2d 1364 (Fed. Cir. 1991) ................................................13, 14, 15

*Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017) .......................................................12, 20

*Hitkansut LLC v. United States*, 127 Fed. Cl. 101 (2016) ............................................................41

*Horne v. Department of Agric.*, 135 S. Ct. 2419 (2015)...................................................38, 47, 48

*Howarth v. United States*, 41 Fed. Cl. 160 (1998)....................................................................32

*In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*,
     900 F. Supp. 2d 1055 (C.D. Cal. 2012) ......................................................................12

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790 (E.D. Va. 2009) .....26

*In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47 (1st Cir. 2007) ..........................34

*Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415 (2006) ...................................................48

*Int'l Paper Co. v. United States*, 282 U.S. 399 (1931) .................................................................49

*Ironclad/EEI v. United States*, 78 Fed. Cl. 351 (2007)....................................................................41

*Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90 (1991)................................................................22

*Keller v. Wilson & Co.*, 190 A. 115 (Del 1936)............................................................................45

*Kentera v. United States*, 2017 WL 401228 (E.D. Wis. Jan. 30, 2017) .........................................67

*Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949) .............................................................44

*Kipple v. United States*, 102 Fed. Cl. 773 (2012) .........................................................................68

*Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013)...................................44, 49

*Kowalski v. Tesmer*, 543 U.S. 125 (2004) ...................................................................................23

*Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374 (1995) ....................................................3, 19

*Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528 (2005).....................................................................50

*Lion Raisins, Inc. v. United States*, 416 F.3d 1356 (Fed. Cir. 2005) .............................................13

*Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982).........................................48

*Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982).......................................................................14

*Maiz v. Virani*, 253 F.3d 641 (11th Cir. 2001) .......................................................................24, 25

*Makowiec v. United States*, 137 Fed. Cl. 591 (2018) .............................................................56, 57

*Maniere v. United States*, 31 Fed. Cl. 410 (1994) ........................................................40

*Maritrans v. United States*, 342 F.3d 1344 (Fed. Cir. 2003) .........................................50

*Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573 (4th Cir. 2017) ............12, 20

*Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71 (2006) ...................................27

*Moden v. United States*, 404 F.3d 1335 (Fed. Cir. 2005) ..............................................42

*Murr v. Wisconsin*, 137 S. Ct. 1933 (2017) ....................................................................35

*N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111 (2015) ..........................................67, 68

*Nat'l Ass'n for Advancement of Colored People v. Fed. Power Comm'n*,
    425 U.S. 662 (1976) ....................................................................................................65

*Nathan v. Rowan*, 651 F.2d 1223 (6th Cir. 1981) ..........................................................34

*National Trust for Historic Preservation in U.S. v. F.D.I.C.*, 21 F.3d 469 (D.C. Cir. 1994) ........69

*NLRB v. Catholic Bishop of Chicago*, 440 US. 490 (1979) .............................................29

*Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825 (1987) ...................................................36

*Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005) .............................................67

*Norman v. United States*, 63 Fed. Cl. 231 (2004) ..........................................................53

*Novosteel SA v. United States*, 284 F.3d 1261 (Fed. Cir. 2002) .....................................41

*O'Melveny & Myers v. FDIC*, 512 U.S. 79 (1994) ........................................................12

*Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923) ......................................49

*Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298 (Fed. Cir. 2004) .....................66

*Pagan v. Calderon*, 448 F.3d 16 (1st Cir. 2006) ............................................................23

*Palazzolo v. Rhode Island*, 533 U.S. 606 (2001) .....................................................35, 36

*Palmyra Pacific Seafoods LLC v. United States*, 561 F.3d 1361 (2009) ..............................50

*Pareto v. FDIC*, 139 F.3d 696 (9th Cir. 1998) ..............................................................23

*Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978) ......................52, 53

*Perry Capital v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) .........................................18, 27, 46, 64

*Perry Capital, LLC v. Mnuchin*,
    864 F.3d 591 (D.C. Cir. 2017) .......................................1, 3, 13, 14, 59, 60, 61, 62, 64, 69, 71

*Phoenix Cos., Inc. v. Abrahamsen*, 2006 WL 2847812 (S.D.N.Y. Sept. 28, 2006) ...............32, 33

*Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016) ..............................................21, 49

*Plaintiffs in All Winstar-Related Cases at Court v. United States*, 44 Fed. Cl. 3 (1999) .............16

*Preseault v. United States*, 100 F.3d 1525 (Fed. Cir. 1996) ......................................13, 15

*Reich v. Collins*, 513 U.S. 106 (1994) ....................................................................3, 29

*Resource Invs., Inc. v. United States*, 85 Fed. Cl. 447 (2009) .......................................55

*RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045 (9th Cir. 2002)............................................24

*Roberts v. FHFA*, 889 F.3d 397 (7th Cir. 2018)..........................................................4, 18, 19, 64

*Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177 (Fed. Cir. 2004) ....................................50

*Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984) ....................................................................47

*Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006).......................................35

*S. P.R. Sugar Co. Trading Corp. v. United States*, 334 F.2d 622 (Ct. Cl. 1964)..........................69

*Saxton v. FHFA*, 245 F. Supp. 3d 1063 (N.D. Iowa 2017)............................................................32

*Saxton v. FHFA*, 901 F.3d 954 (8th Cir. 2018)........................................................................2, 45

*Scott Timber Co. v. United States*, 692 F.3d 1365 (Fed. Cir. 2012) ............................................41

*SEC v. Fed. Labor Relations Auth.*, 568 F.3d 990 (D.C. Cir. 2009) ............................................22

*Sisti v. FHFA*, 2018 WL 3655578 (D. R.I. Aug. 2, 2018) ......................................................13, 19

*Slattery v. United States*, 583 F.3d 800 (Fed. Cir. 2009)..................................................10, 11, 24

*SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312 (Fed. Cir. 2006)............41, 44, 60, 64

*Sonoma Apartment Assocs. v. United States*, 124 Fed. Cl. 595 (2015) ........................................43

*Starr Int'l Co., Inc. v. United States*, 121 Fed. Cl. 428 (2015) ..............................................43, 68

*Starr Int'l Co., Inc. v. United States*, 856 F.3d 953 (Fed. Cir. 2017) ..............................21, 24, 68

*Statesman Sav. Holding Corp. v. United States*, 41 Fed. Cl. 1 (1998) .........................................16

*Stevens v. FDIC*, 2011 WL 3925087 (C.D. Cal. Aug. 25, 2011).................................................13

*Stockton E. Water Dist. v. United States*, 583 F.3d 1344 (Fed. Cir. 2009)..................................43

*Strubel v. United States*, 2009 WL 1636355 (Fed. Cl. June 10, 2009)........................................38

*Suess v. FDIC*, 770 F. Supp.2d 32 (D.D.C. 2011) ................................................................72, 73

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302 (2002) ...........35

*Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965)...........................................21

*Textainer Equipment Management Ltd. v. United States*, 115 Fed. Cl. 708 (2014) .....................40

*Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031 (Del. 2004)...........................23, 25

*Turney v. United States*, 126 Ct. Cl. 202 (1953)..........................................................................18

*United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) ....................................47

*United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016)............12

*United States v. Dow*, 357 U.S. 17 (1958) ..................................................................................35

*United States v. Guzman*, 591 F.3d 83 (2d Cir. 2010) .................................................................61

*United States v. ICC*, 337 U.S. 426 (1949)..................................................................................22

*United States v. Mitchell*, 463 U.S. 206 (1983) .....................................................22, 70, 71, 72

*United States v. Petty Motor Co.*, 327 U.S. 372 (1946)................................................................63

*United States v. Rodgers*, 461 U.S. 677 (1983) ...........................................................61

*United States v. Testan*, 424 U.S. 392 (1976) ..............................................................67

*Ventas, Inc. v. United States*, 381 F.3d 1156 (Fed. Cir. 2004) ....................................69

*Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7 (2018) ...................56, 67, 68

*Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155 (1980)...................48, 49

*Webster v. Doe*, 486 U.S. 592 (1988) ...........................................................................29

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457 (2001) .......................................62

*Wyatt v. United States*, 271 F.3d 1090 (Fed. Cir. 2001) ..............................................40

## Statutes and Administrative Materials

12 U.S.C.

§ 1451 note.................................................................................................................19
§ 1453........................................................................................................................59
§ 1455(*l*)(l)(A) ..........................................................................................................59
§ 1455(*l*)(1)(B).....................................................................................................59, 63
§ 1455(*l*)(1)(C).............................................................................................59, 63, 74
§ 1455(*l*)(4) ...............................................................................................................5
§ 1716........................................................................................................................19
§ 1716b......................................................................................................................19
§ 1718........................................................................................................................59
§ 1719(g)(1)(A)..........................................................................................................59
§ 1719(g)(1)(B).....................................................................................................59, 63
§ 1719(g)(1)(C).............................................................................................59, 63, 74
§ 1719(g)(2)(D)......................................................................................................62, 63
§ 1719(g)(4) ................................................................................................................5
§ 1821(b)(2)(J)...........................................................................................................73
§ 1821(d)(2)(A)(i).......................................................................................................26
§ 1821(d)(ii)...............................................................................................................54
§ 4501........................................................................................................................19
§ 4511(a) ...................................................................................................................10
§ 4614...................................................................................................................19, 20
§ 4617(a).....................................................................................................................5
§ 4617(a)(2)...............................................................................................................72
§ 4617(a)(3)(J)...........................................................................................................20
§ 4617(a)(3)(K)..........................................................................................................20
§ 4617(a)(4)...............................................................................................................20
§ 4617(a)(5)(A)..........................................................................................................28
§ 4617(a)(7) .........................................................................................................10, 18
§ 4617(b)(2)(A).....................................................................................................70, 71

§ 4617(b)(2)(A)(i) ................................................................................20, 26
§ 4617(b)(2)(B)(iii) ........................................................................................71
§ 4617(b)(2)(D) ..............................................................................59, 71, 72
§ 4617(b)(2)(E) ..............................................................................................72
§ 4617(b)(2)(J) ...............................................................................................62
§ 4617(b)(2)(J)(ii) ....................................................................................62, 73
§ 4617(b)(2)(K)(i) ...............................................................................27, 30, 54
§ 4617(b)(11)(E) ............................................................................................72
§ 4617(c)(1) ...........................................................................................7, 54, 72
§ 4617(c)(2) ...................................................................................................72
§ 4617(i) .........................................................................................................72

12 C.F.R.

§ 1229.13(1) ...................................................................................................65
§ 1237.12 .......................................................................................................17
§ 1237.12(a) ...................................................................................................65
§ 1237.12(b)(1)-(4) ........................................................................................65

Del. Code tit. 6, § 8-302 ...............................................................................40

Va. Code § 8.8A-302 ....................................................................................40

Conservatorship and Receivership, 76 Fed. Reg. 35,724, 35,727 (June 20, 2011) ................66, 72

## Other

1 E. Allen Farnsworth, Farnsworth on Contracts § 3.4 (3d ed. 2004) .............................63

18 Moore's Federal Practice: Civil § 132.02 (2018) ................................................33

Fannie Third Quarter 2018 10-Q, https://goo.gl/N4icfN ..............................................10

FHFA, Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac Per the PSPAs, https://goo.gl/MjVakc ................................................10, 53

FHFA, Table 2: Dividends on Enterprise Draws from Treasury, https://goo.gl/QQpFDY ................................................9, 10, 53

Freddie, Annual Report at 196 (Form 10-K) (Feb. 24, 2011), https://goo.gl/jLd5Eu ................................................16, 17

Freddie Third Quarter 2018 10-Q, https://goo.gl/LCasid ...........................................10

History of Fannie Mae and Freddie Mac Conservatorships, FHFA, http://goo.gl/PjyPZb ................................................20

Restatement (2d) of Judgments § 28(2) (1982) ....................................................33

Richard A. Epstein, The Government Takeover of Fannie Mae and Freddie Mac, 10 N.Y.U J.L. & Bus. 379 (2014) ................................................22

U.S. Senate Democratic Policy Committee, H.R. 3221, the Housing and Economic Recovery Act of 2008 (July 25, 2008), https://goo.gl/ebkJtE ................................................27

Wright & Miller, Fed. Prac. & Proc. § 1840 ......................................................34

## GLOSSARY

### Key Terms

| | |
|---|---|
| Agencies | Treasury and FHFA |
| APA | Administrative Procedure Act, as amended, Pub. L. No. 79-404, 60 Stat. 237 (1946) |
| *Bailey I* | *Bailey v. United States*, 78 Fed. Cl. 239 (2007) |
| *Bailey II* | *Bailey v. United States*, 116 Fed. Cl. 310 (2014) |
| Charters | Fannie's Charter and Freddie's Charter |
| Companies | Fannie and Freddie |
| *FAIR* | *Rumsfeld v. Forum for Acad. & Inst. Rights, Inc.*, 547 U.S. 47 (2006) |
| Fannie | Federal National Mortgage Association |
| Fannie's Charter | Federal National Mortgage Association Charter Act, as amended, codified at 12 U.S.C. §1716 *et seq.*, *available at* http://www.fanniemae.com/resources/file/aboutus/pdf/fm-amended-charter.pdf. |
| FDIC | Federal Deposit Insurance Corporation |
| FHFA | Federal Housing Finance Agency |
| FIRREA | Financial Institutions Reform, Recovery, and Enforcement Act of 1989, Pub. L. 101-73, 103 Stat. 183 (1989) |
| Freddie | Federal Home Loan Mortgage Corporation |
| Freddie's Charter | Federal Home Loan Mortgage Corporation Act, as amended, codified at 12 U.S.C. § 1451 *et seq.*, *available at* http://www.freddiemac.com/governance/pdf/charter.pdf. |
| Government Stock | Senior Preferred Stock |
| HERA | Housing and Economic Recovery Act of 2008, Pub. L. No. 110-289, 122 Stat. 2654 (2008) |
| *Kentera* Br. | *Kentera v. United States*, No. 16-1020 (E.D. Wis. Jan. 11, 2017), ECF No. 19 |
| Liquidation Preference | Liquidation rights requiring upon windup Treasury be paid $1 billion plus any additional amount drawn from Treasury's funding commitment |

| | |
|---|---|
| MTD | Defendant's Amended Omnibus Motion to Dismiss in *Arrowood Indemnity Co. v. United States*, No. 13-698C (Fed. Cl. Oct. 1, 2018), ECF No. 45; *Cacciapalle v. United States*, No. 13-466C (Fed. Cl. Oct. 1, 2018) 76, ECF No.; *Fairholme Funds, Inc. v. United States*, No. 13-465C (Fed. Cl. Oct. 1, 2018), ECF No. 421; *Fisher v. United States*, No. 13-608C (Fed. Cl. Oct. 1, 2018), ECF No. 42; *Rafter v. United States*, No. 1:14-740C (Fed. Cl. Oct. 1, 2018), ECF No. 37; and *Reid v. United States*, No. 14-152C (Fed. Cl. Oct. 1, 2018), ECF No. 28. |
| Net Worth Sweep | Requirement that the Companies pay their entire net worth, minus a small capital buffer, to Treasury, on a quarterly basis, forever |
| *Perry I* | *Perry Capital v. Lew*, 70 F. Supp. 3d 208 (D.D.C. 2014) |
| *Perry II* | *Perry Capital v. Mnuchin*, 864 F.3d 591 (D.C. Cir. 2017) |
| Plaintiffs | Plaintiffs in *Arrowood Indemnity Co. v. United States*, No. 13-698C (Fed. Cl.); *Cacciapalle v. United States*, No. 13-466C (Fed. Cl.); *Fairholme Funds, Inc. v. United States*, No. 13-465C (Fed. Cl.); *Fisher v. United States*, No. 13-608C (Fed. Cl.); *Rafter v. United States*, No. 1:14-740C (Fed. Cl.);,and *Reid v. United States*, No. 14-152C (Fed. Cl.). |
| Preferred Stock Purchase Agreements or PSPAs | Senior Preferred Stock Purchase Agreements between Treasury and FHFA as Conservator for Fannie and Freddie |
| *Starr I* | *Starr Int'l Co., Inc. v. United States*, 121 Fed. Cl. 428 (2015) |
| *Starr II* | *Starr Int'l Co., Inc. v. United States*, 856 F.3d 953 (Fed. Cir. 2017) |
| Third Amendment | Third Amendment to the PSPAs |

### Complaints

| | |
|---|---|
| Arrowood | Second Am. Compl., *Arrowood Indemn. Co. v. United States*, No. 13-698 (Fed. Cl. Sept. 17, 2018), ECF No. 44 |
| Cacciapalle | Am. Consol. Class Action Compl., *Cacciapalle v. United States*, No. 13-466 (Fed. Cl. Mar. 8, 2018), ECF No. 67 |
| Fairholme | Second Am. Compl., *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Aug. 3, 2018), ECF No. 413 |
| | Pub. Redacted Second Am. Compl. *Fairholme Funds, Inc. v. United States*, No. 13-465 (Fed. Cl. Oct. 2, 2018), ECF No. 422 |

| | |
|---|---|
| Fisher | Second Am. Derivative Compl., *Fisher v. United States*, No. 13-608 (Fed. Cl. Mar. 8, 2018), ECF No. 36 |
| Rafter | Second Am. Verified Compl., *Rafter v. United States*, No. 14-740 (Fed. Cl. Mar. 8, 2018), ECF No. 25 |
| | Redacted Second Am. Verified Compl., *Rafter v. United States*, No. 14-740 (Fed. Cl. Apr. 20, 2018), ECF No. 27 |
| Reid | Am. Derivative Compl., *Reid v. United States*, No. 14-152 (Fed. Cl. Mar. 8, 2018), ECF No. 22 |

# INTRODUCTION[1]

This case concerns one of the largest Government appropriations of private property in the history of this Nation, more befitting "a banana republic" than "a constitutional one." *Perry Capital, LLC v. Mnuchin* ("*Perry II*"), 864 F.3d 591, 648 (D.C. Cir. 2017) (Brown, J., dissenting). Fannie and Freddie operate under federal charters that establish them as privately-owned, for-profit enterprises. Since 2008, however, the Companies have been under the control of the federal government through conservatorships initiated and directed by FHFA, the Companies' regulator.

When FHFA took control of the Companies, the agency made clear that the conservatorships would be temporary, that they were designed to rehabilitate the Companies, and that the Companies' shareholders retained their economic interest in the Companies. FHFA exercised its new-found authority over the Companies by entering into investment agreements with Treasury. Treasury committed to provide Fannie and Freddie with funds to maintain a positive net worth, for which Treasury received a generous return, including $1 billion of senior preferred stock in each Company, liquidation rights requiring that upon windup Treasury be paid that $1 billion plus any additional amount drawn from Treasury's funding commitment, dividends equal to 10% of this liquidation preference if paid in cash or 12% if paid in kind, and warrants to purchase 79.9% of the Companies' common stock for a nominal fee.

The common stock warrants made clear that this transaction did not eliminate the rights of other Fannie and Freddie shareholders. The warrants gave Treasury an economic upside, on top of its above market dividend return, but that upside would have to be shared with other investors.

---

[1] This brief is filed on behalf of the Fairholme, Class (Cacciapalle), Arrowood, Rafter, Fisher, and Reid Plaintiffs, who have asserted direct and derivative claims against the United States for takings, illegal exaction, breach of contract, and/or breach of fiduciary duty, and each of whom join in the arguments herein in accordance with the schedule set forth at Appendix A.

That is because to pay Treasury dividends or liquidation payments on common shares, Fannie and Freddie would be bound to make such payments first to the Companies' junior preferred shareholders, with corresponding payments to all of the Companies' common shareholders.

In August 2012, however, after the housing market rebounded and it became apparent that Fannie and Freddie were positioned to become tremendously profitable, FHFA and Treasury sought to ensure that Treasury would *not* have to share any profits with private shareholders. Rather, the Agencies sought to ensure, in Treasury's formulation, that "every dollar of earnings that Fannie Mae and Freddie Mac generate will benefit taxpayers," i.e., Treasury. The Agencies accomplished this goal by adopting the "Net Worth Sweep." The Net Worth Sweep replaces the prior dividend structure with one that requires Fannie and Freddie to pay their *entire net worth*, minus a small capital buffer, to Treasury on a quarterly basis, *forever*. The Net Worth Sweep has seized over $120 billion from Fannie and Freddie that otherwise would have been retained or paid out for the benefit of all shareholders, not just Treasury. Private shareholders are now left "holding worthless stock," with the economic interest they once had in the Companies now expropriated by Treasury. *Saxton v. FHFA*, 901 F.3d 954, 961 (8th Cir. 2018) (Stras, J., concurring).

The Sweep also prohibits Fannie and Freddie from rebuilding capital and exiting conservatorship—precisely the ends FHFA as conservator is supposed to be pursuing, not thwarting. Treasury touted this aspect of the Sweep as well, emphasizing that it ensures that the Companies "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." Rafter ¶83. "Fannie Mae and Freddie Mac are forever trapped in a zombie-like trance as wards of the state, bled of their profits quarter after quarter in perpetuity." *Collins v. Mnuchin*, 896 F.3d 640, 679, 690-91 (5th Cir. 2018) (Willett, J., dissenting).

The Net Worth Sweep has been immensely profitable for the United States, as FHFA and

Treasury knew it would be when they adopted it. To date, Fannie and Freddie have paid Treasury over $230 billion in Net-Worth-Sweep dividends, over $120 billion more than Treasury otherwise could have received. All other shareholders, by contrast, are left with nothing. That cannot stand. If the Government is permitted to use the expedient of the Net Worth Sweep to nationalize institutions that it regulates, the public markets will not supply much needed capital to those institutions. The Fifth Amendment does not permit the Government to seize shareholders' interests in profitable companies. And none of the cases cited by the Government say that it can.

The Government's motion to dismiss Plaintiffs' claims chiefly relies on two infirm arguments. First, the Government contends that using FHFA as "conservator," and the expedient of a contract to nationalize all of the Companies' assets, somehow exempts the Government's appropriation of property from constitutional constraints and strips this Court of jurisdiction. But that argument must be rejected under binding Federal Circuit and Supreme Court precedent. The Government cannot "evade the most solemn obligations imposed in the Constitution" through formalities and labels. *Lebron v. Nat'l R.R. Passenger Corp.*, 513 U.S. 374, 397 (1995).

Second, the Government invokes cases holding that judicial review of the Net Worth Sweep under the Administrative Procedure Act is barred by statute to argue that judicial review of the Net Worth Sweep is also barred here. But that position would allow the Government to violate the Constitution and bar the judiciary from ever reviewing its conduct and is itself an "unconstitutional infringement of due process." *Bartlett v. Bowen*, 816 F.2d 695, 703 (D.C. Cir. 1987); *see also Reich v. Collins*, 513 U.S. 106, 111 (1994). Unsurprisingly, none of the decisions cited by the Government support its argument that judicial review is barred here. The D.C. Circuit expressly acknowledged that the applicable statute does not bar "constitutional claims" or "judicial review through cognizable actions for damages." *Perry II*, 864 F.3D at 613-14. And the Seventh

3

Circuit noted that this Court is "the proper forum for" "a takings claim" based on the Net Worth Sweep. *Roberts v. FHFA*, 889 F.3d 397, 407 (7th Cir. 2018).

Because the Government's actions are not shielded from judicial review, its arguments to dismiss Plaintiffs' claims against the Net Worth Sweep lack merit. If authorized by federal law, the Net Worth Sweep is an uncompensated taking that requires the payment of just compensation; if not authorized, it is an illegal exaction that requires the payment of damages. The Net Worth Sweep also breached the fiduciary responsibilities that federal law assigns the United States to observe in its dealings with Fannie and Freddie and their shareholders. The Government's motion to dismiss should be denied.

## STATEMENT OF THE CASE[2]

### A.    Fannie and Freddie.

This Nation's multi-trillion-dollar housing finance market is built on the foundation of two privately owned entities: Fannie and Freddie. The Companies insure and securitize mortgages, providing liquidity that has made homeownership possible for millions of American families.

The Companies, whose primary business is mortgage insurance, took a conservative approach to investing in risky mortgages issued during the national run-up in home prices from 2004 to 2007. Fairholme ¶¶44-47. As a result, they remained in a strong financial condition in 2008 that allowed them to rescue America's mortgage system by facilitating mortgage funding even as distressed banks exited the marketplace. Rafter ¶¶28, 30-31. Throughout the financial crisis and the years that followed, the Companies were capable of meeting their obligations to insureds and creditors and of absorbing any losses they might reasonably incur. Fairholme ¶91.

---

[2] This statement is drawn from the allegations contained Plaintiffs' separate complaints. Citations in this statement (and in the brief generally) are to examples of common allegations.

**B.      FHFA Forces the Companies into Conservatorship.**

Invoking its statutory authority under the HERA, FHFA, at the insistence of Treasury, forced the Companies into conservatorship on September 6, 2008. Fairholme ¶64; *see* 12 U.S.C. § 4617(a). FHFA stated that the purpose of the conservatorship was to restore confidence in and stabilize the Companies with the objective of returning them to normal business operations. Fairholme ¶66; Rafter ¶32; Cacciapalle ¶28.

Treasury exercised its temporary authority under HERA to enter into agreements with FHFA to purchase equity in the Companies. Fairholme ¶¶68-71; Rafter ¶45; *see* 12 U.S.C. §§ 1455(*l*)(4), 1719(g)(4). These PSPAs allowed the Companies to draw up to $100 billion each from Treasury to avoid a negative net worth—an amount subsequently increased to allow the Companies to draw unlimited sums from Treasury until the end of 2012, and thereafter capped at the amount drawn from 2010 through 2012, plus $200 billion per Company. Fairholme ¶¶72, 84.

In return for Treasury's funding commitment, the PSPAs provided that the Companies would give the Government several forms of consideration. First, the PSPAs created a new class of senior preferred stock with very favorable terms to the Government. For each Company, this Government Stock had an initial liquidation preference of $1 billion, an amount that would increase by one dollar for every dollar drawn on Treasury's funding commitment. Fairholme ¶¶75-76. The original PSPAs also provided for the Companies to pay quarterly dividends on the outstanding liquidation preference. These dividends could be paid in cash, at an annual rate of 10%, or in kind, at an annual rate of 12%, by adding to the liquidation preference the amount of dividends due. *See* Fairholme ¶¶77-80. Opting to pay the dividends in kind would not have reduced the amount available under Treasury's funding commitment. Rafter ¶48.

Second, the PSPAs required the Companies to issue warrants entitling the Government to buy 79.9% of their common stock at a nominal price. The common stock warrants gave the

Government "upside" via participation in the Companies' profitability, but this upside would be *shared* with the Companies' other preferred and common shareholders. *See* Fairholme ¶6.

Third, the PSPAs provided for the Companies to pay the Government a quarterly periodic commitment fee beginning in 2010. Fairholme ¶81. Prior to the Net Worth Sweep, Treasury consistently waived this fee, and it could only be set with the agreement of the Companies at a market rate. Fairholme ¶115; Rafter ¶49. Freddie forecasted its "sensitivity" to imposition of the periodic commitment fee beginning in 2013 at $0.4 billion per year. Fairholme ¶115.

The PSPAs did not eliminate the economic interests of the Companies' private shareholders. As FHFA's Director assured Congress when the PSPAs were signed in September 2008, the Companies' "shareholders are still in place," and "both the preferred and common shareholders have an economic interest in the companies," which "going forward . . . may [have] some value." Fairholme ¶65; Rafter ¶¶51-52; Cacciapalle ¶¶31-34.

## C.   Unwarranted Accounting Decisions Artificially Increased the Companies' Draws from Treasury, Yet the Companies Returned to Sustained Profitability.

Under FHFA's supervision, the Companies were forced to dramatically write down the value of their assets and to incur substantial non-cash accounting losses in the form of loan loss reserves and write-offs of deferred tax assets.[3] Over ninety billion dollars of these accounting adjustments were based on FHFA's wildly pessimistic assumptions about potential future losses and were wholly unwarranted. Fairholme ¶¶85-90. By June 2012, the Companies had drawn $161 billion from Treasury to make up for the paper losses caused by these accounting decisions, even though there was no indication that the Companies' actual cash expenses could not be met by their

---

[3] Loan loss reserves reduce reported net worth to reflect anticipated future losses. Fairholme ¶87. Deferred tax assets are used to reduce taxable income on future earnings. The book value of a tax asset depends on the likelihood that the corporation will earn sufficient income to use the tax asset. Fairholme ¶86.

cash receipts. The Companies drew an additional $26 billion to pay dividends to Treasury. Fairholme ¶90.

Because of these transactions, the Government's liquidation preference swelled to $189 billion. Rafter ¶56. But based on the Companies' performance in the second quarter of 2012, it was apparent that the Companies' private shares still had value. Rafter ¶¶63, 65. The Companies were thriving, paying cash dividends on the Government Stock without drawing additional capital from Treasury. Fairholme ¶8. And based on the improving housing market and the high quality of the newer loans backed by the Companies, Treasury and FHFA knew the Companies would enjoy stable profitability for the foreseeable future and begin to rebuild significant capital. Fairholme ¶¶92-95; Rafter ¶¶67-68. For example, minutes of a July 2012 Fannie management meeting indicating that the Company was entering "golden years" of earnings were circulated broadly within FHFA, and projections attached to the minutes showed Fannie's cumulative dividend payments to Treasury exceeding its total draws by 2020 and that over $115 billion of Treasury's commitment would remain available after 2022. Fairholme ¶103. Similar projections were shared with Treasury less than two weeks before the Net Worth Sweep was announced. Fairholme ¶101.

The Government also knew that the Companies would soon reverse many of their previous unjustified non-cash accounting losses. Indeed, at an August 9, 2012 meeting, just eight days before the Net Worth Sweep was imposed, Fannie's Chief Financial Officer told senior Treasury officials that release of the valuation allowance on Fannie's deferred tax assets would likely occur in mid-2013 and that, even without accounting for the profits Fannie would generate from its operations, deferred tax assets would cause Fannie to report profits in the range of $50 billion—a prediction that proved to be remarkably accurate. Fairholme ¶102. This $50 billion reversal was not included in the projections that were circulated within the Agencies around the same time. The

Government was keenly interested in the deferred tax assets, which would have catalyzed the Companies' capital rebuilding process; indeed, Treasury discussed the deferred tax assets with its financial consultant as early as May 2012, and a key item on Treasury's agenda for the August 9 meeting was how quickly Fannie forecasted releasing its reserves. *See* Fairholme ¶¶98, 105.

### D.    The Government Imposes the Net Worth Sweep.

On August 17, 2012, just days after the Companies announced robust second quarter earnings indicating that they had earned more than enough to pay Treasury's dividends without making a draw from the funding commitment, the Government imposed the Net Worth Sweep to ensure, as Treasury put it, that "every dollar of earnings that Fannie Mae and Freddie Mac generate will be used to benefit taxpayers." Fairholme ¶118; Cacciapalle ¶¶56-57. The Net Worth Sweep accomplishes this objective by replacing the prior dividend structure with one that requires the Companies to pay Treasury their entire net worth on a quarterly basis, minus a small capital buffer. Fairholme ¶113; Cacciapalle ¶56. Since the Net Worth Sweep guarantees that Treasury will receive all of the Companies' comprehensive income anyway, the Agencies also agreed to suspend the periodic commitment fee. Fairholme ¶115. The Agencies thus nationalized the Companies and expropriated not just their future earnings but also their retained capital, thereby depriving the Companies' private shareholders of all of their economic rights. *See* Rafter ¶¶70-71, 78, 92.

The Agencies have claimed, both publicly and before the courts, that the Net Worth Sweep was necessary to prevent a "death spiral" in which the Companies' increasing dividend obligations to Treasury would consume Treasury's funding commitment. *See* Fairholme ¶141. But the PSPAs permitted the Companies to pay dividends in kind—they were never required to pay cash dividends or to draw on Treasury's funding commitment to do so. Rafter ¶48.

More important, the Government's "death spiral" narrative cannot be squared with internal

Government documents and testimony obtained through discovery. This evidence reveals that the Net Worth Sweep was imposed *after* the Companies had returned to stable profitability, and *just days after* the Government learned that they were on the verge of reporting tens of billions of dollars in profits that would far exceed the 10% dividend. *See* Rafter ¶¶11-12.

The evidence thus makes clear that the Net Worth Sweep was adopted not out of concern that the Companies would earn too little, but rather out of concern that the Companies would earn *too much* and complicate the Government's plans to shackle them in perpetual conservatorship and to prevent their private shareholders from recouping their investment. Edward DeMarco, FHFA's then-Acting Director, testified that he had no intention of allowing the Companies to emerge from conservatorship under what he viewed as flawed charters. Fairholme ¶136. Similarly, an internal Treasury document finalized the day before the Sweep was announced specifically identified the Companies' "improving operating performance" and the "potential for near-term earnings to *exceed* the 10% dividend" as reasons for the Net Worth Sweep. Fairholme ¶130 (emphasis added); *see also* Rafter ¶84. And a senior White House official closely involved in the process acknowledged that the "substance and intent" of the Net Worth Sweep was to "deprive [the Companies] of all their capital" to ensure that it never would be "feasible for them to return as private companies . . . ." Fairholme ¶138; *see also* Rafter ¶85; Cacciapalle ¶69.

The Net Worth Sweep has resulted in massive and unprecedented payments to the Government. Since the Companies first began paying dividends under the Net Worth Sweep during the first quarter of 2013, they have transferred to the Government nearly $230 billion in dividends—over $120 billion more than the Government could have received under the original PSPAs. *See* FHFA, Table 2: Dividends on Enterprise Draws from Treasury, https://goo.gl/QQpFDY. Altogether, the Government has recouped over $95 billion more than it

disbursed to the Companies. *See id.*; FHFA, Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac Per the PSPAs, https://goo.gl/MjVakc. Yet, the liquidation preference has not declined by one cent and the Government has the right to all of the Companies' net worth in perpetuity.[4]

## ARGUMENT

### I. This Court Has Jurisdiction to Decide Whether the Government Is Liable for Nationalizing the Companies.

#### A. Claims Against Treasury Are Against the United States.

The Government does not dispute that claims based on Treasury's conduct are against the United States and within the Tucker Act. While the Government purports to rewrite the Complaints to assert only claims against "FHFA as conservator," MTD 20, it is not the master of Plaintiffs' Complaints, which are replete with allegations to establish Treasury's role in the takings claims, *e.g.*, Rafter ¶¶70-81, and the illegal exaction claims. The Government's only rejoinder to these allegations is to argue that a voluntary agreement with Treasury cannot support a taking. MTD 21. That argument is limited to Plaintiffs' takings claims and, as addressed below, fails because FHFA acted as the Government's agent and was subject to Government coercion. Because Treasury is the Government, the claims based on its conduct can proceed.

#### B. A Federal Conservator Is the United States When It Expropriates Its Ward's Assets for the Benefit of the Government.

FHFA is an "agency of the Federal Government," 12 U.S.C. § 4511(a), and that remains the case when it acts as conservator, *see id.* § 4617(a)(7) (conservator shall not be subject to direction of "any *other* agency of the United States") (emphasis added). *Slattery v. United States*,

---

[4] Figures in this brief do not include additional $6.6 billion in dividends to be swept to the Government based on the Companies' third quarter earnings. *See* Freddie Third Quarter 2018 10-Q, https://goo.gl/LCasid; Fannie Third Quarter 2018 10-Q, https://goo.gl/N4icfN.

583 F.3d 800, 826-29 (Fed. Cir. 2009), establishes that FHFA's decision to approve the Net Worth Sweep is attributable to the United States. In *Slattery*, the Federal Circuit said that "**whether the FDIC as receiver is 'the government' depends on the context of the claim**," and held that the FDIC as receiver could be sued in this Court for a taking when it retained a failed bank's liquidation surplus for the Government rather than distributing the surplus to shareholders. *Id.* at 827 (emphasis added). The Federal Circuit explained that the receiver's efforts to expropriate shareholders' property made the case "unlike the standard receivership situation in which the receiver is enforcing the rights or defending claims and paying the bills of the seized bank." *Id.* at 827-28. Applying *Slattery*, this Court recently ruled that the FDIC as receiver was the United States where it was accused of "misallocating litigation recoveries, to benefit itself, and committing corporate waste by mismanaging the receivership's liquidation." *Citizens Cent. Bancorp, Inc. v. United States*, No. 15-1539, slip op. at 10 (Fed. Cl. Sept. 7, 2017), ECF No. 49. Under *Slattery*, the Government cannot avoid jurisdiction by simply labeling its actions as those of a federal "conservator" or "receiver." Irrespective of labels, "**A government corporation performing a government function for the government's benefit must be the government for purposes of the Tucker Act.**" *Id.* at 12 (emphasis added). Because FHFA expropriated private property for the Government's benefit when it approved the Net Worth Sweep, binding precedent compels the conclusion that FHFA acted as the Government.

    *Slattery* is consistent with a host of other cases treating federal conservators and receivers as the Government for particular purposes. *See, e.g.*, *FDIC v. Meyer*, 510 U.S. 471, 475-83 (1994) (sovereign immunity); *Bank One, Texas, NA v. Taylor*, 970 F.2d 16, 33-34 (5th Cir. 1992) (sovereign immunity); *Auction Co. of America v. FDIC*, 132 F.3d 746, 749 (D.C. Cir. 1997) (statute of limitations); *Battista v. FDIC*, 195 F.3d 1113, 1120-21 & n.9 (9th Cir. 1999)

(prejudgment interest); *FDIC v. Hartford Ins. Co.*, 877 F.2d 590, 591-94 (7th Cir. 1989) (Federal Tort Claims Act and venue statute); *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig.*, 900 F. Supp. 2d 1055, 1066 (C.D. Cal. 2012) (statute of limitations); *FHFA v. Royal Bank of Scotland Grp. PLC*, 2012 WL 3580522, at *4 (D. Conn. Aug. 17, 2012) (Private Securities Litigation Reform Act). Thus, while the Government seeks to create the impression that the actions of federal conservators and receivers are never attributable to the United States, the more nuanced, contextual inquiry set forth in *Slattery* is required.[5]

Without mentioning *Slattery* or any of the other cases treating federal conservators and receivers as the United States, the Government emphasizes out-of-circuit cases in which courts have ruled in other contexts that FHFA's actions as conservator or the actions of the Companies are not attributable to the Government. But those cases concerned routine personnel decisions, *Herron v. Fannie Mae*, 861 F.3d 160 (D.C. Cir. 2017), arm's length negotiations over asset sales to private parties, *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017), and whether the Companies are agents of the federal government for purposes of the False Claims Act, *United States ex rel. Adams v. Aurora Loan Servs., Inc.*, 813 F.3d 1259 (9th Cir. 2016). In none of the Government's cases did FHFA stand accused of expropriating private property for the benefit of the federal government. The Government is on even weaker footing

---

[5] In *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994), the Supreme Court said that FIRREA "appears to indicate that the FDIC as receiver 'steps into the shoes'" of the financial institutions under its care. *O'Melveny did not* concern "the primary conduct of the United States or any of its agents," but rather "only the FDIC's rights and liabilities, as receiver, *with respect to primary conduct on the part of private actors that ha[d] already occurred.*" *Id*. at 88 (emphasis added). This case, by contrast, concerns *primary conduct on the part of FHFA seeking to advance the Government's interests*. Courts have not treated *O'Melveny* as applicable outside the context in which it arose, *see Auction Co.*, 132 F.3d at 748-49, and it does not insulate the United States from liability for the actions FHFA took for its benefit in this case. In any case, this Court is bound by *Slattery*, which was decided after *O'Melveny*.

when it relies on *Perry II*'s sovereign immunity ruling. Far from concluding that FHFA's approval of the Net Worth Sweep was not attributable to the United States, *Perry II* assumed that FHFA had acted as the United States for sovereign immunity purposes but found that sovereign immunity was waived. 864 F.3d at 622-23. *Perry II* thus supports the conclusion that FHFA acted as the Government when it approved the Net Worth Sweep. *See Sisti v. FHFA*, 2018 WL 3655578, at *7 (D. R.I. Aug. 2, 2018); *Stevens v. FDIC*, 2011 WL 3925087, at *3 n.3 (C.D. Cal. Aug. 25, 2011).

## C. The Conservator Acted as an Agent of the Government and Was Coerced by the Government to Approve the Net Worth Sweep.

Even if the Court concludes that the expropriative nature of the Net Worth Sweep does not demonstrate that FHFA's actions are the Government's, it still has jurisdiction under the Tucker Act. The Government is also subject to suit in this Court for the acts of a private third party "if the third party is acting as the government's agent or the government's influence over the third party was coercive." *A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1154 (Fed. Cir. 2014). Here, FHFA both acted as an agent of the Government and was coerced by the Government.

### 1. FHFA Approved the Net Worth Sweep as the Government's Agent.

"[I]f agents of the federal government accomplish takings of private property, the action of the agent is the act of the government and it is the federal government that is liable for suit." *Lion Raisins, Inc. v. United States*, 416 F.3d 1356, 1362 (Fed. Cir. 2005) (brackets and quotation marks omitted). To determine whether such an agency relationship exists, courts ask whether the third party exercised "legal authority to carry out the government's business." *A&D Auto Sales*, 748 F.3d at 1154. Under this standard, even state and local officials may be deemed agents of the federal government when they exercise power derived from a federal law. *Preseault v. United States*, 100 F.3d 1525, 1550 (Fed. Cir. 1996) (en banc); *Hendler v. United States*, 952 F.2d 1364, 1379 (Fed. Cir. 1991). In approving the Net Worth Sweep, FHFA acted with another federal

agency to advance federal interests pursuant to a federal statute. That makes FHFA the Government's agent even if it is otherwise deemed a private entity when it acts as conservator. *Cf. Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (private party's actions attributable to government for purposes of state action doctrine when private party is a "willful participant in joint activity with the State or its agents").

Here, FHFA approved the Net Worth Sweep "for the benefit of the federal government." *B&G Enters., Ltd. v. United States*, 220 F.3d 1318, 1324 (Fed. Cir. 2000). *See, e.g.*, Fairholme ¶119 ("FHFA shared Treasury's goal of advancing the Government's interests and ensuring that private shareholders would not benefit from their stock ownership."). Indeed, it is precisely because FHFA sought to advance the Government's interests that the D.C. Circuit held that the Net Worth Sweep was within the scope of FHFA's statutory authority: "Congress, consistent with its concern to protect the public interest, . . . made a deliberate choice in [HERA] to permit FHFA to act in its own best governmental interests, which may include the taxpaying public's interest." *Perry II*, 864 F.3d at 608. In approving the Net Worth Sweep, FHFA set aside the interests of the Companies and their private shareholders and worked with Treasury to further federal policies and enrich the federal government. It follows that FHFA acted as the Government's agent.

This conclusion is further supported by the fact that FHFA could not have lawfully agreed to the Net Worth Sweep if it had been acting as a private entity. If it had been agreed to before the Companies went into conservatorship, or by FHFA with no authority beyond its right to "step into the shoes" of the Enterprises, the Net Worth Sweep would have been a flagrant violation of management's duty of loyalty and numerous other state law principles. *Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345, 361 (Del. 1993). That is why FHFA has insisted that it agreed to the Net Worth Sweep by acting "under authority granted" to it by HERA. *Hendler*, 952 F.2d at 1379. *See also*

*Bhatti v. FHFA*, No. 17-2185 (D. Minn. Nov. 16, 2017), ECF No. 49 at 10 (quotation marks omitted) (FHFA stating that in approving the Net Worth Sweep it "acted pursuant to HERA, rather than merely under powers inherited from the Companies"). The Federal Circuit has repeatedly held that where someone derives authority from federal law to take property in furtherance of federal interests, such actions are attributable to the federal government. *Preseault*, 100 F.3d at 1550; *Hendler*, 952 F.2d at 1379. The same result should obtain here.

Moreover, the Net Worth Sweep was adopted against the backdrop of the original PSPAs, which ceded critical aspects of FHFA's conservatorship authority to Treasury. Under the original PSPAs, Treasury's approval was required before FHFA could direct the Companies to: (1) issue new equity; (2) pay dividends to any shareholder other than Treasury; (3) sell or transfer assets outside the ordinary course of business; (4) incur debt above a specified level; or (5) make certain fundamental changes to their business. *See* Fairholme ¶82. The PSPAs also prohibited FHFA from terminating the conservatorships without Treasury's consent except by placing the Companies into receivership. *Id.* Taken together, these PSPA provisions gave Treasury a major role in key conservatorship decisions, and for this reason the conservator should be understood to have acted as the Government's agent when it approved the Net Worth Sweep.

### 2. The Government Coerced the Approval of the Net Worth Sweep.

The Government may be sued in this Court for the actions of a private third party if its "influence over the third party was coercive rather than merely persuasive." *A&D Auto Sales*, 748 F.3d at 1154. Plaintiffs' claims may proceed because in approving the Net Worth Sweep, the conservator was unduly influenced by two Government entities: FHFA as regulator and Treasury.

a. The Government errs by assuming that Plaintiffs can only establish that the conservator was coerced by showing that Treasury compelled FHFA to approve the Net Worth Sweep. MTD 23-26. FHFA itself has "dual roles"—those of conservator and regulator—and when it acts as

regulator the agency's actions are indisputably those of the Government. *See Plaintiffs in All Winstar-Related Cases at Court v. United States*, 44 Fed. Cl. 3, 7 (1999); *see also Anchor Sav. Bank v. United States*, 121 Fed. Cl. 296, 323 (2015); *Statesman Sav. Holding Corp. v. United States*, 41 Fed. Cl. 1, 13 (1998). It follows that FHFA's decision as conservator to approve the Net Worth Sweep is attributable to the Government if the conservator was not independent of FHFA acting in its regulatory capacity.

FHFA is not the first federal agency to have dual roles as a financial institution's conservator and regulator. In the *Winstar* litigation, the FDIC managed these roles by working "to the maximum possible extent [to] discharge its conflicting duties in a manner that keeps the interests separated." *All Winstar-Related Cases*, 44 Fed. Cl. at 7. To that end, the FDIC established a "firewall" within its legal department "so that the lawyers working with the Justice Department in defense of these cases (and thus representing the interests of the successor to the former regulators who negotiated the contracts in issue and the interests of the insurance corporation) [did] not overlap with the lawyers representing the interests of the failed thrifts." *Id.* at 7 n.5. This separation was essential to this Court's conclusion that the FDIC had standing to assert claims against the Government in a private capacity as receiver of failed financial institutions. *Id.* at 7.

FHFA made no attempt to silo its pursuit of its conservatorship from its regulatory functions. *See* Fairholme ¶63. Instead, the same officials who have final authority over how the agency exercises its conservatorship powers also decide how to regulate the Companies. In blending its conservatorship and regulatory roles, FHFA has long used its conservatorship powers to pursue inherently governmental objectives, including "mov[ing] the housing industry to a new state, one without Fannie Mae and Freddie Mac." Fairholme ¶135 (quoting FHFA, REPORT TO CONGRESS: 2012 at 13 (June 13, 2013)). As early as 2011, Freddie warned that "guidance from

our Conservator" requiring it to pursue Treasury's housing finance policy objectives would have "a negative impact on our business, operating results, or financial condition." Freddie, Annual Report at 196 (Form 10-K) (Feb. 24, 2011), https://goo.gl/jLd5Eu. Among Treasury's stated policy objectives at the time was seeking to "wind down both institutions" and to "work with FHFA" to do so. Rafter ¶59; Cacciapalle ¶¶59-62, 65.

The Net Worth Sweep was a product of this blending of regulatory and conservatorship functions. Although putatively approved by FHFA as conservator, FHFA said that this action was designed to achieve two governmental ends: (1) "ensure[ ] all the [Companies'] earnings are used to benefit taxpayers," Fairholme ¶119 (second alteration in original); Cacciapalle ¶57; and (2) "reinforce the notion that the [Companies] will not be building capital as a potential step to regaining their former corporate status," Fairholme ¶135 (alteration in original); Cacciapalle ¶¶59, 65. And FHFA's role as regulator is integral to the implementation of the Net Worth Sweep, because the regulator must sign off on every dividend payment that the Companies make to Treasury. *See* 12 C.F.R. § 1237.12. The fact that FHFA intermingled its roles as conservator and regulator when it approved the Net Worth Sweep makes this case fundamentally different from *Winstar* cases in which this Court and the Federal Circuit sometimes treated FDIC-Receiver as a private entity. FHFA pursued governmental objectives through the Net Worth Sweep, simultaneously wearing both its conservator and regulator hats in a way that the FDIC has historically sought to avoid. Because FHFA simultaneously acts as *both* conservator *and* regulator, its actions are attributable to the United States. *See Anchor Sav. Bank*, 121 Fed. Cl. at 325.

b. The conservator's approval of the Net Worth Sweep was also the product of coercion by the White House and Treasury. Coercion may result from an "existing relationship between the government and a third party that gave the government the ability to exercise general control over

the third party's action." *A&D Auto Sales*, 748 F.3d at 1155; *see Turney v. United States*, 126 Ct. Cl. 202, 207-08 (1953). A senior White House official testified that the Net Worth Sweep was imposed through a "Treasury-driven process," and it was Treasury that informed the Companies of the decision. Fairholme ¶147. There is no evidence that FHFA proposed alternatives to the Net Worth Sweep or attempted to calculate the effect that the change would have on the dividends paid to Treasury. *Id.* Instead, FHFA simply acquiesced to Treasury's demands, and Treasury was so confident that FHFA would do so that it did not plan for the possibility that FHFA might refuse. Fairholme ¶146; *see also* Rafter ¶¶10, 92.

The Government argues that there was no coercion because some of Plaintiffs' complaints say that the Net Worth Sweep was the product of a "negotiation" between Treasury and FHFA. But no "direct order" is necessary to establish coercion, and the "highly fact-specific" inquiry mandated by Federal Circuit precedent does not turn on semantics. *A&D Auto Sales*, 748 F.3d at 1154. Instead, the Court must consider the degree of influence the President and Treasury enjoyed over FHFA, the extent of the economic pressure they were able to bring to bear on the Companies, and "whether the government had any role in creating the economic circumstances" that gave rise to the alleged coercion. *Id.* at 1155. Plaintiffs' allegations are sufficient to plead coercion.

The Government also makes much of two APA cases which held that plaintiffs challenging the Net Worth Sweep failed to allege facts establishing a violation of 12 U.S.C. § 4617(a)(7). MTD 24-25 (discussing *Roberts*, 889 F.3d at 406 and *Perry I*, 70 F. Supp. 3d at 226). But the Court must credit the well-pleaded allegations in the complaints before it, and how other courts have assessed other complaints in other cases does not matter. Moreover, the question in both *Roberts* and *Perry I* was whether FHFA had operated under the "direction or supervision" of Treasury. 12 U.S.C. § 4617(a)(7). The Seventh Circuit interpreted this provision to permit FHFA to "ced[e] significant

control to Treasury" and "enter[ ] into the Third Amendment at Treasury's behest." *Roberts*, 889

F.3d at 406. In light of that interpretation of Section 4617(a)(7), the courts in *Roberts* and *Perry I*

had no occasion to apply the very different and "highly fact-specific" test for coercion required by

Federal Circuit precedent. *A&D Auto Sales*, 748 F.3d at 1154.

> **D.     The Net Worth Sweep Is Attributable to the Government Because the Companies Are Government Instrumentalities.**

Finally, the Net Worth Sweep is attributable to the Government because the Companies

are themselves federal instrumentalities under *Lebron v. National Railroad Passenger Corp.*, 513

U.S. 374, 399 (1995). That case held that a corporation must be treated as the Government for

constitutional purposes where the Government: (1) "creates a corporation by special law"; (2) "for

the furtherance of governmental objectives"; and (3) "retains for itself permanent authority to

appoint a majority of the directors of that corporation." *Id.*

The Companies easily satisfy the first two elements. Congress created the Companies to

accomplish government objectives, including to "provide stability" and "ongoing assistance" to

"the secondary market for residential mortgages." 12 U.S.C. §§ 1451 note, 1716; *see also* 12

U.S.C. §§ 1716b, 4501. Indeed, in other litigation FHFA has conceded that the first two prongs of

the *Lebron* test support the conclusion that the Companies are government instrumentalities. *See*

*Sisti*, 2018 WL 3655578, at *4.

The only remaining question under *Lebron* is whether the Government "retains for itself

permanent authority to appoint a majority of the directors" of the Companies. *Lebron*, 513 U.S. at

399. A federal district court recently held that it does. *Sisti*, 2018 WL 3655578, at *4-6. And the

Net Worth Sweep itself confirms *Sisti*'s conclusion: Because the Net Worth Sweep permanently

deprives the Companies of their ability to reduce their debt or accumulate capital reserves, the

Companies have no reasonable prospect of becoming "adequately capitalized" under 12 U.S.C.

§ 4614. The Companies will thus remain undercapitalized—likely "significantly" or "critically" undercapitalized—in perpetuity and, as such, subject to the perpetual discretionary or mandatory power of the Director of FHFA to act as their conservator or receiver. *See* 12 U.S.C. §§ 4617(a)(3)(J), (K), 4617(a)(4). *See also* Rafter ¶¶7, 146, 159, 167. Indeed, the Government imposed the Net Worth Sweep to prohibit the Companies from positioning themselves to exit conservatorship. *See* Fairholme ¶14. The Net Worth Sweep thus demonstrates that FHFA has no intention of ceding its total control over the Companies. Indeed, in a statement that remains on its website to this day, FHFA insists that it "will continue to carry out its responsibilities as Conservator" until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." Fairholme ¶136; *History of Fannie Mae and Freddie Mac Conservatorships*, FHFA, http://goo.gl/PjyPZb. Former Acting Director DeMarco similarly stated that at the time of the Net Worth Sweep he had no intention of returning the Companies to private control under charters he perceived to be "flawed." Fairholme ¶136.

To be sure, some courts, unlike *Sisti*, have ruled that the Companies are not the Government. Those courts have reasoned that "the purpose of the conservatorship is to restore [the Companies] to a stable condition" and conservatorship is therefore a form of "indefinite but temporary control" that "does not transform [the Companies] into . . . government actor[s]." *Herron*, 861 F.3d at 169.[6] If FHFA were seeking to restore Fannie and Freddie to stability and ultimately to private control this reasoning might have merit. But the Net Worth Sweep belies any notion that FHFA is seeking to restore the Companies to a stable condition, and, more than a decade into conservatorships that FHFA does not regard as temporary, characterizing the

---

[6] *Meridian Invs., Inc. v. Fed. Home Loan Mortg. Corp.*, 855 F.3d 573, 579 (4th Cir. 2017), rested its conclusion on the mistaken premise that the "common shareholders elect Freddie's board." In fact, FHFA selects both Companies' boards. 12 U.S.C. § 4617(b)(2)(A)(i).

Government's control of the Companies as "indefinite but temporary" is implausible.

Nor is this Court bound by *dicta* in *Piszel v. United States*, 833 F.3d 1366, 1376 (Fed. Cir. 2016), that described Fannie as a "private party." *Piszel* did not assess whether the Companies are governmental entities under *Lebron*, and the parties did not contest this issue. *See id.* at 1372 n.3. Because the Government has nationalized the Companies and exercises permanent control over them, the Court should treat the Companies and their federal conservator as the Government.

> **E.      28 U.S.C. § 1500 Does Not Divest this Court of Jurisdiction.**

The Government argues that 28 U.S.C. § 1500 rids this Court of jurisdiction over the *Fairholme*, *Cacciapalle*, and *Arrowood* cases. It concedes, however, that its position is foreclosed by "current Federal Circuit precedent, *Tecon Engineers, Inc. v. United States*, 343 F.2d 943 (Ct. Cl. 1965)." MTD 48. The Government's Section 1500 argument therefore must be rejected.

## II.      Plaintiffs Are Entitled to Pursue Both Direct and Derivative Claims.

> **A.      Plaintiffs Have Sufficiently Pleaded Direct Claims.**

Before the Net Worth Sweep, shareholders had a right to receive dividends and liquidation proceeds under certain circumstances. For example, if the Government wanted more than the 10% cash dividend on its senior preferred stock, it could exercise its warrants to acquire 79.9% of the common, and could receive additional dividends by authorizing dividends to the common shareholders—thus triggering the right of private preferred shareholders to be paid their dividends first, and the right of common shareholders to receive dividends pro rata with the Government. After the New Worth Sweep, the private shareholders have lost all of their rights. That direct injury gives rise to direct claims.

1. As the Government acknowledges, the direct or derivative nature of Plaintiffs' claims is a question of federal law. MTD 28 n.12; *see Starr II*, 856 F.3d at 965-66. And although federal

courts often look to state law principles when distinguishing between direct and derivative claims, they will not do so when the application of state law "would be inconsistent with the federal policy underlying the cause of action." *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991). The federal constitutional policy underlying Plaintiffs' takings and illegal exactions claims is that the Government must pay for the private property it takes and only take private property when it has legal authority to do so. The federal policy underlying Plaintiffs' fiduciary duty claims is that FHFA as conservator must act as a fiduciary for the Companies and their shareholders; "it naturally follows that the Government should be liable in damages for the breach of its fiduciary duties." *United States v. Mitchell*, 463 U.S. 206, 226 (1983).

If the Court agrees with the Government that HERA's succession clause bars all derivative claims, and then also agrees that all of Plaintiffs' claims are derivative, that would mean that *no one* can vindicate these constitutional and statutory policies. Under the Government's arguments, shareholders cannot sue because all claims pertaining to the Net Worth Sweep are derivative, the Companies cannot sue because they are under FHFA's control, and FHFA cannot sue because doing so would require it to sue itself. *See United States v. ICC*, 337 U.S. 426, 430 (1949) (recognizing the "general principle that no person may sue himself"); *SEC v. Fed. Labor Relations Auth.*, 568 F.3d 990, 997 (D.C. Cir. 2009) (Kavanaugh, J., concurring). But an interpretation of the succession clause to bar all claims would be unconstitutional.[7] If the Court concludes that the succession clause bars all derivative claims, it should deem Plaintiffs' claims to be direct as a matter of federal law to vindicate the federal policies that underlie Plaintiffs' claims.

This analysis finds strong support in the Supreme Court's relaxation of prudential third-

---

[7] *See also* Richard A. Epstein, *The Government Takeover of Fannie Mae and Freddie Mac*, 10 N.Y.U J.L. & Bus. 379, 395 (2014). The Class Plaintiffs also address this in their standalone brief.

party standing rules in cases in which there is a "close relationship" between the plaintiff and a third party facing "a 'hindrance' to [his] ability to protect his own interests." *Kowalski v. Tesmer*, 543 U.S. 125, 130 (2004). With FHFA incapable of suing on behalf of the Companies to vindicate the important principles at stake in this case, Plaintiffs' close relationship to the Companies makes them the appropriate parties to assert the claims at issue here. *See Pagan v. Calderon*, 448 F.3d 16, 28 (1st Cir. 2006) (observing that "the rule that a shareholder cannot sue in his own name for an injury sustained by the corporation is not ironclad" and recognizing possible exception "if it is absolutely inconceivable that the corporation itself would pursue a claim for the misconduct").

2. Plaintiffs also have direct claims under governing principles of state law. "Causes of action for the misallocation of shares among competing stockholders or for discrimination against specific stockholders have often been found to be direct and not derivative in nature." *Deephaven Risk Arb Trading Ltd. v. UnitedGlobalCom, Inc.*, 2005 WL 1713067, at *8 n.41 (Del. Ch. July 13, 2005); *cf. Pareto v. FDIC*, 139 F.3d 696, 699-700 (9th Cir. 1998). That is because rearranging a corporation's capital structure to shift part of the corporation's ongoing value from one shareholder to another does not necessarily injure the corporation. In such cases, the disadvantaged shareholder directly suffers the "alleged harm" and receives "the benefit of any recovery." *Tooley v. Donaldson, Lufkin & Jenrette, Inc.*, 845 A.2d 1031, 1033 (Del. 2004).

The Net Worth Sweep rearranged the Companies' capital structure so that economic rights previously shared with Plaintiffs are now held exclusively by the Government. The Government's argument that this change to the Companies' capital structure harms Plaintiffs only derivatively is not correct; for example, the Government's receipt of dividends that would have otherwise been payable to Plaintiffs harms Plaintiffs, not the Companies. Accordingly, Plaintiffs "can prevail without showing an injury to the corporation." *Id.* at 1039. Indeed, even if the Net Worth Sweep

benefitted the Companies, Plaintiffs would be no less injured by having their economic rights transferred to the Government.

To be sure, Plaintiffs allege that the Net Worth Sweep also harmed the Companies by depriving the Companies of their entire net worth in perpetuity. But that does not defeat Plaintiffs' direct claims. "The same conduct may result in injury to both the corporation and the individual shareholders." *RK Ventures, Inc. v. City of Seattle*, 307 F.3d 1045, 1057 (9th Cir. 2002). The Government is wrong when it contends that any award of damages or just compensation for Plaintiffs' claims must ultimately redound to the benefit of the Companies rather than their shareholders. Indeed, this is demonstrated by what would happen if the result of this litigation were simply an award of compensation or damages to the Companies—so long as the Net Worth Sweep remains in place, such an award would simply be swept back to Treasury the following quarter. Shareholders other than Treasury would receive no benefit from such an outcome. While this does not preclude a remedy being crafted for the derivative claims that would benefit private shareholders, *see Slattery*, 583 F.3d at 824-25; *AmBase Corp. v. United States*, 100 Fed. Cl. 548, 578 (2011), it underscores that private shareholders have suffered an injury distinct from that suffered by the Companies, and an award of damages to the Companies would not remedy that injury. To the extent that the Court concludes that the Net Worth Sweep effected a taking or illegal exaction of Plaintiffs' rights or a violation of the fiduciary duties owed them, Plaintiffs—not the Companies—are owed just compensation or damages.

3. Even if the Court concludes that federal and state law would otherwise treat Plaintiffs' claims as derivative, it should still permit Plaintiffs to sue directly because the Net Worth Sweep targeted shareholders. Both Delaware and federal law provide shareholder standing when the challenged action "targeted shareholders directly." *Starr II*, 856 F.3d at 973; *see Maiz v. Virani*,

253 F.3d 641, 655-56 (11th Cir. 2001); *Tooley*, 845 A.2d at 1039.

Shareholders were the direct targets of the Government's actions. Well before the Net Worth Sweep was announced, Treasury's Undersecretary for Domestic Finance wrote in an internal memo to Secretary Geithner of the "Administration's commitment to ensure existing common equity holders will not have access to any positive earnings from the [Companies] in the future." Fairholme ¶118 (alteration in original); Cacciapalle ¶61. In furtherance of that goal, a senior White House official wrote in an August 13, 2012 email that the Net Worth Sweep would "lay to rest permanently the idea that the outstanding privately held pref[ferred stock] will ever get turned back on" and emphasized that "all the investors will get this very quickly." Fairholme ¶138. FHFA shared this understanding of the Net Worth Sweep. Mario Ugoletti, the FHFA official who communicated with Treasury concerning the Net Worth Sweep, wrote in an August 17, 2012 email that the Net Worth Sweep would "not allow the Enterprises to build up a retained surplus, which may give the impression that they are healthy institutions." Fairholme ¶146; Cacciapalle ¶63. Former FHFA Director Lockhart summed up FHFA's attitude towards private shareholders shortly after the Net Worth Sweep was announced: the Companies' privately-owned stock "is worthless and should be worthless." Fairholme ¶117. Because the Net Worth Sweep targeted private shareholders, Plaintiffs are entitled to sue directly.

## B. Plaintiffs May Pursue Derivative Suits on Behalf of the Companies Because FHFA Faces a Manifest Conflict of Interest.

Binding precedent and constitutional considerations make clear that Plaintiff shareholders may maintain a derivative suit because FHFA, which controls the Companies as conservator, is unwilling and unable to bring a suit due to a manifest conflict of interest.

### 1. Precedent Dictates that the HERA Succession Clause Does Not Preclude a Derivative Suit Where a Manifest Conflict of Interest Exists.

HERA's provisions concerning conservatorship and receivership were copied directly

from FIRREA, a statute which governs conservatorship and receivership of banks. Among the provisions HERA copied from FIRREA is the succession clause, which the Government claims bars derivative suits during conservatorship. *Compare* 12 U.S.C. § 4617(b)(2)(A)(i) *with* 12 U.S.C. § 1821(d)(2)(A)(i). (The Government does not argue that the succession clause bars direct claims.)

The Federal Circuit has squarely held that FIRREA's succession clause does *not* preclude derivative suits where the government conservator or receiver faces a conflict of interest. In *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1282-84 (Fed. Cir. 1999), a bank shareholder alleged the FDIC had breached contracts with the bank and committed unlawful takings by raising bank capital requirements during receivership beyond the levels to which the FDIC had previously agreed. The Federal Circuit held that where the FDIC faces a manifest conflict of interest in deciding whether to sue, shareholders can maintain a derivative suit notwithstanding FIRREA's succession clause. The court explained:

> We agree with the Court of Federal Claims that, as a general proposition, the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of the insured depository institution now in its receivership. However, the very object of the derivative suit mechanism is to permit shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due to a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation.

*Id.* at 1295. The court found such a manifest conflict of interest because "FDIC was asked to decide on behalf of the depository institution in receivership whether it should sue the federal government based upon a breach of contract, which, if proven, was caused by the FDIC itself." *Id.*; *see also Delta Sav. Bank v. United States*, 265 F.3d 1017, 1023-24 (9th Cir. 2001) (permitting derivative suit notwithstanding FIRREA succession clause given "significant and manifest" conflict of interest FDIC faced in bringing lawsuit "against one of its closely-related, sister agencies"); *In re Fed. Home Loan Mortg. Corp. Deriv. Litig.*, 643 F. Supp. 2d 790, 797 (E.D. Va. 2009) (recognizing conflict of interest exception under HERA but finding no conflict); *Branch v. FDIC*,

825 F. Supp. 384, 405 (D. Mass. 1993) (FIRREA "does not alter the settled rule that shareholders of failed national banks may assert derivative claims"). Because HERA's succession clause is materially identical to FIRREA's, it must be construed the same way.[8]

While some courts in other Circuits declined to follow *First Hartford* in construing HERA, this Court has no such discretion because *First Hartford* is binding Federal Circuit precedent. Furthermore, other courts decline to follow *First Hartford* based on flawed constructions of HERA. *Perry I*, for example, described the HERA succession clause as "explicitly bar[ring]" derivative suits, 70 F. Supp. 3d at 231. But HERA does not "explicitly bar" derivative suits; neither the succession clause nor any other provision of HERA even references derivative suits.

Moreover, multiple provisions of HERA confirm that the succession clause does not entirely extinguish shareholders' rights or the ability to protect those rights through litigation. For example, HERA provides that stockholders retain important economic rights, including to future distributions and to participate in a statutory claims process regarding the Companies' residual assets. *See* 12 U.S.C. § 4617(b)(2)(K)(i), (c)(1). If HERA transferred all stockholder rights to FHFA without exception, then the stockholders' rights to residual assets would accrue to FHFA,

---

[8] Disregarding *First Hartford* would be particularly inappropriate here because HERA copied FIRREA's succession clause *after* the law was well-established that FIRREA's succession clause does not preclude all derivative suits. That Congress merely copied HERA's succession clause from FIRREA, without revising the statute in a way that would suggest Congressional disagreement with *First Hartford*, provides strong evidence that Congress intended HERA to be interpreted consistent with such precedent. *See, e.g.*, *Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit*, 547 U.S. 71, 85 (2006). This is particularly so because *First Hartford* is one of the seminal rulings in the *Winstar* litigation and affected the outcomes in dozens of cases in this Court that imposed billions of dollars of liability on the Government. That Congress intended the FHFA to have similar powers under HERA as the FDIC has under FIRREA is further confirmed by legislative history. As a summary of HERA noted, "the legislation would provide this regulator with broad new authority, equivalent to the authority of other federal financial regulators, to ensure the safe and sound operations of the GSEs." *See* U.S. Senate Democratic Policy Committee, *H.R. 3221, the Housing and Economic Recovery Act of 2008* (July 25, 2008), https://goo.gl/ebkJtE.

and there would be no need to include stockholders in any claims process. *See Branch*, 825 F. Supp. at 404-05 (analyzing similar terms of FIRREA to hold that "despite its strong language, [FIRREA] does not transfer all incidents of stock ownership"). Similarly, HERA expressly provides that during conservatorship a "regulated entity" may sue "for an order requiring the Agency to remove itself as conservator." 12 U.S.C. § 4617(a)(5)(A). Since FHFA controls the Companies during conservatorship and cannot sue itself, this provision would be meaningless if HERA transferred those Company rights to FHFA.

### 2.   The Court May Not Interpret HERA to Preclude Judicial Review of Plaintiffs' Takings and Illegal Exaction Claims.

Unlike the parties in *Perry* and the other cases the Government cites, Plaintiffs raise takings and illegal exaction claims that derive from the Constitution. That Plaintiffs assert constitutional claims is significant, because were this Court to hold that the Government may take or illegally exact the Companies' property pursuant to HERA, and then invoke HERA to bar judicial review of the alleged taking and illegal exaction, such a ruling would cause HERA to violate due process by denying Plaintiffs a remedy for a constitutional claim. Specifically:

> [A] statutory provision precluding all judicial review of constitutional issues removes from the courts an essential judicial function under our implied constitutional mandate of separation of powers, and deprives an individual of an independent forum for the adjudication of a claim of constitutional right. We have little doubt that such a limitation on the jurisdiction of both state and federal courts to review the constitutionality of federal legislation…would be [an] unconstitutional infringement of due process.

*Bartlett v. Bowen*, 816 F.2d 695, 699 (D.C. Cir. 1987) (last two alterations in original) (quotations omitted). The deprivation of a judicial remedy is particularly problematic as to the takings claim because the Takings Clause is not "only a limitation on the power of the Government to act" but also a "remedial provision … that dictates the remedy for … a taking." *First English Evangelical Lutheran Church v. Cty. of Los Angeles*, 482 US. 304, 315–16 & n.9 (1987). Because "the

compensation remedy [for a taking] is required by the Constitution," *id.* at 316, Congress may not negate that remedy by statute. If the Court were to construe HERA to preclude all derivative claims, then HERA would be unconstitutional as applied to Plaintiffs' derivative takings and illegal exaction claims.

The simple way to avoid this problem is to follow *First Hartford*. Where two interpretations of a statute are permissible, the Court must adopt the interpretation that does not raise "serious constitutional concerns." *Edward J. DeBartolo Corp. v. Fla. Gulf Coast Bldg. & Co.*, 485 U.S. 568, 577 (1988); *see also NLRB v. Catholic Bishop of Chicago*, 440 US. 490, 500 (1979); *Elmco Props. v. Second Nat'l Fed. Sav. Ass'n*, 94 F.3d 914, 922 (4th Cir. 1996) (construing jurisdictional bar provision of FIRREA to contain exception not explicitly set forth in statute in order to avoid Due Process violation). These principles apply with particular force where the disfavored statutory construction would leave a plaintiff with no forum in which to assert a colorable constitutional claim, *see Webster v. Doe*, 486 U.S. 592, 603 (1988), or foreclose all remedies for the unconstitutional taking of property, *see Reich v. Collins*, 513 U.S. 106, 109-10 (1994). At a minimum, *First Hartford* provides a *permissible* construction of HERA that avoids the serious constitutional problem the Government's position would create.

### 3.     There Is No Basis to Distinguish *First Hartford*.

The Government's attempts to distinguish *First Hartford* each lack merit. Invoking the *First Hartford* court's statements that its holding was "limited to the situation [t]here" and that it would not "express an opinion" about "plaintiffs in other circumstances," the Government argues that the manifest-conflict exception can apply *only* to situations with the exact same facts as *First Hartford*. MTD 33-34 (quoting *First Hartford*, 194 F.3d at 1295). In fact, *First Hartford* was making the unremarkable point that the existence of a manifest conflict of interest depends upon the facts of a given case. 194 F.3d at 1295. While this *factual* question turns on case-specific

considerations, the *legal* rule *First Hartford* announced—that a shareholder can maintain a derivative suit where a receiver or conservator faces a manifest conflict of interest—applies generally. Accordingly, where, as here, Plaintiffs have pleaded a manifest conflict of interest, *First Hartford* permits their derivative claims to proceed.

The Government's attempt to limit *First Hartford* to receiverships, not conservatorships, is likewise unavailing. Nothing in the decision hints at such a limitation, and the rationale behind *First Hartford* focuses on the nature of derivative proceedings rather than any particular aspect of receivership. *Id.* at 1295.[9]

The Government's argument that *First Hartford* is distinguishable because the claims there "involved circumstances that predated the receivership," rather than "decisions" the FHFA made "as conservator," must also be rejected. MTD 35. Nothing in *First Hartford* suggests that this temporal distinction makes a difference. The announcement of the "manifest conflict" rule in *First Hartford* did not depend upon when or how the wrongful conduct occurred, but rather, "most significantly, upon the conflict of interest faced by the FDIC in determining whether to bring suit." 194 F.3d at 1295; *see also Delta Savings*, 265 F.3d at 1023-24 (same).

The Government's fallback contention that permitting derivative suits would frustrate the succession clause and undermine the "immense discretionary power" HERA gave to FHFA is equally unpersuasive. MTD 37. This, in substance, reprises an argument that the succession clause precludes all derivative suits—a contention that *First Hartford* considered and rejected. Whatever

---

[9] The need to permit shareholders to maintain derivative suits when FHFA faces a conflict of interest is most acute in conservatorship. Unlike the appointment of a receiver, the appointment of a conservator does not "terminate" shareholder claims and trigger a statutory claims process. *See* 12 U.S.C. § 4617(b)(2)(K)(i). And without the protections of this statutory claims process, there is a greater need for a conflict-of-interest exception to protect shareholders during conservatorship and to avoid deprivation of a remedy for claims that derive from the Constitution.

"discretion" HERA may have given FHFA, Congress could not purport to give FHFA "discretion" to effect illegal exactions or takings without just compensation and then to preclude any judicial remedy for such constitutional violations.

### 4.      FHFA Faces a Manifest Conflict of Interest.

The Government mounts no real challenge to Plaintiffs' factual allegations demonstrating a conflict of interest. FHFA has assumed management of the Companies and is thus the relevant decision-maker for conflict purposes. *See, e.g.*, Fairholme ¶165. Plaintiffs allege detailed facts establishing FHFA's role in entering into the Net Worth Sweep and FHFA's admitted purpose of benefitting the Government to the detriment of the Companies, *id.* ¶¶119, 135-36, 141-47, together with FHFA's close relationship to the Treasury, *id.* ¶¶147-49, 165. Any suggestion that FHFA lacks a manifest conflict when faced with the decision whether to sue the United States for an action that FHFA itself agreed to and has since tenaciously defended in the courts would be frivolous.

### C.      Issue Preclusion Does Not Require This Court to Disregard Binding Precedent.

The Government argues that the holdings in *Perry* preclude Plaintiffs from arguing that HERA permits derivative claims where the FHFA faces a conflict of interest. MTD 37-40. The implication is that this Court must disregard the controlling precedent of *First Hartford* in favor of the *Perry* decisions. The doctrine of issue preclusion does not require any such thing.

The Government acknowledges that issue preclusion requires that "the issue previously adjudicated is *identical* with that now presented." MTD 38 (emphasis added). The issues presented here, however, are not identical to the issues in *Perry*. The plaintiffs in *Perry*—who did not include all Plaintiffs before this Court—asserted a derivative claim only for breach of fiduciary duty; they asserted no constitutional claims. That distinction is significant because the Court must construe

31

HERA to avoid extinguishing all judicial remedies for constitutional violations. *See supra* at 28-29. Indeed, even if *Perry*'s holding precludes any common law claims, whether HERA can be construed to foreclose all judicial remedies for constitutional claims presents a distinct question.

Moreover, the issues in *Perry* were not identical to the issues here because the courts in *Perry* were not bound by *First Hartford* as controlling precedent, while this Court is. *Phoenix Cos., Inc. v. Abrahamsen*, 2006 WL 2847812, at *8 (S.D.N.Y. Sept. 28, 2006). Notably, the court in *Saxton v. FHFA*—another case addressing whether derivative claims concerning the Net Worth Sweep were barred by HERA's succession clause—declined to give preclusive effect to *Perry* for similar reasons—that is, that the plaintiffs in *Perry* asserted different claims than the plaintiffs in *Saxton*, and therefore the plaintiffs in each of the two cases "lack[ed] sufficiently aligned interests." 245 F. Supp. 3d 1063, 1074-75 (N.D. Iowa 2017), *aff'd*, 901 F.3d 954 (8th Cir. 2018).

Furthermore, three important exceptions to issue prelusion apply here. First, a prior decision has no preclusive effect if the issue decided "is 'one of law and treating it as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based.' " *Chicago Truck Drivers, Helpers & Warehouse Union Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 531 (7th Cir. 1997) (quoting RESTATEMENT (2D) OF JUDGMENTS § 29(7) & cmt. i); *see also Howarth v. United States*, 41 Fed. Cl. 160, 164-65 (1998), *aff'd sub nom.*, *Bell v. United States*, 217 F.3d 853 (Fed. Cir. 1999) (*per curiam*) (unpublished). Courts thus decline to apply issue preclusion where "the issue was determined in an appellate court whose jurisdiction is coordinate with … that of [the present court]; [and] the issue is of general interest and has not been resolved by the United States Supreme Court." *Af-Cap Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007) (quoting RESTATEMENT (2D) OF JUDGMENTS § 29 cmt. i). Applying these principles, courts decline

to give preclusive effect to rulings of law from other jurisdictions where doing so may foreclose the development of law in the court in which preclusion is sought. *Glictronix Corp. v. Am. Tel. & Tel. Co.*, 603 F. Supp. 552, 571-72 (D.N.J. 1984); *Chicago Truck*, 125 F.3d at 531; *Af-Cap*, 475 F.3d at 1086.[10]

If courts may decline to afford preclusive effect to rulings on questions of law from other circuits where the same issue is *unresolved* in the circuit in which preclusion is sought, it necessarily follows that a court cannot give preclusive effect to decisions that contradict controlling precedent within the circuit in which preclusion is sought. And here, the Government attempts to invoke issue preclusion to avoid the controlling precedent of *First Hartford*.

Second, issue preclusion does not apply where superseding authority calls into question the prior decision. *See Bobby v. Bies*, 556 U.S. 825, 834 (2009) (quoting RESTATEMENT (2D) OF JUDGMENTS § 28(2) & cmt. c); *Dow Chem. Co. v. Nova Chems. Corp. (Can.)*, 803 F.3d 620, 628 (Fed. Cir. 2015). The rationale behind this exception is simple: issue preclusion should not be invoked to disregard controlling precedent. *See* 18 MOORE'S FEDERAL PRACTICE: CIVIL § 132.02 (2018). Although this exception typically arises where a subsequent decision casts doubt on the prior decision, the same principle logically denies preclusive effect to decisions from other jurisdictions that conflict with existing controlling precedent in the jurisdiction where preclusion is proposed. *See, e.g.*, *Phoenix*, 2006 WL 2847812, at *8 (applying "intervening change" exception to situation where "controlling law in the putative new action differs from that in the original

---

[10] *See* RESTATEMENT (2D) OF JUDGMENTS § 28(2) (1982) (where "[t]he issue is one of law … a new determination is warranted in order to … avoid inequitable administration of the laws"); *B&B Hardware, Inc. v. Hargis Indus., Inc.*, 135 S. Ct. 1293, 1303 (2015) ("The Court … regularly turns to the Restatement (Second) of Judgments for a statement of the ordinary elements of issue preclusion.").

case").[11]

Third, as the Government acknowledges, issue preclusion only applies to a party to the prior action or someone in privity with such a party. The named Plaintiffs asserting derivative claims here did not assert derivative claims in the prior actions upon which the Government relies. The Government's contention that there is nevertheless privity depends on its argument that Plaintiffs' claims are subject to the rule that in derivative cases "parties and their privies include the corporation and all nonparty shareholders." *Nathan*, 651 F.2d at 1226. But that rule does not apply, because in the prior derivative actions the courts determined that the plaintiffs *lacked the capacity* to sue on behalf of the Companies due to HERA's succession clause. The rationale for finding privity between shareholder derivative plaintiffs in separate suits is that the true plaintiff in interest in all such suits is the corporation. That rationale cannot apply when a putative shareholder derivative suit is dismissed because the plaintiff lacks "capacity to bring the suit," and in such cases the dismissal "will not bar other stockholders from bringing a derivative action." WRIGHT & MILLER, FED. PRAC. & PROC. § 1840.[12]

### III.   Plaintiffs Who Purchased the Companies' Shares After the Date of the Net Worth Sweep Have Standing.

The Government's argument that Plaintiffs who purchased shares in the Companies after August 17, 2012—the date of the Net Worth Sweep—lack standing must be rejected. MTD 46-48.

---

[11] None of the cases cited by the Government address a purely legal issue of statutory construction, like the question presented here. *See Arduini v. Hart*, 774 F.3d 622, 633-36 (9th Cir. 2014) (addressing demand futility); *In re Sonus Networks, Inc., S'holder Deriv. Litig.*, 499 F.3d 47, 63-64, 67-68 (1st Cir. 2007) (addressing demand futility); *Nathan v. Rowan*, 651 F.2d 1223, 1226-27 (6th Cir. 1981) (addressing the application of the statute of limitations to specific facts).

[12] The First Circuit has held that issue preclusion may apply in the demand futility context, *Sonus*, 499 F.3d at 64, but unlike here there was no issue with the plaintiff in the first case lacking the *capacity* to represent the company. Indeed, the First Circuit's statement of the rule makes clear that the prior plaintiff's capacity to represent the company is essential: "*if the shareholder can sue on the corporation's behalf*, it follows that the corporation is bound by the results of the suit in subsequent litigation, even if different shareholders prosecute the suits." *Id.* (emphasis added).

A. Resolution of the Government's standing argument now is unnecessary and inefficient. There is no dispute that many Plaintiffs *did* own stock in the Companies at the time of the Net Worth Sweep, *see, e.g.*, Fairholme ¶40, and "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." *FAIR*, 547 U.S. at 52 n.2; *see also Bowsher v. Synar*, 478 U.S. 714, 721 (1986). Because the Government's standing argument does not affect this Court's subject matter jurisdiction, this Court "need not consider the standing issue as to the [challenged Plaintiffs]" on this motion. *Id.* at 721.

B. More importantly, the Government's standing argument is wrong. The Government perfunctorily cites decisions for the proposition that only those with an interest in property "at the time" of the taking are entitled to compensation. MTD 46-47. But its attempt to extend this principle—which typically applies in cases where the Government directly condemns or permanently physically invades property, *see, e.g.*, *United States v. Dow*, 357 U.S. 17 (1958)—into a blanket rule covering all permutations of property interests cannot stand. The Supreme Court has made clear that such blanket exemptions from takings liability are disfavored. *See, e.g.*, *Arkansas Game & Fish Comm'n v. United States*, 568 U.S. 23, 31, 32 (2012); *Murr v. Wisconsin*, 137 S. Ct. 1933, 1943 (2017). Rather, the takings inquiry is "designed to allow 'careful examination and weighing of all the relevant circumstances.' " *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (citations omitted).

The Government also ignores contrary precedents. In *Palazzolo v. Rhode Island*, 533 U.S. 606, 630 (2001), for example, the Supreme Court rejected the notion that persons that purchase property after a state enacts a new law effecting a taking can *never* assert a regulatory takings challenge to such enactments. The Court held that a regulatory takings claim was "not barred by the mere fact that title was acquired after the effective date of the state-imposed restriction," and

it distinguished regulatory takings cases from cases involving "direct condemnation" or physical invasions of property. *Id.* at 628, 630; *see also Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 833 n.2 (1987) (rejecting argument that landowners' rights in connection with takings challenge to policy conditioning approval to develop property on granting of access easement were "altered because they acquired the land well after the Commission had begun to implement its policy"). The Government's argument that subsequent purchasers never have standing is refuted by these decisions.

Nor does the Government address *Bailey v. United States* ("*Bailey I*"), 78 Fed. Cl. 239, 272-75 (2007), which held that a party had standing to challenge a regulatory taking even when the regulation went into effect and the taking commenced before the party acquired the property. The Court in *Bailey* engaged in a comprehensive review of the history and foundations of the general rule restricting compensation to those owning property on the date of the taking, *id.* at 258-64, and concluded that central to that rule's rationale were the features of direct condemnations and presumptively permanent physical invasions of property that justified treating the right to compensation for such actions as inuring solely to the owners of the property at that time. In those cases, the owner at the time of condemnation or permanent physical occupation no longer had a property interest to transfer to a subsequent purchaser. "It was this ouster of possession, this permanent removal of the property interest, which swapped a suit for compensation, or 'chose in action' not running with the land, in place of a real property interest." *Id.* at 263; *see also id.* at 268; *Bailey II*, 116 Fed. Cl. at 315.

Very different considerations are present, however, in cases involving the taking of intangible property. In most such cases, the Government does not effect a taking "by building permanent structures, but by words on paper." *Bailey I*, 78 Fed. Cl. at 272. And, as the Court in

*Bailey* acknowledged, "there is nothing about" those "words on paper" that "irrevocably commits the government." *Id.* When a regulatory restriction on use of property "is found to go too far," and thus to amount to a taking, the Government "has the option of cutting its losses by loosening its restriction." *Id.* The Government, in short, can easily issue new "words on paper" that undo the effects of previous actions that go so far as to effect a taking. *See also Bailey II*, 116 Fed. Cl. at 316; *cf. First English Evangelical Lutheran Church of Glendale v. Los Angeles*, 482 U.S. 304, 317 (1987) (Government may convert a regulatory taking into a temporary regulatory taking by "elect[ing] to abandon its intrusion or discontinue regulations").

Unlike instances in which the Government directly condemns or permanently and physically invades tangible property, the taking of intangible property (as illustrated by the typical regulatory taking) does not transfer the property to the Government in the classic sense. *Bailey I* recognized that application of the traditional standing rule to such takings makes little sense:

> [W]hile a government-imposed restriction on the use of private property persists, the owner at any particular time is the one who is inconvenienced by the restriction. If that inconvenience is severe enough to amount to a taking, *any owner of the property while the restriction continues should be compensated for the interest taken*. Such an action is not a claim for the compensation the government would owe any predecessors, whose conveyance of the subject property truncates their claims to ones for temporary takings ….

78 Fed. Cl. at 273 (emphasis added) (footnote omitted). The Court thus held that just compensation for regulatory takings may be owed "to owners who have acquired their property interests after the onset of the taking, due to the government's ability to transform regulatory takings into temporary ones." *Id.* at 274.

The considerations that led the Court to reject the Government's standing argument in *Bailey I* should produce the same result here. The Government's taking here was effected by "words on paper," i.e., the Third Amendment which imposed the Net Worth Sweep. Given the ongoing effects of the Net Worth Sweep and the Government's ability, using more "words on

paper," to discontinue the Net Worth Sweep, this case falls squarely into the type of situation that led this Court to conclude that owners who had "acquired their property interests after the onset of the taking" have standing to seek compensation for that taking. *Id.*; *see also Strubel v. United States*, 2009 WL 1636355, at *18 (Fed. Cl. June 10, 2009).[13]

Moreover, the Government's standing argument focuses solely on allegations that a taking occurred when the Third Amendment was signed on August 17, 2012, MTD 47, and ignores other allegations that each payment under the Net Worth Sweep constitutes another taking. *See, e.g.*, Fairholme ¶16 ("The Net Worth Sweep has resulted in a massive and unprecedented expropriation of private property. To the extent this *ongoing expropriation* is authorized by law, the Fifth Amendment compels the Government to pay just compensation.") (emphasis added); *see also* Rafter ¶120. These allegations, which the Government does not even mention, much less address, are fully consistent with the proposition, supported by decisions such as *Palazzolo*, *Nollan*, and *Bailey*, that stockholders who bought shares after August 17, 2012 have suffered (and continue to suffer) a taking of their property interests and have standing under the Fifth Amendment to seek compensation for that taking. *See Eyherabide v. United States*, 345 F.2d 565, 571 (Ct. Cl. 1965) (awarding compensation for temporary physical taking to plaintiffs who purchased property after taking began).[14]

---

[13] The *Bailey* Court limited its holding to regulatory takings involving real property. *Bailey I*, 78 Fed. Cl. at 270 n.57; *id.* at 274. But the rationale underlying that decision applies fully to any takings of intangible property. And, since *Bailey*, the Supreme Court has emphatically reaffirmed that interests in personal property are as fully protected by the Fifth Amendment as are interests in real property. *See Horne v. Department of Agric.*, 135 S. Ct. 2419, 2426 (2015) ("[The Takings Clause] protects 'private property' without any distinction between different types.").

[14] *See also Hatter v. United States*, 203 F.3d 795, 797 (Fed. Cir. 2000) (en banc) (claims that judges' pay was unconstitutionally diminished accrued "each time moneys [were] deducted from the judges' pay and paid into the Treasury"); *Burich v. United States*, 366 F.2d 984, 986 (Ct. Cl. 1966) (new cause of action for compensation payable periodically arises each time Government fails to make payment).

To be sure, in *CRV Enterprises, Inc. v. United States*, 626 F.3d 1241, 1249 (Fed. Cir. 2010), the Federal Circuit applied the general standing rule to plaintiffs alleging a regulatory taking. *See* MTD 46 (citing *CRV*). But the taking alleged in *CRV* was not a typical regulatory taking, as it involved the alleged impacts on the claimant's property of the Government's decision to construct a permanent physical structure (a log boom) on nearby land. *See* 626 F.3d at 1250. The taking thus did not involve the issuance of mere "words on paper" that restrict the use of property and that can be undone with a stroke of a pen. Accordingly, the facts in *CRV* were much more closely aligned to the circumstances in typical cases involving direct appropriation or permanent physical invasions of property than to the circumstances underlying most takings claims involving intangible property. The decision demonstrates merely "the nearly infinite variety of ways in which government actions or regulations can affect property interests," *Arkansas Game*, 568 U.S. at 31, and does not call into question how the standing inquiry should be conducted in cases, like this one, involving an ongoing, but reversible, takings of intangible property, *see Bailey II*, 116 Fed. Cl. at 317-18 (finding "no reason for extending [*CRV*'s holding] beyond the particular circumstances of the physical construction of a structure that is presumed to permanently interfere with property usage"). In addition, the primary issue addressed in *CRV* was when the takings claim accrued; the property owner did not take issue with the proposition that if the claim accrued before it acquired the property, it would lack standing. *CRV*, 626 F.3d at 1249. The applicability and parameters of the general "owner at the time" rule, having been conceded, were not decided by the Court. *See Bailey II*, 116 Fed. Cl. at 317-18 & n.6.

Nor do the other decisions cited by the Government support its argument. As noted, because *Dow* involved a direct one-time condemnation of property, it stands to reason that only the owner of the property at that time would have standing. Similarly, the claims in *Textainer*

*Equipment Management Ltd. v. United States*, 115 Fed. Cl. 708, 711 (2014), involved a one-time physical appropriation of property (the "government's decision to take title and possession of shipping containers"), and the claims in *Banks v. United States*, 88 Fed. Cl. 665, 674 (2009), involved a one-time permanent physical invasion of property (erosion of shoreline property caused by government construction of harbor jetties). *Wyatt v. United States*, 271 F.3d 1090, 1096 (Fed. Cir. 2001), does not speak to the standing of subsequent purchasers, as the plaintiff in that case did not possess a property interest at *any time* after the date of the taking. *See Bailey I*, 78 Fed. Cl. at 268 (discussing *Wyatt*). And while the claim in *Maniere v. United States*, 31 Fed. Cl. 410, 421 (1994), did involve the taking of an interest in stock, the main issue contested by the parties and addressed by the Court in its cursory analysis was not the "owner at the time of the taking" rule in cases involving stock, but instead when the alleged taking in that case occurred.

The case for allowing the current holders of the Companies' stock to pursue claims for just compensation premised on the implementation and operation of the Net Worth Sweep is even stronger than in cases involving other types of property interests. The property interest at issue in this case is one that itself inheres in the ownership of stock. *See, e.g.*, Fairholme ¶¶171-72. The Government has not disputed that by operation of relevant state law, the rights that underlay Plaintiffs' property interests are held by the *current* owners of the stock. *See, e.g.*, DEL. CODE tit. 6, § 8-302; VA. CODE § 8.8A-302. Significantly, just last month, Judge Lamberth decided, in the related district court litigation challenging the Net Worth Sweep, that because "[r]ights associated with dividends and liquidation preferences inhere in the security," contractual rights relating to those interests were held by subsequent acquirers of the stock. *Fairholme Funds, Inc. v. FHFA*, 2018 WL 4680197, at *8 (D.D.C. Sept. 28, 2018).

Given the close relationship between the contractual claims in that case and the takings

claims asserted in this action, a rule allowing stockholders who purchased shares after the announcement of the Net Worth Sweep to seek to vindicate their contract rights, but forbidding those same stockholders from seeking to vindicate their property rights, makes little sense.[15] Indeed, such a rule could conceivably expose the Government to double liability, as it would, in cases involving post-Net Worth Sweep stock purchases, effectively split recovery on viable contract claims (which could be asserted by the purchasers) from recovery on viable takings claims based on the same underlying interests (which could only be asserted by the sellers).

## IV.     Plaintiffs Have Alleged Viable Takings Claims.[16]

### A.      Plaintiffs' Takings Claims Do Not Sound in Tort.

The Government argues that this Court lacks jurisdiction over Plaintiffs' takings claims because they "necessarily depend on allegations that FHFA committed some form of misconduct" and therefore sound in tort. MTD 46. But Plaintiffs do not *rely* on the Government's motives or tortious conduct for purposes of their takings claims. Moreover, that Plaintiffs may characterize the actions effecting the taking as self-dealing or an abuse of discretion and as giving rise to other claims does not convert Plaintiffs' takings claims into tort claims outside the Tucker Act.

Allegations that might support a tort claim may also support other claims subject to this

---

[15] The Government suggests in passing that such stockholders also lack standing to pursue contract or illegal exaction claims. MTD 47. But the Government's sole support for this drive-by argument, *Scott Timber Co. v. United States*, 692 F.3d 1365, 1372 (Fed. Cir. 2012), says nothing about the standing of purchasers of stock to bring contract or illegal exaction claims against the Government premised on the contractual and property rights that inhere in such stock. The decision holds only that because the covenant of good faith and fair dealing applies to the *performance* of a contract, a claim for breach of the covenant typically cannot be premised on conduct that occurred prior to the existence of *any* contract.

[16] The Government does not dispute the derivative Plaintiffs' claims that the Net Worth Sweep constitutes a taking of the Companies' property in violation of the Fifth Amendment. The Government has therefore waived any such argument. *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1319 (Fed. Cir. 2006); *Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed. Cir. 2002); *Hitkansut LLC v. United States*, 127 Fed. Cl. 101, 112 n.5 (2016); *Ironclad/EEI v. United States*, 78 Fed. Cl. 351, 358 (2007).

Court's jurisdiction under the Tucker Act. "That the complaint suggests the United States may have acted tortiously … does not remove it from the jurisdiction of the Court of Federal Claims." *El-Shifa Pharm. Indus. Co. v. United States*, 378 F.3d 1346, 1353 & 1354 n.3 (Fed. Cir. 2004); s*ee also Moden v. United States*, 404 F.3d 1335, 1341 (Fed. Cir. 2005); *Del-Rio Drilling Programs, Inc. v. United States*, 146 F.3d 1358, 1363 (Fed. Cir. 1998).

The Government's reliance on *Golden Pacific Bancorp v. United States*, 25 Cl. Ct. 768, 769-70, 770 n.2 (1992), *aff'd*, 15 F.3d 1066, 1069, 1071 (Fed. Cir. 1994), and *Franklin Savings Corp. v. United States*, 46 Fed. Cl. 533, 535-37 (2000), is misplaced, as neither holds that allegations that may support a tort claim preclude this Court from exercising jurisdiction under the Tucker Act. In *Golden Pacific*, this Court simply noted that the Court would not have jurisdiction over a cause of action resting on the discretion of the Comptroller and thus sounding in tort, before applying the standard takings' analysis to the plaintiffs' takings claim. 25 Cl. Ct. at 770 n.2. In *Franklin*, the plaintiffs were relying on allegations the regulators were "motivated by bad faith and acted in reckless disregard of plaintiffs' rights" to *distinguish* their takings claim from Federal Circuit precedent that "would appear to preclude a taking claim" on the conduct at issue. 46 Fed. Cl. at 535. But this Court found that allegations of bad faith and recklessness could *not* distinguish the takings claim and that the claim failed on the same grounds the prior bank takeover claims failed. *Id.* at 536-37. The takings claim did not fail *because* of the allegations of bad faith.

Indeed, it would be perverse if allegations of bad faith could *insulate* the Government from liability if the same action taken in good faith would constitute a taking.

### B.   Allegations of Unauthorized Conduct Do Not Defeat Takings Claims.

The Government argues that Plaintiffs' takings claims fail because some Plaintiffs have argued that the Net Worth Sweep violated HERA. MTD 68. This argument rests on a misunderstanding of the relationship between Plaintiffs' takings and illegal exactions claims—

which plead *in the alternative* that the Government is liable for a taking if the Net Worth Sweep was authorized by statute, or for an illegal exaction if it was not. *See, e.g.*, *Starr I*, 121 Fed. Cl. at 472. This Court rejected the argument made by the Government here in *Figueroa v. United States*, which held that although a takings claim cannot be premised on unauthorized action, the "rules of this court" permit a plaintiff to plead "inconsistent claims" (there, takings and illegal exaction claims) "in the alternative." 57 Fed. Cl. 488, 496 (2003). This Court routinely rejects motions to dismiss takings claims based on allegations supporting alternative claims. *See, e.g.*, *Stockton E. Water Dist. v. United States*, 583 F.3d 1344, 1369 (Fed. Cir. 2009); *Sonoma Apartment Assocs. v. United States*, 124 Fed. Cl. 595, 598-600 (2015).

The cases relied upon by the Government, MTD 68-69, stand only for the proposition that a takings claim cannot be "*premised*" upon illegal action and thus that courts assume the lawfulness of the government act *for purposes of the takings claim. Acadia Tech., Inc. v. United States*, 458 F.3d 1327, 1331 (Fed. Cir. 2006) (emphasis added). For example, in *Acadia*, the Federal Circuit merely held that complaints about the lawfulness of the Government action are not properly addressed in the "context of [a] takings claim." *Id.* at 1331 (quoting *Rith Energy, Inc. v. United States*, 270 F.3d 1347, 1352-53 (Fed. Cir. 2001)). As the Federal Circuit explained, "a taking does not result simply because the government acted unlawfully, *nor does a takings claim fail simply because the government's conduct is subject to challenge as unlawful*." *Id.* at 1330 (emphasis added) (quoting *Rith*); *see also Del-Rio Drilling Programs*, 146 F.3d at 1363; MTD 68.

Applying those rules here is straightforward. Plaintiffs have, as permitted by RCFC 8, pleaded their claims in the alternative. For their takings claims, the Court should assume that the Net Worth Sweep did not violate HERA. For other claims, it should not.

C.     **Plaintiffs Have Cognizable Property Rights.**

1.     **Derivative Plaintiffs Have a Cognizable Property Interest.**

The Government makes no argument that Plaintiffs bringing derivative claims have failed to identify a cognizable property interest. *See* MTD 51-52. The Government has therefore waived any such argument. *SmithKline Beecham*, 439 F.3d at 1319. This is unsurprising given that it is well established that a company's assets, including its monetary assets, are "property" within the meaning of the Fifth Amendment. *See, e.g.*, *Kimball Laundry Co. v. United States*, 338 U.S. 1 (1949); *Koontz v. St. Johns River Water Mgmt. Dist.*, 133 S. Ct. 2586 (2013).[17]

2.     **Direct Plaintiffs Have a Cognizable Property Interest.**

For the direct claims, the Government argues that Plaintiffs "fail to identify a legally cognizable property right in their purported contractual rights to dividends and liquidation." MTD 51. This is wrong. The rights at issue are Plaintiffs' contractual, economic interest in the Companies—"the rights to receive dividends, liquidation proceeds, or other distributions in accordance with the terms" of Plaintiffs' stock certificates, and Plaintiffs' vested rights to participate in the Companies' income stream and residual value under the Companies' charters. Cacciapalle ¶125; Rafter ¶116. Contract and charter-based rights such as these are protected under the Fifth Amendment. *See A&D Auto Sales, Inc. v. United States*, 748 F.3d 1142, 1152 (Fed. Cir. 2014) (takings clause protects contracts); *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 53-56 (1986) (corporate charters create rights "held to constitute 'property' within the meaning of the Fifth Amendment"). The Federal Circuit accordingly has

---

[17] This is consistent with the Federal Circuit cases relied on by the Government with respect to the property interest underlying Plaintiffs' direct claims, such as *Golden Pacific Bancorp*, 15 F.3d at 1066, which did not involve derivative challenges. Moreover, because the regulatory framework of a conservatorship is premised on preserving assets—not transferring them to the conservator— Net Worth Sweep is inconsistent with "historically rooted expectation[s]." *Id.* at 1072. *See also Cienega Gardens v. United States*, 331 F.3d 1319, 1350 (Fed. Cir. 2003).

recognized that "shares of stock" are "property," *Golden Pacific*, 15 F.3d at 1073, and that "a shareholder's direct interest in a liquidation surplus is a cognizable property interest the taking of which by the federal government gives rise to standing to sue," *First Hartford*, 194 F.3d at 1283. *See also Keller v. Wilson & Co.*, 190 A. 115, 124 (Del 1936).

The Net Worth Sweep takes Plaintiffs' rights because it assigns *all equity interest in Fannie and Freddie to Treasury*. Before the Net Worth Sweep, shareholders other than Treasury had an economic interest in Fannie and Freddie through their rights to the Companies' residual value, whether realized through dividends, liquidations, or accretion. After the Net Worth Sweep, those shareholders are left "holding worthless stock," *Saxton*, 901 F.3d at 961 (Stras, J., concurring), because the economic interest they had in Fannie and Freddie has been transferred to Treasury. "With the stroke of a pen, the Agencies … nationalized the Companies and [took] all the value of the Companies for Treasury, thereby depriving the private shareholders of all their economic rights." Fairholme ¶10.

The Government argues that it was free to destroy Plaintiffs' rights because "background principles derived from the statutory and regulatory framework" entail that "shareholders lack *any* property right, cognizable under the Takings Clause, when the corporations are in conservatorship or receivership." MTD 51 (emphasis added). The implications of this argument are startling: if correct, it would allow the Government to freely take the rights not only of Fannie's and Freddie's shareholders but also of all shareholders in any and all of the Nation's banks and other financial institutions. Fortunately, the Government's argument is wrong.

The Government's argument is premised on a flawed reading of *Golden Pacific Bancorp*, 15 F.3d at 1066, and *California Housing Securities, Inc. v. United States*, 959 F.2d 955, 957 (Fed.

Cir. 1992), that the D.C. District Court erroneously adopted in *Perry I*, 70 F. Supp. 3d at 241.[18] These cases do not hold that "shareholders lack any property right[s]" during conservatorship. Instead, they apply the "very narrow" holding, *California Housing*, 959 F.2d at 958, that shareholders lack the right to *exclude* a conservator, *id.*; *Golden Pacific*, 15 F.3d at 1073. This carve out is very limited: shareholders lack the right to exclude a conservator *only* "at those times when the government could legally impose a conservatorship or receivership." *California Housing*, 959 F.2d at 958; *Golden Pacific*, 15 F.3d at 1073 (quoting *California Housing*). And this is not because "shareholders hold less than the full bundle of property rights," as the Government argues. MTD 51 (quotation marks and brackets omitted). It is because shareholders in a company subject to laws and regulations that permit the Government to place it into conservatorship in specified situations cannot "develop[ ] a historically rooted expectation of compensation" that the Government will not place the company into conservatorship when such situations occur. *California Housing*, 959 F.2d at 958. It does not follow that once the Companies are in conservatorship, the conservator is free to loot shareholders' property at will, nor that shareholders have no property interests. Historically rooted expectations of conservatorship would contemplate that the conservator became the steward, and not the owner (or destroyer), of the property.

Whether Plaintiffs have a cognizable property interest within a regulated industry thus depends on whether the regulations prevent them from developing an expectation of compensation

---

[18] The other cases on which the Government relies all involved the normal application of established regulations and therefore are inapposite. *See* MTD 59 (citing *Acceptance Ins. Cos., Inc. v. United States*, 583 F.3d 849 (Fed. Cir. 2009) (rejecting takings claim by insurance company that was denied approval by its regulator to sell a portfolio of policies held by its subsidiary); *Branch v. United States*, 69 F.3d 1571 (Fed. Cir. 1995) (rejecting takings claim based on application of a statute making banks liable for losses caused by the failure of affiliated banks); *American Cont'l Corp. v. United States*, 22 Cl. Ct. 692, 693 (1991) (rejecting takings claim based on the appointment of a conservator and receiver for a failed savings and loan that engaged in "abusive" transactions that placed the bank in "an unsafe and unsound condition")).

if the Government were to take the interest in question. "[M]ere participation in a heavily regulated environment does not bar a plaintiff from showing that it has a property interest compensable under the Fifth Amendment." *Acceptance Ins. Cos.*, *Inc. v. United States*, 84 Fed. Cl. 111, 117 (2008), *aff'd*, 583 F.3d 849 (Fed. Cir. 2009).[19] Nothing in the regulatory framework suggests that shareholders should expect the uncompensated transfer of their interests in Fannie and Freddie to the Government. HERA's provisions allowing the Companies to be placed into conservatorship, *see* MTD 52, do not create this expectation because they only put investors on notice that the Companies may be placed into conservatorship in specified circumstances. *See Golden Pacific*, 15 F.3d at 1070; *California Housing*, 959 F.2d at 957. Nor do HERA's provisions related to the operating of Fannie and Freddie while they are in conservatorship create this expectation, *see* MTD 52-53, because none contemplate diverting all of the Companies' equity to the United States.

Moreover, the Net Worth Sweep is not expressly contemplated in HERA, which makes it different than the express statutory power to place the companies in *California Housing* and *Golden Pacific* into conservatorship that placed investors on notice that such an event may occur. *Golden Pacific*, 15 F.3d at 1069 (citing 12 U.S.C. §§ 191, 1821); *California Housing*, 959 F.2d at 956 (discussing 12 U.S.C. §§ 1441, 1464). Investors also could not have expected the Net Worth Sweep's diversion of the Companies' assets to the Government because no conservator, in any industry, has ever implemented such a measure, and it is contrary to FHFA's own explanation of

---

[19] *See also Horne v. Department of Agric.*, 135 S. Ct. 2419, 2430 (2015) (rejecting argument that physical seizure of raisins "is not a taking because raisin growers voluntarily choose to participate in the raisin market"); *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 998 (1984) (holding that plaintiff's trade secret qualified as private property despite extensive federal regulation of pesticide industry); *Cienega Gardens*, 331 F.3d at 1334 (finding that federal statutes preventing the prepaying of subsidized mortgages were a taking of private property despite heavy regulation of the federal housing program); *United Nuclear Corp. v. United States*, 912 F.2d 1432 (Fed. Cir. 1990) (taking found in highly regulated mining industry).

the conservatorship's purpose. *See* Fairholme ¶65 (FHFA assured Congress that "both the preferred and common shareholders have an economic interest in the companies," and that have "going forward there may be some value"). Because nothing in the regulatory background placed investors on notice that the Net Worth Sweep was a possibility, nothing forecloses Plaintiffs' cognizable property interest in their rights as Fannie and Freddie shareholders.

### D.     Plaintiffs Adequately Allege a *Per Se* Taking.

The Government argues that Plaintiffs have failed to state a direct *per se* takings claim because Plaintiffs only allege that the Government "frustrated performance of a private contract." But, as explained above, contract and charter-based rights qualify as a property interest for purposes of the Fifth Amendment. *See Innovair Aviation, Ltd. v. United States*, 72 Fed. Cl. 415, 420 (2006), *rev'd on other grounds*, 632 F.3d 1336 (Fed. Cir. 2011). Further, contrary to the Government's argument, the Supreme Court applies a *per se*, not regulatory, taking analysis whenever the Government seizes property for itself, whether that property interest be a small portion of real property, *see Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982), or intangible property, *see Armstrong v. United States*, 364 U.S. 40 (1960) (a boat lien). *See also Horne*, 135 S. Ct. at 2427-28 (reaffirming "the established rule of treating direct appropriation[s] of real and personal property alike"). When the Government appropriates even a small portion of property, that is a *per se*, or categorical, taking. *Innovair Aviation*, 72 Fed. Cl. at 422.

For example, the Supreme Court has held that it is a *per se* taking when the Government imposes a rule requiring interest on trust accounts to be paid to the Government and not to the private owners of the underlying funds. *See Brown v. Legal Found. of Wash.*, 538 U.S. 216, 235 (2003); *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 162 (1980). Likewise, it is a *per se* taking when the Government imposes a rule requiring all economic interest in Fannie and Freddie equity to be assigned to the Government notwithstanding the rights of junior shareholders.

48

The rights associated with shares of stock in a corporation are the private property of the owner of the security in the same way that interest payments on accounts are the private property of the owner of the account, and the Government is liable for a taking when it diverts the owners' rights to itself. *See Brown*, 538 U.S. at 235; *Webb's*, 449 U.S. at 162; *Koontz*, 133 S. Ct. at 614.

The Government's actions here are analogous to cases in which the Government has physically diverted water for Government or other use. In those cases, the courts have held that a *per se* taking has occurred. *See Casitas Mun. Water Dist. v. United States*, 543 F.3d 1276, 1289-90 (Fed. Cir. 2008); *Int'l Paper Co. v. United States*, 282 U.S. 399 (1931). Similarly, Plaintiffs' holdings here entitle them to an economic interest in Fannie and Freddie, which the Government is diverting to itself for its own use. That is a classic *per se* taking.

The Government does not and cannot explain how its seizure of private property for its own use is not a *per se* taking, nor cite a single case where a court has not applied a *per se* taking analysis to a situation in which the Government seized private property for itself.[20]

The Government invokes the line of cases derived from *Omnia Commercial Co. v. United States*, 261 U.S. 502 (1923), to argue that "a taking of contract rights occurs only if the Government appropriates a private contract for its own use by substituting itself for the private contractor." MTD 55. This is not the rule of *Omnia*. In *A&D Auto*, the Court explained that *Omnia* provides only that "government action directed to a third party does not give rise to a taking if its effects on the plaintiff are merely unintended or collateral." 748 F.3d at 1153-57. *See also Cienega Gardens*, 331 F.3d at 1335 ("*Omnia* refers to legislation targeted at some public benefit, which incidentally

---

[20] *Piszel v. United States*, 833 F.3d 1366 (Fed. Cir. 2016), is not on point. The plaintiff there alleged a taking resulting from a statute and regulation that barred payment of his "golden parachute" compensation upon termination. *See id.* at 1369-72. The Government did not divert the unpaid compensation payments to itself, so there was no *per se* taking.

affects contract rights, not…legislation aimed at the contract rights themselves in order to nullify them"); *Palmyra Pacific Seafoods LLC v. United States*, 561 F.3d 1361, 1370 (2009). *Omnia* thus does not apply because the Net Worth Sweep's diversion of Plaintiffs' rights was not "unintended or collateral" but the very purpose of implementing the sweep. Fairholme ¶¶117-18, 138, 146; Cacciapalle ¶¶86, 89. At any rate, through the Net Worth Sweep the Government did appropriate Plaintiffs' contractual rights for itself, satisfying the rule of *Omnia* even if it did apply.

> ### E. Plaintiffs Adequately Allege a Regulatory Taking.

> #### 1. Plaintiffs Adequately Allege a Categorical Regulatory Taking.

Government action can also qualify as a *per se* or categorical taking when the regulation "completely deprive[s] an owner of 'all economically beneficial use' of her property." *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005) (brackets omitted) (quoting *Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1019 (1992)); *see also Casitas Mun. Water Dist.*, 543 F.3d at 1288-89. This form of regulatory taking, alternatively known as the "total wipeout," applies to Plaintiffs' direct claims: the Net Worth Sweep eliminates all economic value associated with Plaintiffs' dividend and liquidation rights, and thus constitutes a "total wipeout" under *Lucas*.[21]

The Government's argument that "plaintiffs allege no plausible scenario in which the Third Amendment wiped out [their shareholder contract] rights[,]" MTD 60, ignores that the Net Worth Sweep transferred to the Government all rights and value Plaintiffs had with respect to the Companies' accumulated capital and net worth, including through future dividends or liquidation payments. *See* Cacciapalle ¶¶9, 57, 61, 65, 68, 73, 76. And while the Government notes that

---

[21] The Government's suggestion that it is "unsettled" whether this categorical taking doctrine can apply to property other than real property, MTD 59, is without merit, as the Federal Circuit has applied the doctrine to personal property. *Maritrans v. United States*, 342 F.3d 1344, 1353-54 (Fed. Cir. 2003) (applying *Lucas* doctrine to takings claim involving a boat); *Rose Acre Farms, Inc. v. United States*, 373 F.3d 1177, 1196-98 (Fed. Cir. 2004) (chickens).

Plaintiffs still own and can trade their shares of stock, MTD 60, that is irrelevant to Plaintiffs' claim that they have suffered a total wipeout of their dividend, residual, and liquidation rights. As Plaintiffs allege, the only "beneficial use" they can make of their shares is to sell them for a value "that depends on the Net Worth Sweep being invalidated by the courts or Congress—or from a court awarding damages or just compensation for the Net Worth Sweep." Cacciapalle ¶9. While the Net Worth Sweep persists, the value of Plaintiffs' economic rights is, and will continue to be, zero because the Net Worth Sweep ensures that "every dollar of earnings that Fannie Mae and Freddie Mac generate" goes to the Government. Cacciapalle ¶¶57, 65, 73; Rafter ¶¶70-71. Plaintiffs thus allege a "total wipeout" under *Lucas*.

The Government also argues, both here and under the *Penn Central* analysis, that "plaintiffs cannot show that their 'economic interests' in [the Companies'] stock were worth more in the regulatory environment that existed before the [Net Worth Sweep] than they were after." MTD 60. *See also id.* at 62-63. But before the Net Worth Sweep, Plaintiffs had an economic interest in two highly profitable companies. Now they have nothing. *See, e.g.*, Fairholme ¶110.

In a vain attempt to support its argument, the Government points to the suspension of dividends at the outset of conservatorship and the PSPAs' requirement that Treasury approve dividends to other shareholders. But these facts support Plaintiffs' argument that there was value in the private shares before the Net Worth Sweep. Indeed, even as FHFA temporarily suspended dividend payments, it made clear that it *was not* permanently depriving the shares of all value. As FHFA's then-Director told Congress, "both the preferred and common shareholders have an economic interest in the companies" and that "going forward there may be some value" in that interest. Fairholme ¶65. After the Net Worth Sweep, that value was gone.

The structure of Treasury's original investment also demonstrates the continued value of

Plaintiffs' shares. A key component of that investment was Treasury's right to purchase 79.9% of the common stock of each Company. As Treasury noted when entering the PSPAs, the warrants "provide potential future upside to the taxpayers." Fairholme ¶73; Rafter ¶46. But the Government could not realize that potential future upside unless Treasury approved dividends to other shareholders. That is because Treasury could only receive dividends on common shares if the Companies also paid dividends to the junior preferred shareholders and to the holders of the other 20.1% of the common shares. The Net Worth Sweep changed a structure in which Treasury *shared* in the Companies' economic upside to one in which Treasury *took it all for itself*. The notion that these two structures were economically equivalent for other shareholders is ludicrous.

The Government also asserts that "plaintiffs cannot show that their liquidation preference had value but for the adoption of the Third Amendment" because "plaintiffs do not allege a but-for scenario in which the [Companies] would have had a surplus to distribute to private shareholders after payment of Treasury's senior liquidation preference." MTD 61, 63. But Plaintiffs' allege precisely that "the Companies' return to robust profitability and the stable recovery of the housing market showed in early 2012 that the Companies could in time *redeem Treasury's Government Stock* and that value remained in their Preferred Stock and Common Stock." Fairholme ¶96 (emphasis added); *see also id.* ¶110. And events since the Net Worth Sweep have proven the plausibility of these allegations. Indeed, had the Companies used the dividends they have paid Treasury above the prior 10% amount to instead pay down Treasury's liquidation preference, they would have paid down all but $2.1 billion of that preference. *See* Fairholme ¶126.

### 2.    Plaintiffs Adequately Allege a Regulatory Taking Under *Penn Central*.

Plaintiffs also satisfy the "ad hoc" regulatory taking framework set forth in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104 (1978). The *Penn Central* taking analysis is appropriate where Government regulation decreases the value of property or prevents the owner

from making some use of it. In those cases, courts look to a number of "essentially ad hoc, factual inquiries," such as the "economic impact of the regulation on the claimant and, particularly, the extent to which the regulation has interfered with distinct investment-backed expectations," as well as the character of the action and the nature and extent of the interference with the claimant's rights. *Id.* at 124, 130. Consideration of the *Penn Central* factors demonstrates that Plaintiffs have stated a claim for a regulatory taking.

First, the economic impact of the Net Worth Sweep is massive. Since the Companies began paying dividends under the Net Worth Sweep during the first quarter of 2013, they have transferred to the Government roughly $230 billion in dividends—over $120 billion more than the Government could have received under the original PSPAs. *See* FHFA, Table 2: Dividends on Enterprise Draws from Treasury, https://goo.gl/QQpFDY. Altogether, the Government has recouped over $95 billion more than it disbursed to the Companies. *See id.*; FHFA, Table 1: Quarterly Draws on Treasury Commitments to Fannie Mae and Freddie Mac Per the PSPAs, https://goo.gl/MjVakc. The enormous economic impact of the Net Worth Sweep weighs heavily in favor of the occurrence of a taking under *Penn Central*.

Second, Plaintiffs had reasonable investment-based expectations. "[T]he investment-based expectation criterion 'limits recovery to owners who can demonstrate that they bought their property in reliance on the non-existence of the challenged regulation.'" *Norman v. United States*, 63 Fed. Cl. 231, 262 (2004). This criterion is easily satisfied here. No holder of stock reasonably could have expected the Government to appropriate all equity interest for the benefit of Treasury, effectively nationalizing the Companies, without paying stockholders any compensation. Indeed, such an action is unprecedented in the history of the Nation. Plaintiffs would never have bought their shares had they reasonably expected that the Government would first provide financial

support based on one very specific agreement, and then, once the Companies returned to profitability, unilaterally change the terms of that agreement to expropriate all the value that would otherwise go to shareholders. Cacciapalle ¶¶55, 80-81, 83-84.[22]

The Government's argument that "Fannie Mae and Freddie Mac shareholders could not have had a reasonable investment-backed expectation that these highly regulated Enterprises would not be placed into and operated in conservatorship," MTD 64, is irrelevant because Plaintiffs' claim is based on the Net Worth Sweep, not the conservatorship. Moreover, both HERA and prior conservatorship and receivership regimes contain priority schemes that expressly tell shareholders that if the seized financial institution ends up having positive value after paying all creditors and claimants, that positive value will inure to shareholders, not to the Government. *See* 12 U.S.C. §§ 4617(b)(2)(K)(i), 4617(c)(1); *see also id.* § 1821(d)(ii).

The Government makes much of the fact that that the "certificates advised shareholders that dividends are declared and paid at the 'sole discretion' of the Boards of Directors and therefore, the conservator." MTD 65. But that is true of every corporation—dividends are declared at the discretion of the board of directors. Cacciapalle ¶¶81-82. And the Certificates in no way advised shareholders that there was a reasonable possibility, or any possibility, that the Government would forever foreclose them from sharing in the profitability of the Companies. "Nothing in the certificates would allow the Plaintiffs reasonably to expect the Net Worth Sweep." *Fairholme Funds, Inc.*, 2018 WL 4680197, at *10.

Third, consideration of the nature and character of the Government action requires that the

---

[22] Statements that the conservatorship would not be "managed with a strategy to maximize common shareholder returns," MTD 66, confirmed (or at least did not contradict) Plaintiffs' reasonable investment-backed expectations that the Government would not *expropriate* their property.

Court "consider the nexus between the regulation and its effects, looking at 'the relative benefits and burdens associated with the regulatory activity …. In doing so, the court reviews '[t]he purposes served, as well as the effects produced, by a particular regulation [to] inform the takings analysis.' " *Resource Invs., Inc. v. United States*, 85 Fed. Cl. 447, 517 (2009) (second and third alterations in original) (citations omitted).

The nature of the Government's action here is simple: it is a pure money grab, seizing for the Government the property rights of private shareholders. As alleged in the various Complaints, the Net Worth Sweep ensures that no matter how profitable the Companies become, the private shareholders will *never* be allowed to receive *any* value. *E.g.*, Cacciapalle ¶¶12, 72-73, 86. This weighs heavily in favor of finding a taking. While the Government argues that it was the Treasury that provided the financing to help bring the Companies back to financial health, and therefore private shareholders should not benefit, MTD 67, this ignores that Treasury entered into a very specific agreement governing the Government Stock that guaranteed it extraordinarily favorable terms: a 10% cumulative dividend for every dollar invested, *plus* an additional $1 billion, *plus* the right to buy 79.9% of the common stock for a nominal price. Cacciapalle ¶¶5, 38. Once the housing market rebounded and the Companies returned to profitability in 2012, the Government stood to make *tens of billions of dollars* in profits on its investment without changing the PSPAs at all. *Id.* ¶¶47-54. But not content with these astronomical returns, the Government imposed the Net Worth Sweep to ensure that it received *everything* and private shareholders would get *nothing*. Moreover, unlike the initial PSPAs, the Government provided *no new investment in* the Companies for its taking. The Government has already received billions more than it provided to the Companies, and it will continue reap additional billions *forever*, while the private shareholders will never receive anything. There could hardly be a clearer taking.

**V.      Plaintiffs Have Alleged Viable Illegal Exaction Claims.**

An "illegal exaction" claim can proceed when "the plaintiff has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum" that "was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation." *Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996). "To put it bluntly, 'an illegal exaction has occurred when the Government has the citizen's money in its pocket.' " *Makowiec v. United States*, 137 Fed. Cl. 591, 594 (2018). The "necessary remedy … is a return of that sum." *Virgin Islands Port Auth. v. United States*, 136 Fed. Cl. 7, 14 (2018).

Plaintiffs plead both derivative and direct illegal exaction claims. They allege that the Government exacted billions in cash from the Companies and Plaintiffs' economic interest in the Companies through the Net Worth Sweep that was unlawful under HERA, FHFA's capital distribution rules, and the Constitution. Because the exaction claims plead that the Government exacted money "directly" from the Companies and economic interests "in effect" from the Plaintiffs through the Net Worth Sweep that exceeded its legal authority, and because a remedy is "necessarily provided" under applicable law, the Government's motion to dismiss the exaction claims, *see* MTD 69, must be rejected.

**A.      The Complaints Expressly Plead Exaction of Money and Economic Interests.**

**1.      The Derivative Claims Plead an Exaction of Billions in Cash.**

The Government argues that "the complaints" do not "identify … money … paid directly to the United States." MTD 70. But Plaintiffs' derivative exaction claims allege that "the Government has exacted *cash payments* from Fannie Mae" amounting to "over $77 billion to date" through "improper conduct" constituting "an illegal exaction of Fannie Mae's money without due process." Rafter ¶¶131-32 (emphasis added). In the Government's own words: the Net Worth Sweep takes "*every dollar of earnings* each firm generates," Fairholme ¶¶204, 214 (emphasis

added), and "[o]ver time, [the Net Worth Sweep] will result in *all comprehensive income generated by the GSEs being paid to the government.*" Rafter ¶83 (second alteration in original) (emphasis added); *see also id.* ¶¶78, 81, 84, 87. Because the Government used the Net Worth Sweep to exact billions of Fannie's and Freddie's net worth, to date, there can be no dispute that the Government has the Companies' "money in its pocket." *Makowiec*, 137 Fed. Cl. at 594.

### 2.    The Direct Claims Adequately Plead an Exaction of Shareholders' Economic Interests.

The Government argues that Plaintiffs' direct exaction claims fail to identify either "money that they paid directly to the United States" or "costs incurred by shareholders that the United States otherwise would have had to pay itself." MTD 70. But it is well-settled that an "illegal exaction claim may be maintained when 'the plaintiff has paid money over to the Government, directly *or in effect*, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.' " *Aerolineas Argentinas*, 77 F.3d at 1572-73 (emphasis added) (quoting *Eastport S.S. Corp. v. United States*, 178 Ct. Cl. 599, 605 (1967)). Indirect payments unlawfully obtained by the Government are therefore adequate to support an exaction claim.

Plaintiffs' direct exaction claims satisfy this standard. As the Complaints allege, the Net Worth Sweep has the effect of placing the Plaintiffs' property rights and money in the Government's pocket by foreclosing any payments to which Plaintiffs are otherwise entitled— either as dividends or as a liquidation payment—and redirecting money that would have gone to Plaintiffs to the Government. *See* Cacciapalle ¶¶141, 144; Fairholme ¶195; Arrowood ¶141. But for the Net Worth Sweep, Plaintiffs would have an economic interest in Fannie and Freddie.

The Government tries to avoid these allegations by urging this Court to limit payments to "the Government … in effect," *Aerolineas Argentinas*, 77 F.3d at 1572, to situations where the

Government requires "a plaintiff to incur a cost that the Government otherwise would have had to pay itself." MTD 69. But none of the Government's cases supports this limitation, and it is contrary to the principle that "'illegal exaction' is not strictly construed." *Fireman v. United States*, 44 Fed. Cl. 528, 536 (1999). *Aerolineas Argentinas* shows that *one way* an indirect exaction occurs is when the Government forces a plaintiff to pay a cost the Government was required to pay. 77 F.3d at 1568. But other cases show that indirect exactions can take other forms. For example, *Camellia Apartments, Inc. v. United States*, 167 Ct. Cl. 224 (1964), cited by the Government, *see* MTD 69, shows that "in effect" exactions also occur when the Government unlawfully requires a plaintiff to pay money to a third party that then transmits that money to the Government. *Camellia Apartments*, 167 Ct. Cl. at 226 (explaining that the alleged exaction involved Plaintiffs paying the sums at issue "to their respective mortgagees, who transmitted them to the FHA"). *See also Fireman*, 44 Fed. Cl. at 530, 535-37 (holding that an exaction occurred where the Government received the money indirectly from a political campaign that voluntarily gave the plaintiff's money to the Government). Here, allegations that the Government received the Plaintiffs' assets indirectly through the Companies' Net Worth Sweep payments to Treasury pleads an "in effect" exaction.

### B. The Exactions Effected by the Net Worth Sweep Are Illegal.

The Complaints provide detailed allegations to show that the Agencies exceeded their authority—under HERA, its rules, and the Constitution—when they executed the Net Worth Sweep. MTD 70-71.[23] The Government argues that Plaintiffs do not "identify … illegal conduct," MTD 69, based solely on its conclusory assertion that "rulings in *Perry Capital* demonstrate that FHFA and Treasury acted within the scope of their HERA authority." MTD 71. But this perfunctory assertion cannot overcome allegations which refute the virtually unfettered authority

---

[23] *See, e.g.*, Rafter ¶¶82-92, 121-33; Fairholme ¶¶206-10, 216-20; Cacciapalle ¶¶95-100.

the Agencies claim for themselves under HERA. The Government also ignores other violations alleged in the Complaints that were not addressed by *Perry*. Because the exaction claims are supported by allegations identifying the Government's illegal conduct, the Government's motion to dismiss for failure to "properly allege anything 'illegal'" must be denied. *Id.*

### 1.    FHFA Exceeded Its Statutory Authority Under HERA.

FHFA—like any federal agency—is restrained by the four corners of its enabling statute: "an agency literally has no power to act ... unless and until Congress confers power upon it.'" *FAG Italia S.p.A. v. United States*, 291 F.3d 806, 816 (Fed. Cir. 2002) (quotation marks omitted) (quoting *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)). HERA authorized FHFA to act as a conservator—that is, to conserve the Companies' assets and restore them to a sound financial condition. *See* 12 U.S.C. § 4617(b)(2)(D); *Collins*, 896 F.3d at 678-79 (Willett, J., dissenting). HERA did not authorize FHFA to engage in a sham transaction that gave Treasury all of the Companies' future profits and their net worth in perpetuity, "in exchange for no investment and no meaningful consideration at a time when the GSEs were highly profitable." *Fairholme Funds, Inc.*, 2018 WL 4680197, at *12 (Lamberth, J.).

If Congress had intended to give FHFA the power, as conservator, to strip their assets and effectively nationalize the Companies, it would have done so expressly—and replaced the numerous provisions in the Charter Acts providing for continued private ownership, *see* 12 U.S.C. §§ 1453, 1455(*l*)(l)(A)-(C), 1718, 1719(g)(1)(A)-(C)—not hidden that authority in all of the provisions describing FHFA's authority to conserve their assets. "Congress could not have intended to delegate a decision of such economic and political significance to an agency in so cryptic a fashion." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 160 (2000); *see also Perry II*, 864 F.3d at 643 (Brown, J., dissenting). Even FHFA has recognized that "[b]y law, the conservatorships are intended to rehabilitate the Enterprises as private firms," but other reforms

59

require "assistance [from] Congress." Rafter ¶62. *See also* Fairholme ¶49.

Rather than engaging with Plaintiffs' allegations, the Government conclusorily asserts that the Net Worth Sweep was legal because two judges in *Perry II* determined that "FHFA's execution of the Third Amendment falls squarely within its statutory authority to '[o]perate the [Companies],' … to 'reorganiz[e]' their affairs, … and to 'take such action as may be … appropriate to carry on the[ir] business'" under HERA. MTD 71 (quoting *Perry II*, 864 F.3d at 607) (citations omitted). This cursory invocation of one non-binding decision "do[es] not amount to a developed argument" and waives any "arguments not raised." *SmithKline Beecham*, 439 F.3d at 1319-20. In any event, *Perry II* is not dispositive on whether FHFA exceeded its statutory authority, by adopting the Net Worth Sweep, in this case.

First, *Perry II*—which was decided under the extremely limited review permitted by HERA's anti-injunction provision—only concluded that the Net Worth Sweep fell within FHFA's conservator powers by treating it as an ordinary business decision, for the benefit of the Companies, entitled to deference. For example, *Perry II* stated that "the Third Amendment's redirection of dividends to Treasury came in exchange for a promise of continued access to necessary capital free of the preexisting risk of accumulating more debt simply to pay dividends to Treasury." 864 F.3d at 610-11. But the allegations here show that the Companies did not receive *and never could have received* any meaningful consideration or benefit from the Net Worth Sweep;[24] *and* that the Government knew that to be the case and adopted the Net Worth Sweep *specifically* to harm the Companies and their shareholders.[25]

Similarly, *Perry II*, 864 F.3d at 612, suggested that one reason FHFA *could* have authorized

---

[24] *See, e.g.*, Rafter ¶¶72-74; Fairholme ¶¶114-15.
[25] *See, e.g.*, Rafter ¶¶58-62, 67-68, 76, 82-86, 90-92; Fairholme ¶¶116-140.

the Net Worth Sweep was concern about a downward spiral of debt. But, tellingly, the Government does not raise its debt spiral argument here—because the argument has been conclusively refuted by discovery and Plaintiffs' allegations.[26] The discovery in this action shows what *Perry II* ignored: that the Government did not adopt the Net Worth Sweep because the Companies would need to borrow money from Treasury; *it adopted it because the Companies were so profitable that they would no longer need to do so*. *See, e.g.*, Fairholme ¶14; Rafter ¶12.

Second, *Perry II* wrongly concluded that HERA's provisions delineating FHFA's permissive authority as conservator did not impose an obligation to conserve the Companies' assets because the word "*may*" gave FHFA the free rein to do as it pleased. 864 F.3d at 606-07 (emphasis added). *Perry II*'s analysis contradicts: (1) the well-established rule that the word "may" does not suggest that what follows is optional where the mandatory nature of the duties is an "obvious inference[ ] from the structure and purpose of the statute," *United States v. Rodgers*, 461 U.S. 677, 706 (1983); (2) the background law of conservatorship, which Congress relied on when it drafted HERA, *see Perry II*, 864 F.3d at 639-43 (Brown, J., dissenting) (describing common law and FIRREA conservatorships on which HERA was modeled); and (3) FHFA's own repeated admission that it had an obligation under HERA to "preserve and conserve" the Companies' assets and to put them "in a sound and solvent condition." *See* Rafter ¶¶35, 44, 60, 61 (collecting citations). *Perry II*'s expansive reading also violates the non-delegation doctrine, which requires delegations of authority to be constrained by guiding principles. *See United States v. Guzman*, 591 F.3d 83, 93 (2d Cir. 2010), *as amended*, (Jan. 8, 2010) (Congress must give "the delegated authority's recipient an 'intelligible principle' to guide it").

Third, *Perry II* also badly misread HERA's incidental powers provision—which refers to

---

[26] *See, e.g.*, Rafter ¶¶72-73; Fairholme ¶¶141-46.

FHFA considering "the best interests of … the Agency," 12 U.S.C. § 4617(b)(2)(J). *Perry II* held

that under the provision, FHFA had unlimited power to consider "public" and "governmental"

interests, including the benefits of taxpayers when making fundamental decisions for the

Companies. *Perry II*, 864 F.3d at 608. But Congress "does not alter the fundamental details of a

regulatory scheme in vague terms or ancillary provisions" by "hid[ing] elephants in mouseholes."

*Whitman v. American Trucking Ass'ns*, 531 U.S. 457, 468 (2001). *Perry II*'s expansive reading of

the incidental powers provision is refuted by HERA's plain language, which indicates that it

*restricts* the authorities otherwise granted to FHFA as conservator. FHFA as conservator, the

provision says, may "take any action *authorized by this section*, which the Agency determines is

in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphasis

added). The provision therefore requires FHFA to make a best-interests determination before

taking action authorized elsewhere in HERA.

Finally, *Perry II* ignored the rule that where one reading of a statute would raise "serious

constitutional difficulties," the statute "can and should be read to avoid these difficulties." *Coit*

*Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp.*, 489 U.S. 561, 579 (1989). Reading HERA to

permit the conservator to strip the Companies of their assets raises constitutional difficulties about

whether Congress intended to authorize FHFA to take shareholders' private property without

compensation or to violate the Supreme Court's admonition that, once it issues a corporate charter,

Congress cannot "take away property already acquired under the operation of the charter, or …

deprive the corporation of the fruits actually reduced to possession of contracts lawfully made."

*Bowen*, 477 U.S. at 54-55. FHFA's powers should be read narrowly to avoid those difficulties.

### 2.     Treasury Exceeded Its Statutory Authority Under HERA.

After December 31, 2009, Treasury's authority to purchase securities under HERA

expired, and HERA limited Treasury to "hold[ing]," "sell[ing]," or "exercis[ing] any rights" it had

received in connection with its prior purchases of the Companies' securities. 12 U.S.C. § 1719(g)(2)(D). However, as the Complaints allege:

- Treasury entered into the Net Worth Sweep over two and a half years after its authority to do so under HERA expired, and despite knowing that its "ability to make further changes [to the PSPAs was] constrained" after December 31, 2009. *See* Rafter ¶¶55, 130; Fairholme ¶¶71, 84, 197; Cacciapalle ¶¶44, 100.

- Treasury did not make the required "determination" that the Net Worth Sweep was "necessary" to "provide stability" and "prevent disruptions" in the markets, "[taking] into consideration," the Companies' continued operation "as a private shareholder-owned company" and "plan[ning] for the orderly resumption of private market funding or capital market access." 12 U.S.C. §§ 1455(*l*)(1)(B)-(C), 1719(g)(1)(B)-(C). Nor could Treasury have made such a determination, since the Net Worth Sweep was implemented *to prevent* the Companies' return to private ownership. *See* Rafter ¶¶128-29; Fairholme ¶¶116-40; Cacciapalle ¶40.

- The Net Worth Sweep was not permitted under HERA's provision allowing Treasury to "exercise any rights received in connection with" the Companies' securities. 12 U.S.C. § 1719(g)(2)(D). Because Treasury lacked legal authority unilaterally to require FHFA to agree to the Net Worth Sweep, Treasury's agreement to the Net Worth Sweep was not the "exercise" of a "right." *See United States v. Petty Motor Co.*, 327 U.S. 372, 380 n.9 (1946) (an agreement that depends on the parties' subsequent "mutual consent" "does not add to their rights"); 1 E. ALLEN FARNSWORTH, FARNSWORTH ON CONTRACTS § 3.4, at 205 n.3 (3d ed. 2004) (a party has a contractual "right" when it "can initiate legal proceedings that will result in coercing" the other party to act). Fairholme ¶71.

Rather than dispute the adequacy of these allegations, or the illegality of Treasury's

conduct, the Government proclaims that the issue of Treasury's authority under HERA has already been determined in its favor, citing *Roberts* and *Perry I*. MTD 71. The portion of *Roberts* that the Government relies on, however, is *dicta*: The court declined to grant relief against Treasury *on other grounds*, concluding that the injunctive relief sought against Treasury, as FHFA's "counterparty," "would fundamentally 'affect' [FHFA's] conservatorships of Fannie and Freddie and so would run afoul of section 4617(f)." *Roberts v. FHFA*, 889 F.3d 397, 406 (7th Cir. 2018). And *Perry II* adopted the same reasoning, without addressing Treasury's statutory authority. 864 F.3d at 615.

The Government does not advance—and thus has waived, *see SmithKline Beecham*, 439 F.3d at 1319—any arguments as to why the *Roberts dicta* or reasoning in *Perry I* not adopted by the D.C. Circuit should be considered persuasive. They are not. For example, *Perry I* did not identify the statutory authority under which Treasury supposedly could modify the terms of the PSPSA. *See* 70 F. Supp. 3d at 224. And it reasoned that Net Worth Sweep is not a new security purchase subject to Treasury's limitations under Section 1719(g)(1)(a), in part because FHFA asserted the now discredited argument that the Net Worth Sweep was designed to prevent "a downward spiral of repaying *preexisting obligations*." *Id.* at 224 (emphasis in original) (quoting FHFA's motion). In any event, *Roberts* expressly declined to address arguments that Treasury used the Net Worth Sweep to illegally expropriate property, stating that "the Court of Federal Claims" "is the proper forum for such a case." *Roberts*, 889 F.3d at 407; *see also Perry II*, 864 F.3d at 614 (HERA "does not prevent either constitutional claims (none are raised here) or judicial review through cognizable actions for damages").

### 3. The Exaction Claims Are Supported By Other Violations.

The Government's motion to dismiss also ignores allegations in the Complaints that demonstrate the illegality of the Net Worth Sweep, but that were not addressed by *Perry* or

*Roberts*. These allegations—based on FHFA's dereliction of its capital distribution regulations, and on the Constitution—provide additional and uncontested grounds to reject the Government's argument that Plaintiffs fail to properly allege illegal acts in support of their exaction claims.

### a.    The Net Worth Sweep Violated FHFA's Regulations.

Plaintiffs allege, and the Government does not dispute, that the exaction effected by the Net Worth Sweep was illegal under HERA implementing rules providing that "a regulated entity shall make no capital distribution while in conservatorship." 12 C.F.R. § 1237.12(a). The rules define "capital distribution" to include "[a]ny dividend or other distribution in cash or in kind made with respect to any shares of, or other ownership interest in, an Enterprise, except a dividend consisting only of shares of the Enterprise," *id.* § 1229.13(1)—which would include the Net Worth Sweep. *See, e.g.*, Rafter ¶¶89, 123. This limitation was not addressed in *Perry*, *Roberts*, or any other case cited by the Government.

The Net Worth Sweep does not fall within exceptions to the capital distribution ban stated in § 1237.12(b), which grants the Director discretion to authorize a distribution that would: (i) "enhance the ability of the regulated entity to meet [its] risk-based capital level and the minimum capital level," (ii) "contribute to the long-term financial safety and soundness of the regulated entity," (iii) serve the "interest of the regulated entity," or (iv) serve the "public interest."[27] *Id.* § 1237.12(b)(1)-(4); *see* Rafter ¶124. The Net Worth Sweep is inimical to each of these purposes because it strips the Companies of their capital. In adopting the capital distribution rule in 2011, FHFA explained that "allowing capital distributions to deplete the entity's conservatorship assets

---

[27] The limits on FHFA's authority cannot be dispensed under the "public interest" exception in Section 1237.12(b)(4). As the Supreme Court has explained, "in order to give content and meaning to the words 'public interest' as used in [a rule], it is necessary to look to the purposes for which the [rule] w[as] adopted." *Nat'l Ass'n for Advancement of Colored People v. Fed. Power Comm'n*, 425 U.S. 662, 669 (1976). The term "public interest" in the capital distribution rule refers to the stated purpose of the rule: conserving the Companies' assets and continuing their operations.

would be inconsistent with the agency's statutory goals." Conservatorship and Receivership, 76

Fed. Reg. 35,724, 35,727 (June 20, 2011). Because the Net Worth Sweep runs afoul of the capital

distribution ban stated in § 1237.12(b), it is illegal. *See* Rafter ¶¶78-81, 124.

### b.   The Net Worth Sweep Violated the Constitution.

Plaintiffs also allege, and the Government does not dispute, that the Net Worth Sweep is

unauthorized because FHFA is in violation of constitutional separation of powers principles. *See,*

*e.g.*, Fairholme ¶¶198-201; *see Collins v. Mnuchin*, 896 F.3d 640, 659-75 (5th Cir. 2018).

### C.   This Court Has Jurisdiction Over Plaintiffs' Exaction Claims.

The Government errs when it asserts that Plaintiffs must show that HERA is money-

mandating to bring their illegal exaction claim. MTD 67-68. Tucker Act jurisdiction encompasses

"three types" of "monetary claims": (1) "claims alleging the existence of a contract between the

plaintiff and the government;" (2) "illegal exaction" claims "where 'the plaintiff has paid money

over to the Government, directly or in effect, and seeks return of all or part of that sum'"; and (3)

"claims where 'money has not been paid but the plaintiff asserts that he is nevertheless entitled to

a payment from the treasury.'" *Ontario Power Generation, Inc. v. United States*, 369 F.3d 1298,

1301 (Fed. Cir. 2004). In *Ontario*, the Federal Circuit emphasized that *only* claims in the "third

category, *where no payment has been made to the government*, either directly or in effect, require

that the 'particular provision of law relied upon grants the claimant, expressly or by implication, a

right to be paid a certain sum,'" explaining that "[t]his" is the "category … commonly referred to

as claims brought under a 'money-mandating' statute." *Id.* (emphasis added).

Accordingly, "[i]n the context of an illegal exaction, the court has jurisdiction regardless

of whether the provision relied upon can be reasonably construed to contain money-mandating

language." *Figueroa v. United States*, 57 Fed. Cl. 488, 496 (2003).[28] Even the Government has

insisted elsewhere that it is "incorrect" to argue that "a money-mandating statute is necessary for

jurisdiction under the Tucker Act." *Kentera* Br. 7.[29] As the Government emphasized in *Kentera*,

*id.*, the Supreme Court has recognized that a Tucker Act claim requires a statute to be money-

mandating only where "the plaintiff is not suing for money improperly exacted or retained." *United*

*States v. Testan*, 424 U.S. 392, 401-02 (1976); *see also Aerolineas Argentinas*, 77 F.3d at 1579

("A claimant must rely either on a statute that mandates payment of money from the government

to the claimant or on an illegal exaction, that is, a payment to the government by the claimant that

is obtained without statutory authority.").

The Government cites *Norman v. United States*, 429 F.3d 1081 (Fed. Cir. 2005), for the

proposition that plaintiffs need to identify a money-mandating statute. MTD 69, 70. But *Norman*

did not involve a transfer of property to the Government, and the panel decision in that case—

which does not even use the term "money-mandating"—should not be read as overturning the

many cases in which courts have said that no money-mandating statute is required when the

plaintiff has paid money over to the government and seeks its return.

Even if it were to apply, *Norman* at most requires only that illegal exaction claimants

"demonstrate that the statute or provision causing the exaction itself provides, either expressly or

by 'necessary implication,' that 'the remedy for its violation entails a return of money unlawfully

exacted.'" 429 F.3d at 1095. That is a much lower standard than the money-mandating requirement

---

[28] *See also, e.g.*, *Virgin Islands Port Auth.*, 136 Fed. Cl. at 14-15; *N. Cal. Power Agency v. United States*, 122 Fed. Cl. 111, 116 (2015); *Auto Club Ins. Ass'n v. United States*, 103 Fed. Cl. 268, 273 (2012); *Bowman v. United States*, 35 Fed. Cl. 397, 401 (1996); *Eastport S.S. Corp. v. United States*, 372 F.2d 1002, 1008 (Ct. Cl. 1967).

[29] *See also Kentera v. United States*, 2017 WL 401228, at *5 (E.D. Wis. Jan. 30, 2017) (noting Government's argument that "*either a money-mandating statute or an illegal exaction, but not both, are required to bring a claim in the Court of Federal Claims*") (emphasis added).

that the Government purports to require. MTD 70.

Plaintiffs' exaction claims clearly meet that standard. Indeed, this Court has repeatedly held that the "necessary remedy" for statutes under which the Government unlawfully exacts money must be a "return of that sum." *Virgin Islands Port Auth.*, 136 Fed. Cl. at 14.

For example, *Northern California Power*, 122 Fed. Cl. at 116, explained that, "by necessary implication, the remedy [for a violation of the Central Valley Project Improvement Act] would be a return of the payments" improperly assessed. The Court reasoned that the absence of an "express" statutory remedy "does not defeat [the] illegal exaction claim" because "[o]therwise, the Government could assess any fee or payment it wants from a plaintiff acting under the color of a statute that does not expressly require compensation to the plaintiff for wrongful or illegal action by the Government, and the plaintiff would have no recourse for recouping the money overpaid." *Id.*

Similarly, in *Starr I*, this Court found that a return of illegally exacted property was the "necessary implication" of the Federal Reserve Act although it did "not contain express 'money-mandating' language," stating:

> [W]here the Government has imposed unlawful conditions in connection with an emergency loan under Section 13(3) of the Federal Reserve Act, the Government should not be permitted to insulate itself from liability by arguing that Section 13(3) is not "money-mandating." If this were true, the Government could nationalize a private corporation, as it did to AIG, without fear of any claims or reprisals.

121 Fed. Cl. at 465.[30] *See also Kipple v. United States*, 102 Fed. Cl. 773, 777 (2012); *Greene v. United States*, 124 Fed. Cl. 636, 641 (2015).

The concerns animating these decisions—that a refund remedy must be implied so that a

---

[30] In *Starr II*, Judge Wallach argued that illegal exaction plaintiffs should be required to plead a money-mandating statute. 856 F.3d at 976-78 (Wallach, J., concurring-in-part and concurring-in-the-result). The majority (Chief Judge Prost and Judge Reyna) declined to join his attempt to overrule existing precedent to the contrary.

wrong cannot go uncompensated—apply even more strongly to HERA. Because the Government has successfully argued in other courts that Treasury cannot be enjoined from violating HERA when it contracts with FHFA, *see, e.g.*, *Perry II*, 864 F.3d at 615-16, a monetary remedy is necessary to address the Government's unlawful conduct. As Judge Wald explained in *National Trust for Historic Preservation in U.S. v. F.D.I.C.*, 21 F.3d 469, 472-73 (D.C. Cir. 1994) (Wald, J., concurring), it would be constitutionally suspect for Congress to bar all judicial review, including injunctive relief *and* any right to damages claims, for unlawful conduct. Since HERA expressly prevents *injunctive* relief against the Government's unlawful acts, it stands to reason that the statute implicitly authorizes the alternative remedy: a return of unlawfully exacted funds. *See Ventas, Inc. v. United States*, 381 F.3d 1156, 1161 (Fed. Cir. 2004) ("Where Congress includes certain exceptions in a statute, the maxim *expressio unius est exclusio alterius* presumes that those are the only exceptions Congress intended."); *see also Perry II*, 864 F.3d at 613-14 (rejecting dissent's concerns by emphasizing that HERA does not bar "constitutional claims" or "judicial review through cognizable actions for damages").

### D.     Plaintiffs' Illegal Exaction Claims Do Not Sound in Tort.

The Government's argument that Plaintiffs' illegal exaction claims fall outside this Court's jurisdiction because they sound in tort is foreclosed by precedent. *See S. P.R. Sugar Co. Trading Corp. v. United States*, 334 F.2d 622, 626 (Ct. Cl. 1964); *Aerolineas Argentinas*, 77 F.3d at 1578; *Clapp v. United States*, 117 F. Supp. 576, 580 (Ct. Cl. 1954).

## VI.   Plaintiffs Have Alleged Viable Claims for Breach of Fiduciary Duty.

### A.     This Court Has Jurisdiction Over Plaintiffs' Fiduciary Duty Claims.

"[T]his court has Tucker Act jurisdiction over claims founded on a fiduciary duty the government owes an individual or group of citizens … if it is plain from the relevant statutes or regulations that the government has accepted such a responsibility." *Grady v. United States*, 2013

WL 4957344, at *3 (Fed. Cl. July 31, 2013) (citing *United States v. Mitchell*, 463 U.S. 206, 224 (1983); *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 174, 178 (2011)). The Government's argument that "[b]reach of fiduciary duty is generally classified as a tort," MTD 43 (citing *Newby v. United States*, 57 Fed. Cl. 283, 294 (2003)), and that the Tucker Act "cannot support claims sounding in tort," *id.*, is thus beside the point. Whether or not breach of fiduciary duty is *generally* considered a tort, where the fiduciary obligation arises from a statute or regulation that contemplates compensation for damages, this Court has jurisdiction. *See, e.g.*, *Fredericks v. United States*, 125 Fed. Cl. 404, 410-11 (2016). Because HERA gave rise to such fiduciary obligations, the claims for breach of those obligations are within the jurisdiction of this Court.

### B. Through FHFA's Conservatorship, the Government Undertook Fiduciary Duties to the Companies and Their Shareholders.

In *United States v. Mitchell*, 463 U.S. 206 (1983), the Supreme Court interpreted federal statutes and regulations granting the United States "comprehensive responsibilities . . . in managing the harvesting of Indian timber," *id.* at 222 (quotation marks omitted), to require the United States to act as a fiduciary for the benefit of Native Americans when exercising this authority. Key to the Court's analysis was its conclusion that "a fiduciary relationship *necessarily* arises when the Government assumes such elaborate control over forests and property belonging to Indians." *Id.* at 225 (emphasis added). "All of the necessary elements of a common-law trust are present," the Court reasoned: "a trustee (the United States), a beneficiary (the Indian allottees), and a trust corpus (Indian timber, lands, and funds)." *Id.*

The Court's reasoning in *Mitchell* squarely applies to the conservatorship here. As conservator, FHFA has been given comprehensive responsibilities in managing the Companies' assets. Upon its appointment as conservator FHFA "immediately succeed[ed] to … all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such

regulated entity with respect to the regulated entity and the assets of the regulated entity." 12 U.S.C. § 4617(b)(2)(A). A fiduciary relationship necessarily arises when the Government assumes such elaborate control over the assets of a private corporation. As in *Mitchell*, all of the elements of a common-law trust are present: a trustee (the United States, through FHFA as conservator), a beneficiary (the Companies and their shareholders), and a trust corpus (the Companies' assets).

The Government argues that other provisions of HERA foreclose any fiduciary relationship. But HERA's provisions *reinforce* FHFA's fiduciary responsibilities. First, Congress chose the word "conservator" to describe FHFA's role, and it authorized FHFA to "perform all functions of the regulated entity in the name of the regulated entity *which are consistent with the appointment as conservator*." 12 U.S.C. § 4617(b)(2)(B)(iii) (emphasis added). Congress did not choose this word at random; instead, it drew it from the statute governing the conservatorships of this Nation's banking institutions (FIRREA), which in turn drew it from "the long history of fiduciary conservatorships at common law baked into that statute." *Perry II*, 864 F.3d at 641 (Brown, J., dissenting). Conservators have always been understood to be fiduciaries.

Second, Congress entrusted FHFA as conservator with responsibilities that reinforce its role as a fiduciary. As conservator, FHFA is authorized to "take such action as may be . . . necessary to put the regulated entity in a sound and solvent condition" and "appropriate to carry on the business of the regulated entity and preserve and conserve the assets and property of the regulated entity." 12 U.S.C. § 4617(b)(2)(D). These responsibilities—preserving and conserving assets while rehabilitating to soundness and solvency—are at the core of what it means to be a fiduciary conservator. Indeed, the Supreme Court in *Mitchell* indicates that Congress drew on similar concepts in designing the statutory scheme at issue there: "Congress … sought to provide for harvesting timber '*in such a manner as to conserve the interests of the people on the*

71

*reservations*,'" in response to "'the failure of their governmental guardian *to conserve the Indians'*
*land and assets*,'" *Mitchell*, 463 U.S. at 220, 221 (emphases added) (brackets omitted) (quoting 45
Cong. Rec. 6087 (1910); 78 Cong. Rec. 11726)). Conserving assets is central to what
conservators do, and it applies to FHFA no less than to the United States as trustee in *Mitchell*.

The provisions of HERA cited by the Government fail to undermine the conclusion that
FHFA is a fiduciary. The Government first cites a general provision stating that FHFA may "be
appointed conservator or receiver for the purpose of reorganizing, rehabilitating, or winding up the
affairs of a regulated entity." 12 U.S.C. § 4617(a)(2). But this provision simply sets out the
*collective* responsibilities of a conservator and receiver; only later does the statute set out how
those collective responsibilities are allocated between those two roles. And that allocation is clear,
as FHFA itself has recognized outside the context of this litigation: "The ultimate responsibility
of FHFA as receiver is to resolve and liquidate the existing entity. A conservator's goal is to
continue the operations of a regulated entity, rehabilitate it and return it to a safe, sound and solvent
condition." 76 Fed. Reg. 35,724, 35,730; *see also* 12 U.S.C. § 4617(b)(2)(D) (FHFA as conservator
is to seek to rehabilitate the Companies to a sound and solvent condition); *id.* § 4617(b)(2)(E), (i)
(FHFA as receiver "shall" wind up the entities' operation by placing them "in liquidation").

At any rate, even if HERA did grant FHFA as conservator the authority to wind up the
Companies, it would not mean that FHFA could ignore its fiduciary responsibilities when doing
so. Acting as receiver, FHFA cannot simply give the Companies' assets to whomever it pleases
but must instead honor the statutory priority of claims against those assets. *See id.* § 4617(c)(1). It
must also seek to maximize the value of those assets. *See id.* §§ 4617(b)(11)(E), 4617(c)(2). Courts
interpreting the analogous provisions of FIRREA accordingly have found that FDIC as receiver is
a fiduciary. *See Golden Pac. Bancorp v. FDIC*, 375 F.3d 196, 201 (2d Cir. 2004); *Suess v. FDIC*,

770 F. Supp.2d 32, 38 (D.D.C. 2011).

The Government next cites HERA's "best interests" provision, but this incidental provision does not undo the fiduciary obligations the statute otherwise vests in FHFA. To the contrary, it simply states that FHFA, "as *conservator*," may "take any action *authorized by this section*, which the Agency determines is in the best interests of the regulated entity or the Agency." 12 U.S.C. § 4617(b)(2)(J)(ii) (emphases added). As the emphasized language makes clear, this provision simply provides that *when exercising those authorities defined elsewhere in the statute*, FHFA may take its interests into account. Thus, when choosing between otherwise authorized actions, FHFA may choose the option that best facilitates its ability to fulfill its duties as conservator. FHFA may not shed its conservator mandate altogether and seek some unrelated interest it may have—say, in enriching the United States Treasury. That is why the analogous provision of FIRREA has never been found to divest FDIC of fiduciary duties. *See* 12 U.S.C. § 1821(b)(2)(J) (permitting FDIC "as conservator or receiver" to take any authorized action which it "determines is in the best interests of the depository institution, its depositors, or the Corporation").

### C.    Through Treasury's Investment, the Government Undertook Fiduciary Duties to the Companies and Their Shareholders.

The Government also assumed fiduciary duties to the Companies and their shareholders when Treasury exercised its authority under HERA and invested in the Companies through the original PSPAs. The Government's contrary arguments lack merit. The Government first argues that such a fiduciary duty to other shareholders is not among "the considerations that Treasury must make when investing in the Enterprises." MTD 74 (citing 12 U.S.C. §§ 1719(g)(1)(B), 1455(*l*)(1)(B)). But this argument confuses the considerations bearing upon Treasury's determination of whether to invest in the Companies with the legal obligations that flow from making that investment.

The Government then argues that "Congress instructed Treasury to take *six factors into consideration, including* '[t]he need for preferences or priorities regarding payments to the Government' and '[r]estrictions on the use of corporation resources, including limitations on the payment of dividends[.]'" MTD 74 (quoting 12 U.S.C. §§ 1719(g)(1)(C), 1455(*l*)(1)(C)) (emphasis added). *Among the four factors that the Government omits* from this selective quotation of what HERA mandates Treasury take into account are "[t]he need to maintain [each Company's] status as a private shareholder-owned company" and the Companies' "plan for the orderly resumption of private market funding or capital market access." 12 U.S.C. §§1719(g)(1)(C), 1455(*l*)(1)(C). Congress thus recognized that, to "protect the taxpayer," there was a "*need*"—not merely an option or possible alternative—"to maintain" the Companies "as private shareholder owned" entities that could "resum[e] private market funding or capital market access." *Id*. Congress thus sought to protect taxpayers from the financial risks of nationalizing the Companies, which could eliminate their ability to raise private capital and thus entail long-term financial support by the Government.

Only through recognizing that fiduciary duty can one give meaning to Congress's mandate that Treasury protect the taxpayers in this manner. When Treasury invested in the Companies pursuant to HERA, the Government thus assumed fiduciary duties to the Companies and their other shareholders as a matter of federal law.

The Government argues that although Treasury may have been required to protect taxpayers by considering "[r]estrictions on the use of corporation resources, including limitations on the payment of dividends" *when it made its investment*, it was free to disregard that factor, and remove all restrictions on payment of dividends despite the risk to taxpayers, after that investment was made. MTD 74 (alteration in original). But surely Congress did not intend to allow the Government to evade its mandate that Treasury protect the taxpayers by preserving the Companies

as privately-owned companies with access to private market funding in so cavalier a manner.

### D.     HERA Does Not Preempt Plaintiffs' Fiduciary Duty Claims.

The Government's argument that "HERA *preempts* plaintiffs' breach of fiduciary duty claims," MTD 71-72 (emphasis added), misconstrues the foundation for such claims. If Plaintiffs were arguing that state law gave rise to fiduciary duty claims against the United States, a question could arise as to whether HERA preempted such claims. But Plaintiffs' fiduciary duty claims are founded on federal law. There is thus no preemption issue.[31]

### CONCLUSION

The Government is using conservatorships to strip capital from the very entities those conservatorships purport to protect. Without redress, the devastating implications of the Government's conduct when the next economic downturn inevitably arises are clear: the capital markets will not provide liquidity to stressed institutions when the need is greatest. This cannot stand. For the foregoing reasons, and for the reasons set forth in Plaintiffs' accompanying Supplemental Briefs, the Government's motion to dismiss should be denied. However, if the Government's motion is granted in whole or in part, Plaintiffs respectfully seek leave to amend their respective Complaints under Rule of the Court of Federal Claims 15(a)(2).

Date: November 2, 2018                                    Respectfully submitted,

/s/ Hamish P.M. Hume                                     /s/ Charles J. Cooper
Hamish P.M. Hume                                         Charles J. Cooper
*Attorney of Record for Cacciapalle Plaintiffs*          *Attorney of Record for Fairholme Plaintiffs*
BOIES SCHILLER FLEXNER LLP                               COOPER & KIRK, PLLC
1401 New York Ave., N.W.                                 1523 New Hampshire Avenue, N.W.
Washington, DC 20005                                     Washington, D.C. 20036
(202) 237-2727                                           (202) 220-9600
(202) 237-6131 (fax)                                     (202) 220-9601 (fax)
hhume@bsfllp.com                                         ccooper@cooperkirk.com

---

[31] The holding in *Fairholme Funds, Inc.*, 2018 WL 4680197, at *15, that "state law fiduciary claims [against FHFA] are preempted" by HERA, thus has no bearing here.

David H. Thompson
Vincent J. Colatriano
Peter A. Patterson
Brian W. Barnes
COOPER & KIRK, PLLC
1523 New Hampshire Avenue, N.W.
Washington, D.C. 20036
(202) 220-9600
(202) 220-9601 (fax)

*Of Counsel for Fairholme Plaintiffs*

*Interim Co-Lead Class Counsel*

Stacey K. Grigsby
Jonathan M. Shaw
James A. Kraehenbuehl
BOIES SCHILLER FLEXNER LLP
1401 New York Ave. NW
Washington, DC 20005
(202) 237-2727
(202) 237-6131 (fax)
sgrigsby@bsfllp.com
jshaw@bsfllp.com
jkraehenbuehl@bsfllp.com

Eric L. Zagar
Lee D. Rudy
Grant D. Goodhart
KESSLER TOPAZ MELTZER & CHECK LLP
280 King of Prussia Rd.
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
ezagar@ktmc.com
lrudy@ktmc.com
ggoodhart@ktmc.com

*Of Counsel for Cacciapalle Plaintiffs*

Charles J. Piven
BROWER PIVEN
A PROFESSIONAL CORPORATION
1925 Old Valley Road
Stevenson, MD 21153
(410) 332-0030
(410) 685-1300 (fax)
piven@browerpiven.com

Michael J. Barry
GRANT & EISENHOFER P.A.
123 Justison Street
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (fax)
mbarry@gelaw.com

Jeremy A. Lieberman
POMERANTZ LLP
600 Third Avenue, 20th Floor
New York, New York 10016
(212) 661-1100
(212) 661-8665 (fax)
jalieberman@pomlaw.com

Patrick V. Dahlstrom
Ten South LaSalle Street, Suite 3505
Chicago, Illinois 60603
(312) 377-1181
(312) 377-1184 (fax)
pdahlstrom@pomlaw.com

/s/ *Robert C. Schubert*
Robert C. Schubert
*Attorney of Record*

*Of Counsel*:
Noah M. Schubert
Miranda P. Kolbe
SCHUBERT JONCKHEER & KOLBE LLP
Three Embarcadero Ctr Ste 1650
San Francisco, CA 94111-4018
(415) 788-4220
(415) 788-0161 (fax)
rschubert@sjk.law
nschubert@sjk.law
mkolbe@sjk.law

**Counsel for Fisher and Reid Plaintiffs**

*Of Counsel*:
Edward F. Haber
SHAPIRO HABER & URMY LLP
53 State Street
Boston, MA 02109
(617) 439-3939
(617) 439-0134 (fax)
ehaber@shulaw.com

/s/ *Gregory P. Joseph*
Gregory P. Joseph
*Attorney of Record*

*Of Counsel:*
Mara Leventhal
Sandra M. Lipsman
Christopher J. Stanley
Roman Asudulayev
JOSEPH HAGE AARONSON LLC
485 Lexington Avenue, 30th Floor
New York, New York 10017
(212) 407-1200
(212) 407-1280 (fax)
gjoseph@jha.com
mleventhal@jha.com
slipsman@jha.com
cstanley@jha.com
rasudulayev@jha.com

**Counsel for Rafter Plaintiffs**

/s/ *Michael H. Barr*
Michael H. Barr
*Attorney of Record*

*Of Counsel:*
Richard M. Zuckerman
Sandra Hauser
DENTONS US LLP
1221 Avenue of the Americas
New York, New York 10020
(212) 768-6700
(212) 768-6800 (fax)
1900 K Street, NW
michael.barr@dentons.com
richard.zuckerman@dentons.com
sandra.hauser@dentons.com

Drew W. Marrocco
1900 K Street, N.W.
Washington, DC 20006
(202) 408-6400
(202) 408-6399 (fax)
drew.marrocco@dentons.com

**Counsel for Arrowood Plaintiffs**

### Appendix A

The following Plaintiffs join the Plaintiffs' Omnibus Response to Defendant's Amended Omnibus Motion to Dismiss, in whole or in part, as follows:

The *Arrowood* Plaintiffs join the Omnibus Brief except for Section II(B), which addresses whether Plaintiffs may pursue derivative claims; Section III, which addresses whether Plaintiffs that purchased the Companies' shares after the Net Worth Sweep have standing; and Section V(A)(1), which addresses derivative claims of illegal exaction.

The *Cacciapalle* Plaintiffs join the Omnibus Brief in its entirety.

The *Fairholme* Plaintiffs join the Omnibus Brief in its entirety.

The *Rafter* Plaintiffs join the Omnibus Brief *except* its Sections I.E., V.A.2., V.B.3.b., and VI.A., B., C. and D.

The *Fisher* and *Reid* derivative plaintiffs join in the Introduction and Statement of the Case in their entirety. From the Argument section, the derivative plaintiffs join in the following subsections:  I.A-C & E; II.B-C.; IV, footnote 16 and subsection C.1.; V.A.1. and V.B.-D.; VI.A., VI.B & C insofar as those subsections argue that the Government undertook fiduciary duties to the Companies, and VI.D. The *Fisher* and *Reid* derivative plaintiffs also join in the Conclusion in its entirety.