# In the United States Court of Federal Claims

No. 13-465C
(Filed Under Seal:  December 6, 2019)
(Reissued for Publication:  December 13, 2019)*
(Reissued Following Motion to Certify Interlocutory Appeal:  March 9, 2020)**

*************************************

| | |
|---|---|
| FAIRHOLME FUNDS, INC. et al.,   * | Motion to Dismiss; RCFC 12(b)(1); RCFC |
|   * | 12(b)(6); Jurisdiction; Standing; Derivative |
| Plaintiffs,   * | Claim; Direct Claims; Instrumentalities; |
|   * | Coercion; Agent; Collateral Estoppel; Issue |
| v.   * | Preclusion; Conservators; Conflict of |
|   * | Interest; Third-Party Beneficiaries; Stock; |
| THE UNITED STATES,   * | Shareholders; Fannie; Freddie; FHFA; |
|   * | Certification of Interlocutory Appeal |
| Defendant.   * | |

*************************************

Charles J. Cooper, Washington, DC, for plaintiffs.

Kenneth M. Dintzer, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY,** Chief Judge

     Plaintiffs in this case challenge the actions of the United States during the conservatorships of the Federal National Mortgage Association ("Fannie") and the Federal Home Loan Mortgage Corporation ("Freddie").  Specifically, plaintiffs take issue with the conservator for Fannie and Freddie (collectively, the "Enterprises") amending a funding agreement between the Enterprises and the United States Department of the Treasury ("Treasury").  Based on the revisions to that agreement, plaintiffs seek the return of money illegally exacted, damages for breach of contract and breach of fiduciary duty, and compensation for a taking pursuant to the Fifth Amendment to the United States Constitution ("Constitution").  Defendant moves to dismiss plaintiffs' complaint, arguing that the court lacks subject-matter jurisdiction over

---

     * The court initially issued this Opinion and Order under seal with instructions for the parties to propose any redactions.  The parties informed the court that no redactions were necessary to the Opinion and Order.

     ** Following the issuance of this opinion, the parties moved to certify the opinion for interlocutory appeal.  The court granted that motion on March 6, 2020, and explained in that order that it would amend the opinion to incorporate the necessary language to certify the opinion.  The language is set forth in Part VIII, supra.

plaintiffs' claims, plaintiffs lack standing to pursue certain claims, and plaintiffs fail to state a claim upon which relief may be granted. For the reasons stated below, the court grants in part and denies in part defendant's motion to dismiss.

## I. BACKGROUND

### A. The Enterprises are private companies that are under the control of a conservator.

#### 1. The Enterprises operated independently before the financial crisis.

Congress created the Enterprises to help the housing market; the Enterprises purchase and guarantee mortgages originated by private banks before bundling those mortgages into securities that are sold to investors. 2d Am. Compl. ¶ 36. Congress chartered Fannie in 1938 and established Freddie in 1980. Id. ¶ 37. Both Enterprises were initially part of the federal government before Congress reorganized them into for-profit companies owned by private shareholders. Id. Freddie is organized under Virginia law, and Fannie is organized under Delaware law. Id. ¶¶ 33-34. The Enterprises, consistent with the applicable state laws, issued their own common and preferred stock. Id. ¶ 38. Common shareholders obtained the right to receive dividends, collect any residual value, and vote on various corporate matters. Id. ¶ 42. Those owning preferred stock acquired the right to receive dividends and a liquidation preference. Id. ¶ 41.

The Enterprises, up until the financial crisis in the late 2000s, were consistently profitable; Fannie had not reported a full-year loss since 1985, and Freddie had not reported such a loss since becoming privately owned. Id. ¶ 43. Although the Enterprises recorded losses in 2007 and the first two quarters of 2008, the Enterprises continued to generate sufficient cash to pay their debts and retained sufficient capital to operate. Id. ¶ 44. Otherwise stated, the Enterprises were not in financial distress or otherwise at risk of insolvency. Id. ¶¶ 45, 64.

#### 2. Congress created the Federal Housing Finance Agency to regulate the Enterprises and authorized the agency to serve as a conservator for each Enterprise.

In the midst of the financial crisis during the summer of 2008, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"), Pub. L. No. 110-289, 122 Stat. 2654 (codified as amended in scattered sections of 12 U.S.C.). In that statute, Congress created the Federal Housing Finance Agency ("FHFA") and provided it with supervisory and regulatory authority over the Enterprises. See 12 U.S.C. § 4511(a)-(b) (2018).[1] Congress further authorized the FHFA Director to, in limited circumstances, appoint the FHFA as the conservator ("FHFA-C") for each Enterprise to reorganize, rehabilitate, or wind up its affairs.[2] Id.

---

[1] Congress has not amended the relevant portions of HERA since enacting the law in 2008. The court, therefore, refers to the most recent version of the United States Code.

[2] To avoid any ambiguity, the court reiterates that it is using "FHFA" to refer to the agency acting in its regulatory role and "FHFA-C" when discussing the agency acting as a conservator.

§ 4617(a)(2). Specifically, the Director is authorized to appoint a conservator if, among other things, an Enterprise consents, is undercapitalized, or lacks sufficient assets to pay its obligations. Id. § 4617(a)(3).[3] The conservator, once appointed, functions independently; it is not "subject to the direction or supervision of any other agency of the United States or any State in the exercise of [its] rights, powers, and privileges . . . ." Id. § 4617(a)(7).

Congress also delineated the scope of the FHFA-C's powers in HERA. See generally id. § 4617. As soon as it is appointed, the FHFA-C "immediately succeed[s] to . . . all rights, titles, powers, and privileges of the [Enterprise], and of any stockholder, officer, or director of such [Enterprise] with respect to the [Enterprise] and the assets of the [Enterprise] . . . ." Id. § 4617(b)(2)(A). Congress also conferred the conservator with the power to "[o]perate the [Enterprise]." Id. § 4617(b)(2)(B). Pursuant to that power, the conservator "may," among other things, "perform all functions of the [Enterprise]," "preserve and conserve the assets and property of the [Enterprise]," and "provide by contract for assistance in fulfilling any function . . . of the [conservator]." Id. The conservator "may" also "take such action as may be . . . necessary to put the [Enterprise] in a sound and solvent condition; . . . and appropriate to carry on the business of the [Enterprise] and preserve and conserve the assets and property of the [Enterprise]." Id. § 4617(b)(2)(D). Rounding out the panoply of powers, Congress also provided that the conservator "may . . . exercise . . . such incidental powers as shall be necessary to carry out [its enumerated powers]" and "take any action authorized by [12 U.S.C. § 4617(b)], which [it] determines is in the best interest of the [Enterprise] or the [FHFA]." Id. § 4617(b)(2)(J). By describing the FHFA-C's role primarily in terms of what powers it "may" exercise, see generally id. § 4617, Congress provided the FHFA-C with significant discretion on when or how it uses its powers, see United States v. Rodgers, 461 U.S. 677, 706 (1983) ("The word 'may,' when used in a statute, usually implies some degree of discretion."). Simply stated, the FHFA has "extraordinarily broad flexibility to carry out its role as conservator." Perry Capital LLC v. Mnuchin, 864 F.3d 591, 606 (D.C. Cir. 2017) ("Perry II"), cert. denied, 138 S. Ct. 978 (2018).

### 3. Congress authorized Treasury to purchase securities issued by the Enterprises.

At the same time that it established the FHFA, Congress authorized the Treasury Secretary to buy securities issued by the Enterprises in limited circumstances. 12 U.S.C. §§ 1455(l) (Freddie), 1719(g) (Fannie). Congress included a sunset clause on this power; the Secretary could not purchase securities after December 31, 2009. Id. §§ 1455(l)(4), 1719(g)(4). Until that date, the Secretary was permitted to purchase the securities if he determined that doing so was necessary to provide stability to the financial markets, prevent disruptions in the availability of mortgage finance, and protect taxpayers. Id. §§ 1455(l)(1)(B), 1719(g)(1)(B). As part of his obligation to protect taxpayers, the Secretary could only purchase securities after considering:

(i) The need for preferences or priorities regarding payments to the Government.

---

[3] Congress enticed the Enterprises to consent to a conservatorship by insulating their board members from any liability to shareholders or creditors for agreeing in good faith to the FHFA's appointment of a conservator. 12 U.S.C. § 4617(a)(6).

(ii) Limits on maturity or disposition of obligations or securities to be purchased.

(iii) The [Enterprise's] plan for the orderly resumption of private market funding or capital market access.

(iv) The probability of the [Enterprise] fulfilling the terms of any such obligation or other security, including repayment.

(v) The need to maintain the [Enterprise's] status as a private shareholder-owned company.

(vi) Restrictions on the use of [Enterprise] resources, including limitations on the payment of dividends and executive compensation and any such other terms and conditions as appropriate for those purposes.

Id. §§ 1455(*l*)(1)(C), 1719(g)(1)(C).

### 4. The FHFA became the conservator for each Enterprise.

After Congress enacted HERA, Treasury "urg[ed]" the FHFA to place each Enterprise into conservatorship. 2d Am. Compl. ¶ 4. The FHFA and Treasury subsequently sought to persuade each Enterprise's board of directors to consent to conservatorship. Id. ¶ 64. The FHFA and Treasury told each Enterprise's board that the FHFA would seize the Enterprises if the board did not consent to the conservatorship. Id. Around the same time, the FHFA made an offer to each board: consent to a conservatorship in exchange for the FHFA-C aiming to preserve and conserve the Enterprises' assets, attempting to restore the Enterprises to sound and solvent condition, and terminating the conservatorships when those goals were achieved. Id. ¶ 260. Each Enterprise's board accepted that offer and consented to a conservatorship on September 6, 2008, with an understanding that the FHFA-C would operate in the aforementioned limited ways. Id. ¶¶ 64, 67; see also id. ¶¶ 259-63 (discussing the purported offer and acceptance). The FHFA, soon thereafter, issued statements echoing each board's understanding. Id. ¶¶ 66, 261.

The conservatorships became effective on September 6, 2008, upon each Enterprise's board's consent. See id. ¶¶ 64 (discussing the timing of the Enterprises' consent), 259 (alleging that, prior to becoming conservator, the FHFA had not made any of the findings under 12 U.S.C. § 4617(a)(3) that would permit conservatorships without the Enterprises' consent); see also 12 U.S.C. § 4617(a)(3)(I) (permitting the FHFA Director to appoint a conservator when "[t]he [Enterprise], by resolution of its board of directors or its shareholders or members, consents to the appointment").

### 5. The FHFA-C contracted with Treasury to obtain funding for the Enterprises.

On September 7, 2008, the FHFA-C entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury for each Enterprise. 2d Am. Compl. ¶ 68. Treasury entered into the agreements pursuant to its authority under HERA to buy the Enterprises' securities. Id. ¶ 69. The PSPA for each Enterprise is materially identical. Id. ¶ 72. Under the PSPAs, Treasury

committed to provide up to $100 billion to each Enterprise to ensure that the Enterprises maintained a positive net worth.  Id.  If an Enterprise's liabilities exceeded its assets, then the Enterprise could draw on Treasury's funding commitment in an amount equal to the difference between the Enterprise's liabilities and assets.  Id.

In return for Treasury's funding commitment, the Enterprises surrendered stock, dividends, commitment fees, and control.  First, with respect to the stock, Treasury acquired one-million shares of preferred stock in each Enterprise and warrants to purchase 79.9% of their respective common stock at a nominal price.  Id. ¶ 73.  Treasury's preferred stock had an initial liquidation preference of $1 billion, but the amount increased dollar-for-dollar when an Enterprise drew on Treasury's funding commitment.  Id. ¶ 74.  In the event of a liquidation, Treasury was entitled to recover the full liquidation value of its shares before any other shareholder would receive compensation.  Id.  Second, Treasury bargained for the right to a quarterly cash dividend equal to 10% of its liquidation preference.  Id. ¶ 76.  An Enterprise that decided against paying a cash dividend in a specific quarter could make an in-kind payment:  the value of the dividend would be added to the liquidation preference, and the dividend rate would increase to 12%.  Id.  Those in-kind payments, however, did not count as a draw from Treasury's funding commitment.  Id. ¶ 80.  Third, Treasury received the right to a quarterly commitment fee from each Enterprise, but Treasury could waive the fee each year.  Id. ¶ 81.  If Treasury did not waive the fee, the Enterprise could elect to pay the amount in cash or make an in-kind payment by increasing the liquidation preference.  Id.  Fourth, Treasury obtained de facto control over various aspects of each Enterprise; the Enterprises needed to obtain Treasury's consent before awarding dividends, issuing stock, transferring assets, incurring certain types of debt, and making certain organizational changes.  Id. ¶ 82.

The FHFA-C and Treasury amended each Enterprise's PSPA on May 6, 2009, to increase Treasury's funding commitment to each Enterprise from $100 billion to $200 billion.  Id. ¶ 84.  On December 24, 2009, the FHFA-C and Treasury executed another amendment to the PSPAs; they abolished the specific dollar cap and replaced it with a formula to allow Treasury's total commitment to each Enterprise to exceed $200 billion.  Id.

### 6.  The Enterprises' finances improved during their conservatorships.

In the early stages of the conservatorships, each Enterprise's net worth decreased as it reported losses.  The bulk of the losses resulted from the FHFA-C writing down the value of deferred tax assets and designating large loan loss reserves.[4]  Id. ¶ 85.  Notwithstanding those on-paper losses, the Enterprises' cash receipts consistently exceeded their expenses; they maintained net operating revenue in excess of their net operating expenses from the onset of the

---

[4]  A loan loss reserve is an entry on a company's balance sheet that reduces its net worth to reflect anticipated losses on mortgages that it owns.  2d Am. Compl. ¶ 87.  A deferred tax asset is an asset that may be used to offset future tax liability.  Id. ¶ 86.  A company must write down the value of that deferred asset if it is unlikely to be used to offset future taxable profits.  Id.  This write down occurs, for example, if a company predicts it will not be profitable in the future.  Id.

conservatorships under the PSPAs and through the first two amendments to the agreements.  Id. ¶ 91.

By 2012, the Enterprises' financial outlooks were promising.  In addition to an improvement in the housing market, the Enterprises began generating consistent profits and anticipated losing less money on their newer mortgages.  Id. ¶¶ 92, 94-95.  They were positioned to further improve their financial condition by settling lawsuits brought by each Enterprise, id. ¶ 109, and revising their valuations of (1) deferred tax assets because of growing profits and (2) loan loss reserves because losses were less than expected, id. ¶¶ 98-99.  The FHFA-C and Treasury were aware of those forthcoming changes and the Enterprises' improving outlooks.  Id. ¶¶ 94-104.  In August 2012, Treasury noted that the Enterprises would post "[r]ecord earnings," id. ¶ 98 (alteration in original) (quoting Treasury document), and Treasury received projections reflecting that the Enterprises would have positive comprehensive income between 2012 and 2022, id. ¶ 101.  The FHFA-C had similar information; in July 2012, it circulated, within the FHFA, comparable projections and meeting minutes in which Fannie's treasurer was reported as stating that that the next eight years were likely to be "the golden years of [the Enterprises'] earnings."  Id. ¶ 103 (quoting the minutes).  Otherwise stated, the FHFA-C and Treasury knew, by early August 2012, that the Enterprises were poised to generate profits in excess of their respective dividend obligations to Treasury.  Id. ¶ 97.

### 7.  Treasury and the FHFA-C agreed to a third amendment to the PSPAs.

At an unspecified time prior to August 2012, the Treasury and the FHFA-C began considering a third amendment to each PSPA.  Treasury was the driving force behind the initiative to amend the PSPAs' terms.  Id. ¶ 147.  Indeed, an FHFA official reported in early August 2012 that Treasury was making a "renewed push" to implement a new amendment.  Id. ¶ 146 (quoting the FHFA official).  The FHFA-C learned of the proposed changes before the Enterprises; Treasury informed the Enterprises that the new terms were forthcoming and announced the changes to the Enterprises at a subsequent meeting.  Id. ¶ 147.  Treasury officials who were involved with the process do not recall Treasury making any backup or contingency plans in the event that the FHFA-C rejected the proposed terms.  Id.  The FHFA-C accepted the changes without advocating for different terms.  Id.

Treasury and the FHFA-C decided to announce the changed terms in mid-August 2012 because, according to Treasury, the Enterprises would be reporting earnings exceeding their dividend obligation at the beginning of that month.  Id. ¶ 133.  On August 17, 2012, Treasury and the FHFA-C executed the third amendment to each PSPA ("PSPA Amendment").  Id. ¶ 112.  A key component of the amended PSPAs is the requirement—referred to as the "Net Worth Sweep"—that each Enterprise pay Treasury a quarterly dividend equal to 100% of each Enterprise's net worth (except for a small capital reserve amount) rather than a dividend based on a set percentage of the liquidation preference.[5]  Id. ¶ 113.  Additionally, under the amended PSPAs, the Enterprises are not obligated to pay a periodic commitment fee.  Id. ¶ 115.

---

[5]  The capital reserve for each Enterprise started at $3 billion and was set to decrease to $0 by January 2018, but the Enterprises and Treasury agreed in December 2017 to reset the capital reserve amount to $3 billion in the first quarter of 2018.  2d Am. Compl. ¶ 105.

### a. Treasury wanted to ensure that it benefited from the new terms.

With the PSPAs, Treasury sought to secure a more beneficial arrangement for itself, as a representative for taxpayers. During the lead-up to the PSPA Amendments, a Treasury official acknowledged in a December 2010 memorandum to the Treasury Secretary that the government was "committ[ed] to ensur[ing] existing common equity holders will not have access to any positive earnings from the [Enterprises] in the future." Id. ¶ 118 (quoting the memorandum). In another Treasury document, an official noted that the amended PSPAs would put the taxpayer "in a better position" because, rather than having "Treasury's upside . . . capped at the 10% dividend, now the taxpayer will be the beneficiary of any future earnings produced by the [Enterprises]." Id. ¶ 130 (quoting the document); accord id. ¶ 133 (quoting a Treasury official as stating that the Net Worth Sweep would place the taxpayers "in a better position"). Treasury recognized its goal of obtaining all of the Enterprises' profits by executing the PSPA Amendments; when the changes were announced, it noted that "every dollar of earnings that [the Enterprises] generate will be used to benefit taxpayers." Id. ¶ 118 (quoting a Treasury press release).

### b. The FHFA-C agreed to changes that benefit Treasury.

For its part, the FHFA-C was operating under the belief that Treasury would benefit from the PSPA Amendments. An internal Treasury communication indicates that Treasury anticipated that its receipts under the PSPA Amendments would "'exceed the amount that would have been paid if the 10% [dividend] was still in effect' and that the changes would lead to 'a better outcome' for Treasury." Id. ¶ 130 (quoting the communication). Moreover, Mel Watts—a former FHFA Director—confirmed that he was concerned with how decisions affect the taxpayers. Id. ¶ 119. During an interview conducted while he was Director, he stated that he does not "'lay awake at night worrying what's fair to the shareholders' but rather focuses on 'what is responsible for the taxpayers.'" Id. (quoting the interview).

### c. Treasury and the FHFA understood that the PSPA Amendments would not facilitate the Enterprises exiting conservatorship.

Treasury was aware that the new terms of the PSPAs were not conducive to the Enterprises exiting conservatorship. When announcing the PSPA Amendments, Treasury openly acknowledged that the new terms would "expedite the wind down of Fannie Mae and Freddie Mac." Id. ¶ 134 (quoting a Treasury press release). Treasury further explained that the new deal would ensure that the Enterprises "will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." Id.; accord id. ¶ 114 (explaining that Treasury noted that, "[b]y taking all of their profits going forward, we are making clear that [the Enterprises] will not ever be allowed to return to profitable entities"). Indeed, a White House official sent a message to a Treasury official on the day the deal was announced noting that "we've closed off [the] possibility that [the Enterprises] ever[] go (pretend) private again." Id. ¶ 138 (alterations in original) (quoting the message); accord id. (noting in a separate message that a quotation "in Bloomberg" was "exactly right on substance and intent" when describing the deal as depriving the Enterprises of the capital they needed to go private).

The FHFA shared a similar sentiment. The FHFA's former Acting Director, Edward DeMarco, testified before the United States Senate that the PSPA Amendments "reinforce the notion that the [Enterprises] will not be building capital as a potential step to regaining their former corporate status." Id. ¶ 135 (quoting the testimony). He also stated that he had no intention of returning the Enterprises to private control under their existing charters, while another FHFA official testified that the agency's objective "was not for Fannie and Freddie . . . to emerge from conservatorship." Id. ¶ 136 (quoting the testimony). Indeed, the FHFA explained in its 2012 report to Congress that the agency had begun "prioritizing [its] actions to move the housing industry to a new state, one without Fannie and Freddie . . . ." Id. ¶ 135 (quoting the report). Consistent with those actions, the FHFA acknowledged that it would continue to serve as conservator until "Congress determines the future of Fannie Mae and Freddie Mac and the housing finance market." Id. ¶ 136 (quoting an FHFA statement).

**d. Treasury has benefited from the PSPA Amendments at the expense of the Enterprises and other shareholders.**

There are four significant effects that flowed from the PSPA Amendments. First, plaintiffs lost their economic interests in the Enterprises because, under the new terms, private shareholders can never receive dividends or liquidation distributions. Id. ¶ 117; see also id. (alleging that, in the event of liquidation, private shareholders will receive nothing because an Enterprise will never have enough money to pay Treasury's dividend and liquidation preferences). Second, Treasury acquired plaintiffs' economic interests in the Enterprises because Treasury now "has the right to all residual profits, and it hence owns all the equity." Id. ¶ 120. Third, Treasury reaped a windfall of $124 billion in comparison to what it would have received absent changes to the PSPAs. Id. ¶ 123; see id. ¶¶ 122-23 (alleging that the Enterprises paid Treasury $223.7 billion under the PSPA Amendments but would have only paid Treasury $95.5 billion under the previous terms). Fourth, the Enterprises can never be rehabilitated to a sound and solvent condition because, by transferring their profits to Treasury, they will perpetually operate on the brink of insolvency. Id. ¶ 125.

**8. Treasury and the FHFA are committed to ending the conservatorships.**

On March 27, 2019, President Donald J. Trump issued a memorandum in which he directed the Treasury Secretary to develop, "as soon as practicable," a plan for "[e]nding the conservatorships of the [Enterprises] upon the completion of specified reforms . . . ."[6]

--------

[6] The court takes judicial notice of the presidential memorandum because it is a government record published in a reliable source, the Federal Register. See Murakami v. United States, 46 Fed. Cl. 731, 739 (2000) (noting that the court may take judicial notice of government documents), aff'd, 398 F.3d 1342, 1354-55 (Fed. Cir. 2005); see also Democracy Forward Found. v. White House Office of Am. Innovation, 356 F. Supp. 3d 61, 62 n.2 (D.D.C. 2019) ("[J]udicial notice may be taken of government documents available from reliable sources, such as this 2017 Presidential Memorandum."). See generally Fed. R. Evid. 201 (discussing judicial notice). Although a motion to dismiss is normally limited to the allegations in a complaint, the court may consider facts derived from sources subject to judicial notice without converting the

Memorandum on Federal Housing Finance Reform, 84 Fed. Reg. 12,479, 12,479 (Mar. 27, 2019). The President explained that the plan must include proposals for "[s]etting the conditions necessary for the termination of the conservatorships" and outlined some of those conditions. Id. at 12,480. Subsequently, Treasury issued a plan in which it advocated for "begin[ning] the process of ending the [Enterprises'] conservatorships."[7] U.S. Dep't of the Treasury, Housing Reform Plan Pursuant to the Presidential Memorandum Issued March 27, 2019, at 3 (2019), https://home.treasury.gov/system/files/136/Treasury-Housing-Finance-Reform-Plan.pdf [https://perma.cc/RGH8-N385]; accord id. at 26 ("It is, after 11 years, time to bring the conservatorships to an end."). As part of the plan to end the conservatorships, Treasury proposed that it and the FHFA consider revising the Net Worth Sweep to allow the Enterprises to retain more of their earnings. Id. at 26-27.

The FHFA shares Treasury's goals with respect to the conservatorships. Mark Calabria, the current FHFA Director, testified during his confirmation hearing that he wanted to end the conservatorships.[8] 165 Cong. Rec. S2246 (daily ed. Apr. 4, 2019) (statement of Sen. Crapo) (summarizing testimony). See generally Nominations of Bimal Patel, Todd M. Harper, Rodney Hood, and Mark Anthony Calabria: Hearing Before the S. Comm. on Banking, Hous., and Urban Affairs, 116th Cong. 10-40, 74-75, 148-85 (2019) [hereinafter Calabria Testimony] (documenting Mr. Calabria's testimony, statement, and responses to written questions during and after his confirmation hearing). He also stated that, as FHFA Director, he would seek to increase the amount of capital that each Enterprise retains. Calabria Testimony, supra, at 150; see also id. at 25 ("I support the idea of having significantly more capital at the [Enterprises].").

### B. Plaintiffs own or owned Fannie and Freddie stock.

There are three categories of plaintiffs in this case. The first category consists of Andrew Barrett, an individual who has continually owned common stock of both Fannie and Freddie since September 2008. 2d Am. Compl. ¶ 31. The second category consists of Fairholme Funds, Inc.—on behalf of its series, The Fairholme Fund—and The Fairholme Fund, a series of Fairholme Funds, Inc., which owns preferred stock in both Enterprises. Id. ¶ 19. The third category consists of W.R. Berkley Corporation ("Berkley") and ten other plaintiffs that Berkley directly or indirectly owns: Acadia Insurance Company, Admiral Indemnity Company, Admiral Insurance Company, Berkley Insurance Company, Berkley Regional Insurance Company, Carolina Casualty Insurance Company, Continental Western Insurance Company, Midwest Employers Casualty Insurance Company, Nautilus Insurance Company, and Preferred Employers Insurance Company (collectively, with Berkley, "Berkley Companies"). Id. ¶ 20. One of the Berkley Companies, Berkley Insurance Company, has owned preferred stock in

_____

motion into one for summary judgment. Sebastian v. United States, 185 F.3d 1368, 1374 (Fed. Cir. 1999).

[7] The court takes judicial notice of Treasury's reform plan because it is a government record available from a reliable source, Treasury's website. See supra note 6.

[8] The court takes judicial notice of the relevant testimony because the statements are recorded in government documents. See supra note 6.

Fannie since 2005 and Freddie since 2009.  Id. ¶ 40.  The other Berkley Companies acquired preferred stock in both Enterprises before and after August 2012, and many of those shares were later transferred to Berkley Insurance Company.[9]  Id.

## II.  PROCEDURAL HISTORY

Plaintiffs filed their complaint on July 9, 2013.[10]  Defendant moved to dismiss the complaint on December 9, 2013.  Eleven days later, plaintiffs moved to stay briefing on defendant's motion and requested permission to conduct fact discovery for the purpose of responding to defendant's motion.  On February 26, 2014, the court granted plaintiffs' motion, and the parties spent the next four years engaged in discovery.

While discovery was ongoing, Michael Sammons filed a motion to intervene in this case.  In his motion, Mr. Sammons alleged that he owned Fannie and Freddie preferred stock and sought to intervene for the limited purpose of challenging this court's jurisdiction.  He argued that only a court established under Article III of the Constitution can hear Fifth Amendment takings claims and therefore, the United States Court of Federal Claims ("Court of Federal Claims"), as a court established under Article I of the Constitution, is constitutionally barred from entertaining the takings claims at issue in this case.  Mr. Sammons further argued that the principle of sovereign immunity does not apply to claims asserted under the Takings Clause of the Fifth Amendment.  The court denied Mr. Sammons's motion, and he appealed to the United States Court of Appeals for the Federal Circuit ("Federal Circuit").  On appeal, the Federal Circuit affirmed the denial of Mr. Sammons's motion to intervene based on his failure to satisfy the requirements of Rule 24(a) of the Rules of the United States Court of Federal Claims ("RCFC").  See Fairholme Funds, Inc. v. United States, 681 F. App'x 945, 948-49 (Fed. Cir. 2017) (per curiam).  The Federal Circuit, however, did not address Mr. Sammons's argument that the Court of Federal Claims, as an Article I court, is precluded from adjudicating claims arising under the Takings Clause.  See id. at 949.  Rather, it directed this court to address the argument.  See id. at 949-50 ("That argument, to the extent it is a jurisdictional one, must be addressed by the Court of Federal Claims . . . even if Mr. Sammons is not a party and even if no party makes the argument he makes.").

Following the Federal Circuit's decision and the completion of discovery related to defendant's motion to dismiss, plaintiffs filed an amended complaint on March 3, 2018, and a second amended complaint on August 3, 2018.  In their most recent complaint, plaintiffs plead twelve claims:  four direct claims in their individual capacities and eight derivative claims on behalf of the Enterprises.  With respect to the direct claims, which are brought by all plaintiffs, plaintiffs first assert that the Net Worth Sweep constitutes a Fifth Amendment taking (count I) of their economic interests in their stock.  Plaintiffs next assert that the Net Worth Sweep

---

[9]  With the exception of Berkley Insurance Company, it is unclear whether each (or just some) of the Berkley Companies owned stock in the Enterprises before August 2012.  See 2d Am. Compl. ¶ 40.

[10]  At that time, Mr. Barrett was not a plaintiff.  He was added as a plaintiff in the first amended complaint, which was filed on March 3, 2018.

constitutes an illegal exaction (count IV) of those same economic interests because the (1) FHFA was operating unconstitutionally and (2) FHFA-C and Treasury exceeded their statutory and regulatory authority when they approved the PSPA Amendments. Plaintiffs also plead a breach-of-fiduciary-duty claim ("fiduciary duty claim") (count VII) premised on the Net Worth Sweep being unfair; constituting waste, self dealing, gross overreach, and gross abuse of discretion; and failing to further a valid business purpose or reflect a good faith business judgment. Additionally, plaintiffs assert a breach-of-implied-contract claim (count X) based on a purported agreement by which the Enterprises consented to the conservatorship in exchange for the FHFA agreeing to preserve the Enterprises' assets with the goal of making them safe and solvent. Specifically, plaintiffs assert that each dividend payment under the Net Worth Sweep constitutes a breach because it depletes the Enterprises' assets in a manner that undermines the goals of conservatorship. Finally, Mr. Barrett asserts substantively the same claims as derivative claims on behalf Fannie (counts II, V, VIII, XI) and Freddie (counts III, VI, IX, XII).

On October 1, 2018, defendant moved to dismiss—in a single, omnibus motion—the claims in this case and eleven related cases before the undersigned.[11] The plaintiffs in each of the twelve cases filed a response brief on their respective dockets; some of the plaintiffs relied on a joint brief, while others filed a joint brief and a supplemental response brief. Defendant filed its omnibus reply brief in each of the cases on May 6, 2019. At the court's request, defendant filed a statement in which it identified which claims were the subject of each argument in its motion to dismiss ("notice of arguments"). The parties have fully briefed defendant's motion, and the court held a single oral argument on November 19, 2019, involving the plaintiffs from each of the twelve cases that defendant moved to dismiss. The plaintiffs in those cases collaborated during argument; each plaintiff argued some of the issues. Thus, the court infers that the plaintiffs in this case have adopted the favorable arguments made by the plaintiffs in the related cases to the extent that such arguments are relevant.[12] Defendant's motion to dismiss is now ripe for adjudication.

### III. STANDARD OF REVIEW

In ruling on a motion to dismiss a complaint pursuant to RCFC 12(b)(1) and RCFC 12(b)(6), the court generally assumes that the allegations in the complaint are true and construes

---

[11] The eleven related cases are Washington Federal v. United States, No. 13-385C; Cacciapalle v. United States, No. 13-466C; Fisher v. United States, No. 13-608C; Arrowood Indemnity Company v. United States, No. 13-698C; Reid v. United States, No. 14-152C; Rafter v. United States, No. 14-740C; Owl Creek Asia I, L.P. v. United States, No. 18-281C; Akanthos Opportunity Master Fund, L.P. v. United States, No. 18-369C; Appaloosa Investment Limited Partnership I v. United States, No. 18-370C; CSS, LLC v. United States, No. 18-371C; and Mason Capital L.P. v. United States, No. 18-529C.

[12] Given that the plaintiffs in this case are arguing that they alleged both direct and derivative claims, the court does not infer that they adopted the Reid and Fisher plaintiffs' argument that "the shareholder claims asserted in connection with the [PSPA Amendments] are properly asserted as derivative claims." Reid Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 2; accord Fisher Supp'l Mem. in Opp'n to Def.'s Omnibus Mot. to Dismiss 2.

those allegations in the plaintiff's favor. Trusted Integration, Inc. v. United States, 659 F.3d 1159, 1163 (Fed. Cir. 2011). With respect to RCFC 12(b)(1), the plaintiff bears the burden of proving, by a preponderance of the evidence, that the court possesses subject-matter jurisdiction. Id. The allegations in the complaint must include "the facts essential to show jurisdiction." McNutt v. Gen. Motors Acceptance Corp., 298 U.S. 178, 189 (1936). And, if such jurisdictional facts are challenged in a motion to dismiss, the plaintiff "must support them by competent proof." Id.; accord Land v. Dollar, 330 U.S. 731, 735 & n.4 (1947) ("[W]hen a question of the District Court's jurisdiction is raised, . . . the court may inquire by affidavits or otherwise, into the facts as they exist." (citations omitted)). If the court finds that it lacks subject-matter jurisdiction, it must, pursuant to RCFC 12(h)(3), dismiss the complaint.

A claim that survives a jurisdictional challenge remains subject to dismissal under RCFC 12(b)(6) if it does not provide a basis for the court to grant relief. Lindsay v. United States, 295 F.3d 1252, 1257 (Fed. Cir. 2002) ("A motion to dismiss . . . for failure to state a claim upon which relief can be granted is appropriate when the facts asserted by the claimant do not entitle him to a legal remedy."). To survive a motion to dismiss under RCFC 12(b)(6), a plaintiff must include in the complaint "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974), overruled on other grounds by Harlow v. Fitzgerald, 457 U.S. 800, 814-19 (1982).

## IV. SUBJECT-MATTER JURISDICTION

The court begins with jurisdiction because it is a "threshold matter." Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94-95 (1998). Subject-matter jurisdiction cannot be waived or forfeited because it "involves a court's power to hear a case." Arbaugh v. Y & H Corp., 546 U.S. 500, 514 (2006) (quoting United States v. Cotton, 535 U.S. 625, 630 (2002)). "Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the court is that of announcing the fact and dismissing the cause." Ex parte McCardle, 74 U.S. (7 Wall) 506, 514 (1868). Therefore, it is "an inflexible matter that must be considered before proceeding to evaluate the merits of a case." Matthews v. United States, 72 Fed. Cl. 274, 278 (2006); accord K-Con Bldg. Sys., Inc. v. United States, 778 F.3d 1000, 1004-05 (Fed. Cir. 2015). Either party, or the court sua sponte, may challenge the court's subject-matter jurisdiction at any time. Arbaugh, 546 U.S. at 506; see also Jeun v. United States, 128 Fed. Cl. 203, 209-10 (2016) (collecting cases).

The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued." United States v. Sherwood, 312 U.S. 584, 586 (1941). The waiver of immunity "may not be inferred, but must be unequivocally expressed." United States v. White Mountain Apache Tribe, 537 U.S. 465, 472 (2003). Any such waiver must be narrowly construed. Smith v. Orr, 855 F.2d 1544, 1552 (Fed. Cir. 1988). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States, not sounding in tort, that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491(a)(1) (2018); White Mountain, 537 U.S. at

472.  However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." United States v. Testan, 424 U.S. 392, 298 (1976).  Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." Lovelades Harbor, Inc. v. United States, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc).

Defendant challenges the court's jurisdiction to entertain plaintiffs' claims on a number of bases.  Specifically, defendant argues that 28 U.S.C. § 1500 bars plaintiffs' claims, plaintiffs have not asserted claims against the United States, and that the court lacks jurisdiction over the subject matter of certain claims.  The court addresses each of these contentions and Mr. Sammons's argument that the court lacks jurisdiction over Fifth Amendment takings claims.

### A.  Plaintiffs are not barred by 28 U.S.C. § 1500 from litigating their claims in this court.

The court first addresses defendant's argument that the court lacks jurisdiction to consider plaintiffs' claims because plaintiffs initiated lawsuits in other courts after filing their complaint in this court.  Specifically, defendant asserts that the claims are barred by 28 U.S.C. § 1500, which provides:

> The United States Court of Federal Claims shall not have jurisdiction of any claim for or in respect to which the plaintiff or his assignee has pending in any other court any suit or process against the United States or any person who, at the time when the cause of action alleged in such suit or process arose, was, in respect thereto, acting or professing to act, directly or indirectly under the authority of the United States.

Defendant acknowledges that, under binding precedent, § 1500 is not a bar in this case because the limitation only applies "when the suit shall have been commenced in the other court before the claim was filed in [the Court of Federal Claims]." Tecon Eng'rs, Inc. v. United States, 343 F.2d 943, 949 (Ct. Cl. 1965).  Nonetheless, defendant asserts that the court should reinterpret § 1500 as creating a jurisdictional bar regardless of the timing of the filings.  Plaintiffs counter that the court cannot disregard the binding precedent.

As defendant acknowledges, its argument is foreclosed by binding precedent:  the jurisdictional limitation in § 1500 does not apply in this case because plaintiffs filed their complaint in this court before seeking redress in other jurisdictions.  See Tecon, 343 F.2d at 949; see also Res. Invs., Inc. v. United States, 785 F.3d 660, 670 (Fed. Cir. 2015) (noting that Tecon remains good law in this circuit).  Compare Compl. (filed July 9, 2013), with Compl., Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency, No. 13-1053 (D.D.C. July 10, 2013).  Although defendant urges the court to reconsider the rule set forth in Tecon, the court cannot do so because it is bound by that precedent.  See Coltec Indus., Inc. v. United States, 454 F.3d 1340, 1353 (Fed. Cir. 2006) ("There can be no question that the Court of Federal Claims is required to follow the precedent of . . . our court, and our predecessor court, the Court of Claims.").  Plaintiffs' claims, therefore, are not barred by § 1500.

## B. Plaintiffs have asserted claims against the United States.

The court next considers whether plaintiffs have asserted claims against the United States, a necessary element of jurisdiction in the Court of Federal Claims. As set forth in their second amended complaint, plaintiffs' Fifth Amendment takings, illegal exaction, and breach-of-implied-contract claims are premised on actions taken by the FHFA-C and Treasury, while plaintiffs' fiduciary duty claims are premised on the FHFA-C's actions. Defendant argues that the court lacks jurisdiction to consider any claims premised on the FHFA-C's or Treasury's conduct. In response, plaintiffs contend that they have asserted claims against the government because (1) Treasury was involved in the challenged conduct, (2) the FHFA-C exercised nontraditional conservator powers such that its actions must be deemed those of the government, (3) the FHFA-C was the government's agent, (4) the FHFA-C was coerced by the government, and (5) the FHFA-C is a government actor. The court addresses each contention in turn.

### 1. The court cannot exercise jurisdiction based on allegations of Treasury's involvement.

Plaintiffs initially argue that the court has jurisdiction over their Fifth Amendment takings and illegal-exaction claims because they have alleged the involvement of Treasury—indisputably a part of the federal government—in the action underlying these claims, i.e., the Net Worth Sweep. Defendant counters that Treasury alone could not have implemented the PSPA Amendments, and Treasury's role as a counterparty to the voluntary agreement with the Enterprises is not sufficient to establish jurisdiction over plaintiffs' takings claims. Defendant further asserts that the court's order allowing jurisdictional discovery reflects that plaintiffs' allegations concerning Treasury alone are insufficient to confer jurisdiction.

The parties' dispute on the import of allegations concerning Treasury is ultimately immaterial in light of the court's determination, explained below, that the FHFA-C—the other party involved in the PSPA Amendments—is the United States. Nonetheless, the court notes, as defendant asserts, that it implicitly acknowledged in its February 26, 2014 discovery order that the allegations concerning Treasury alone were insufficient to support jurisdiction. In that order, the court permitted plaintiffs to conduct fact discovery on whether the FHFA-C was "the 'United States' for purposes of the Tucker Act." Fairholme Funds, Inc. v. United States, 114 Fed. Cl. 718, 721 (2014). The aforementioned discovery would have been unnecessary (and unwarranted) if, as plaintiffs assert, the court has jurisdiction over plaintiffs' claims based on their allegations concerning Treasury.

### 2. The FHFA-C exercised its statutory conservatorship powers when it approved the PSPA Amendments for each Enterprise.

Plaintiffs next argue that the FHFA-C must be considered the United States because the FHFA-C acted beyond its authority when it expropriated the Enterprises' assets for the government's benefit. Defendant counters that, irrespective of the "expropriation" label assigned by plaintiffs, the FHFA-C's execution of the PSPA Amendments was consistent with its statutory authority and purpose.

The FHFA-C is the United States for any claims challenging the conservator's conduct that exceeded the applicable statutory authority. Cf. Slattery v. United States, 583 F.3d 800, 827-28 (Fed. Cir. 2009) (noting that the Federal Deposit Insurance Company ("FDIC") as receiver is the United States for claims premised on allegations that the receiver failed to distribute funds as required by statute). Thus, resolving the parties' dispute requires determining whether the FHFA-C had statutory authority to enter into the PSPA Amendments. The answer depends on HERA. Under HERA, the FHFA-C has exceptionally broad powers. See Jacobs v. Fed. Hous. Fin. Agency, 908 F.3d 884, 889 (3d Cir. 2018) (noting that the FHFA-C's "powers are many and mostly discretionary"); see also Saxton v. Fed. Hous. Fin. Agency, 901 F.3d 954, 960 (8th Cir. 2018) (Stras, J., concurring) ("Congress came close to handing a blank check to the FHFA."). The FHFA-C wields complete control over the Enterprises; it succeeds to the rights and powers of the Enterprises as well as their shareholders, directors, and officers. 12 U.S.C. § 4617(b)(2)(A)(i). The FHFA-C may (but is not required to) use that power to, among other things, further the FHFA's interests, carry on the Enterprises' business, preserve and conserve the Enterprises' assets, and place the Enterprises in sound and solvent condition.[13] Id. § 4617(b)(2)(B), (D), (J) (noting actions that the FHFA-C "may" undertake; see also Roberts v. Fed. Hous. Fin. Agency, 889 F.3d 397, 403 (7th Cir. 2018) (explaining that Congress's use of "may" reflects that the FHFA-C has discretionary authority).

Congress's broad grant of power to the FHFA-C colors the analysis of whether the FHFA-C became the United States by approving the PSPA Amendments. As an initial matter, plaintiffs' contention that the FHFA-C exceeded its statutory authority by expropriating the Enterprises' assets for the government is unavailing because the FHFA-C is authorized to act in its own interest without regard for the effects on the Enterprises. Moreover, the FHFA-C's approval of the PSPA Amendments is in accordance with its authority to operate the Enterprises and preserve their assets. As operating businesses, the Enterprises needed to "secure ongoing access to capital, manage debt loads, control cash flow, and decide whether and how to pay dividends." Jacobs, 908 F.3d at 890. The FHFA-C achieved those goals with the PSPA Amendments, which are, "in essence[,] a renegotiation of an existing lending agreement." Id. By agreeing to the PSPA Amendments, the FHFA-C eliminated the risk of the Enterprises consuming all of their financial lifeline (Treasury's funding commitment) through cash-dividend payments or entering a cycle of an ever-increasing liquidation preference.[14] Roberts, 889 F.3d at

---

[13] The conclusion that the FHFA-C has some discretionary powers is buttressed by the fact that Congress stated the conservator "may" do certain things but "shall" do others. See Huston v. United States, 956 F.2d 259, 262 (Fed. Cir. 1992) ("When, within the same statute, Congress uses both 'shall' and 'may,' it is differentiating between mandatory and discretionary tasks."). Compare 12 U.S.C. § 4617(b)(2)(D) ("The [FHFA] may, as conservator, take such action as may be . . . necessary to put the regulated entity in sound and solvent condition . . . ." (emphasis added)), with id. § 4617(b)(14)(A) ("The [FHFA] as conservator or receiver shall . . . maintain a full accounting of each conservatorship and receivership or other disposition of a[n Enterprise] in default." (emphasis added)).

[14] If, under the terms of the PSPAs before the PSPA Amendments, the Enterprises chose to make their dividend payment by increasing Treasury's liquidation preference, the future dividends would be more expensive because the dividends were a set percentage of the liquidation preference. Making future dividends more expensive would, in turn, increase the

404-05; see also Jacobs, 908 F.3d at 890 (noting that the Enterprises increased their future obligations and reduced their available funds by drawing funds from Treasury to pay the dividend); Saxton, 901 F.3d at 962 (Callas, J., concurring) ("Crushing dividend payments could have led the entities toward insolvency."). The FHFA-C, with the amendments, also protected the Enterprises against future financial downturns.[15] See Jacobs, 908 F.3d at 890 ("The [PSPA Amendments] insured the [Enterprises] against downturns and 'death spirals,' preventing unpayable dividends from ratcheting up their debt loads to unsustainable levels."); see also Roberts, 889 F.3d at 405 (noting that the Enterprises fared better in some years and worse in other years under the terms of the PSPA Amendments as compared to the previous agreements).

In light of the above, the FHFA-C's execution of the PSPA Amendment for each Enterprise was a "quintessential conservatorship task[]" that is appropriate under HERA. Perry II, 864 F.3d at 607. Although "stockholders no doubt disagree about the necessity and fiscal wisdom of the [PSPA Amendments] . . . , Congress could not have been clearer about leaving those hard operational calls to the FHFA's managerial judgment." Id. In sum, the court joins the growing consensus that the FHFA-C acted within its statutory authority when it entered into the PSPA Amendments. See Jacobs, 908 F.3d at 894; Saxton, 901 F.3d at 963; Roberts, 889 F.3d at 403; Robinson v. Fed. Hous. Fin. Agency, 876 F.3d 220, 231 (6th Cir. 2017); Perry II, 864 F.3d at 606. But see Collins v. Mnuchin, 938 F.3d 553, 582 (5th Cir. 2019) (en banc) (holding, over the dissent of seven judges, that the plaintiffs stated a plausible claim that the FHFA-C exceeded its statutory authority). Thus, plaintiffs' theory that the FHFA-C is the United States because the FHFA-C exceeded its statutory authority is not persuasive.

**3. The FHFA-C was not coerced into approving the PSPA Amendments.**

Plaintiffs also argue that the FHFA-C is the United States because the FHFA-C was coerced into approving the PSPA Amendments by Treasury. Plaintiffs assert that Treasury coerced the FHFA-C into approving the PSPA Amendments because (1) Treasury drove the amendment process, (2) Treasury did not plan for the possibility that the FHFA-C would reject the amendments, and (3) the FHFA-C did not propose any alternatives to the amendments. In the alternative, plaintiffs contend that the FHFA, in its role as regulator, coerced the FHFA-C to approve the amendments because the two entities were not acting independently. Specifically, plaintiffs aver that the lines between the FHFA and the FHFA-C were blurred because (1) the FHFA's consent was required for any dividend payment and (2) the FHFA-C approved the amendments to achieve governmental objectives.

---

likelihood that the Enterprises would again need to rely on increasing Treasury's liquidation preference rather than making a cash payment. The end result is a cycle in which the Enterprises continue to increase Treasury's liquidation preference.

[15] Although the FHFA-C anticipated continued profitability for the Enterprises in the near term, this fact does not undermine the propriety of the PSPA Amendments because ensuring the continued functioning of a company includes guarding against long-term risks. These long-term outlooks are especially important given the indefinite nature of the FHFA-C's role.

Defendant counters that the FHFA-C was not coerced by Treasury because the FHFA-C had a choice of whether to accept or reject the PSPA Amendments. Defendant asserts that there is no coercion if a party has a choice, regardless of however difficult refusal of a particular option may be. With respect to Treasury's involvement, defendant contends that plaintiffs fail to proffer any allegations that Treasury required the FHFA-C to enter into the agreements against its will. Defendant further asserts that other courts have declined to conclude that the FHFA-C felt compelled to follow Treasury based on allegations that Treasury invented the amendment concept or led the process. Defendant also argues that the FHFA-C was not coerced by the FHFA in the latter's role as regulator because there were clear statutory lines delineating the FHFA's authority in each role.[16]

### a. The court has jurisdiction over claims based on actions that resulted from government coercion.

The court has jurisdiction over claims premised on the FHFA-C's actions if Treasury's "influence over the" FHFA-C "was coercive rather than merely persuasive." A & D Auto Sales, Inc. v. United States, 748 F.3d 1142, 1154 (Fed. Cir. 2014). The line between coercion and persuasion "is highly fact-specific." Id. Federal Circuit precedent frames the contours of the inquiry. In Langenegger v. United States, the plaintiffs pleaded that the United States coerced El Salvador by threatening to withhold financial and military assistance unless El Salvador passed legislation expropriating private property. 756 F.2d 1565, 1567 (Fed. Cir. 1985). The Federal Circuit disagreed with the plaintiffs' characterization of the threats because "[d]iplomatic persuasion among allies is a common occurrence, and as a matter of law, cannot be deemed sufficiently irresistible to warrant a finding of [coercion], however difficult refusal may be as a practical matter." Id. at 1572. Similarly, the Federal Circuit concluded in B & G Enterprises, Ltd. v. United States that California was not coerced into enacting restrictions on smoking, notwithstanding the federal government conditioning grants on states enacting such limits. 220 F.3d 1318, 1321, 1325 (Fed. Cir. 2000); see also A & D Auto, 748 F.3d at 1155 (explaining that "coercion was not established" in B & G). The court explained that "it was California's decision to create [the] restrictions[;] . . . Congress may have provided the bait, but California decided to bite." B & G, 220 F.3d at 1325. In A & D Auto, the Federal Circuit addressed coercion in the context of the government allegedly conditioning vital financial assistance to bankrupt automobile companies on those companies terminating some of their franchise agreements. 748 F.3d at 1145. Unable to resolve the issue due to gaps in the record, the court noted in dicta that a relevant consideration was "whether the government financing was essential to the companies." Id.

A common thread runs through the Federal Circuit's decisions: the importance of choice. A nonfederal actor is not coerced when it can choose to go against the wishes of the United States, even if doing so will cause significant hardships, id.; B & G, 220 F.3d at 1325, or result in a loss of prospective benefits, id.; B & G, 220 F.3d at 1325. But there is no choice, in any meaningful sense, when there is only one realistic option. A & D Auto, 748 F.3d at 1145 (noting

---

[16] Defendant frames its argument as addressing whether the FHFA-C acted as an agent for the FHFA in its role as regulator, but defendant is responding to plaintiffs' coercion argument.

the importance of considering whether the companies could survive without accepting the government's offer); cf. Nevada v. Skinner, 884 F.2d 445, 448 (9th Cir. 1989) (noting that, with respect to Congress's spending powers, "the federal government may not, at least in certain circumstances, condition the receipt of funds in such a way as to leave the state with no practical alternative but to comply with federal restrictions"). Put differently, the nonfederal actor must make a voluntary decision, which it cannot do if there is only one realistic option. See BMR Gold Corp. v. United States, 41 Fed. Cl. 277, 282 (1998) (finding that the "the necessary element of coerciveness" for a taking was missing because the plaintiff granted the military permission to cross his land); accord Henn v. Nat'l Geographic Soc., 819 F.2d 824, 826 (7th Cir. 1987) (noting that hard choices remain voluntary when they are not akin to "Don Corelone's 'make him an offer he can't refuse'"). In sum, the FHFA-C was not coerced if it voluntarily chose to enter into the PSPA Amendments.

**b. Plaintiffs have not established that Treasury coerced the FHFA-C into approving the PSPA Amendments.**

In support of their contention that Treasury coerced the FHFA-C into approving the PSPA Amendments, plaintiffs allege that Treasury proposed the terms of the amendments, and the FHFA-C did not make a counteroffer. Those allegations are not enough to establish coercion. First, given the Enterprises' improving financial condition and Treasury's existing funding commitment, the FHFA-C's decision to execute the PSPA Amendments was voluntary because it could reject the deals without imperiling the Enterprises. The facts here, therefore, are diametrically opposed to the circumstances in A & D Auto that the Federal Circuit suggested may support coercion because the automobile dealers faced insolvency if they did not accede to the financing terms. See 748 F.3d at 1145. Second, the FHFA-C's lack of protestation is informative. "[T]he very fact that FHFA[-C] itself [did] not br[ing] suit to enjoin the Treasury from the alleged coercion it was subjected to suggest[s] that FHFA[-C] was an independent, willing participant in its negotiations with the Treasury." Robinson v. Fed. Hous. Fin. Agency, 223 F. Supp. 3d 659, 668 (E.D. Ky. 2016), aff'd, 876 F.3d at 220. The court's conclusion is bolstered by the fact that another court has held that materially similar allegations to those at issue here did not "come close to a reasonable inference that [the] FHFA[-C] considered itself bound to do whatever Treasury ordered." Perry Capital LLC v. Lew, 70 F. Supp. 3d 208, 226 (D.D.C. 2014) ("Perry I"), aff'd in part, rev'd in part sub nom. 864 F.3d at 591. This court agrees with the reasoning in Perry I: the PSPA Amendments were executed by sophisticated parties, and many agreements arise from a party's proposal being accepted by the other party. Id.

**c. Plaintiffs have not established that the FHFA coerced the FHFA-C into approving the PSPA Amendments.**

Plaintiffs also have not alleged facts reflecting that the FHFA coerced the FHFA-C into agreeing to the PSPA Amendments. As an initial matter, plaintiffs have not alleged that the FHFA unduly influenced the FHFA-C's decision-making process with respect to the proposed agreements. They merely allege that the FHFA did not silo its regulatory and conservator roles. The lack of a firewall (without more), however, does not indicate that the FHFA deprived the FHFA-C of meaningful choice. Moreover, plaintiffs' focus on the FHFA-C allegedly pursuing

government objectives when it approved the PSPA Amendments is a red herring. The purported pursuit of government objectives is not germane to the coercion inquiry because it does not suggest that the FHFA-C lacked any choice in the matter. Even if it was relevant to coercion (or to some other theory for jurisdiction), plaintiffs would not prevail because Congress permitted the FHFA-C to act in the interests of the government. See 12 U.S.C. § 4617(b)(2)(J) (allowing the FHFA-C to "take any action" that "is in the interests of the [Enterprises] or the [FHFA]"). The mere pursuit of government objectives, therefore, would not reflect a blending of any roles but rather the FHFA-C using powers afforded to it by Congress.

In conclusion, plaintiffs have not established that the FHFA-C was coerced into approving the PSPA Amendments by Treasury or the FHFA.

### 4. The FHFA-C is not Treasury's agent.

Plaintiffs further argue that that the FHFA-C's actions are attributable to the United States because the FHFA-C is Treasury's agent. Plaintiffs assert that the FHFA-C is a government agent because (1) Treasury, by virtue of the PSPAs, had a major role in conservator decisions; (2) the FHFA-C approved the PSPA Amendments for the taxpayers' benefit; and (3) the FHFA-C could not have approved the amendments absent statutory authority. Defendant counters that plaintiffs have not pleaded an agency relationship because Treasury does not control the FHFA-C's operations and is statutorily barred from exercising such control.

The United States is subject to claims in this court for the actions of a third party "if [that] party is acting as the government's agent . . ." A & D Auto, 748 F.3d at 1154. "An essential element of agency is the principal's right to control the agent's actions." Hollingsworth v. Perry, 570 U.S. 693, 713 (2013) (quoting Restatement (Third) of Agency § 1.01, cmt. f (Am. Law. Inst. 2005)); accord O'Neill v. Dep't of Hous. & Urban Dev., 220 F.3d 1354, 1360 (Fed. Cir. 2000) (acknowledging that the common-law meaning of agency requires, among other things, that the principal has the right to control the agent's conduct; see also Preseault v. United States, 100 F.3d 1525, 1537 (Fed. Cir. 1996) (concluding that a state's actions were attributable to the United States when the state acted pursuant to the Interstate Commerce Commission's order); Hendler v. United States, 952 F.2d 1364, 1378-79 (Fed. Cir. 1991) (attributing a state's actions to the United States when the state acted under authority flowing from an Environmental Protection Agency order). The facts, as alleged, do not reflect that Treasury controlled the FHFA-C's actions because Congress explicitly precluded the FHFA-C from being subservient to another agency, 12 U.S.C. § 4617(a)(7) (providing that the FHFA-C cannot be subject to the "direction or supervision" of any other agency), and plaintiffs have not alleged facts indicating that Treasury exercised such control notwithstanding the statutory bar. Although the FHFA-C was required by the PSPAs to obtain Treasury's approval for certain actions (e.g., issuing dividends), the PSPAs did not provide Treasury with the right to unilaterally order amendments. Moreover, plaintiffs describe an FHFA-C that made decisions independently; Treasury "urg[ed]" the FHFA to pursue conservatorship and "push[ed]" for the PSPA Amendments. 2d Am. Compl. ¶¶ 4, 146. Simply stated, plaintiffs have not alleged facts establishing that Treasury exercised the control over the FHFA-C that is necessary for an agency relationship.

**5. The FHFA-C is the United States because the FHFA-C retains the FHFA's governmental character.**

Finally, plaintiffs contend that the FHFA-C is itself a government actor. Defendant disagrees. First, relying on O'Melveny & Myers v. FDIC, 412 U.S. 79 (1994), defendant argues that the FHFA-C is not the United States because the FHFA-C stands in the Enterprises' shoes. Specifically, defendant asserts that Congress's decision to have the FHFA-C succeed to the Enterprises' rights reflects that Congress intended that the FHFA-C step into the Enterprises' private shoes and shed its government character. Second, defendant argues that the FHFA-C's exercise of nontraditional conservatorship powers is immaterial because Congress can expand the conservator's role without transforming it into it into a government actor. Third, defendant argues that the Enterprises are not government instrumentalities—which means that the FHFA did not step into the shoes of a government actor when it became the Enterprises' conservator—because the government does not retain permanent authority to appoint the Enterprises' directors. Defendant contends that the government only has temporary, albeit indefinite, control over the Enterprises because conservatorships are not permanent.

In response, plaintiffs dispute the premise of defendant's argument that, pursuant to O'Melveny, the FHFA becomes the Enterprises when acting as conservator. Plaintiffs assert that O'Melveny does not concern whether an entity is the United States or, if the decision can be read as addressing that issue, is distinguishable because it concerns receivers or is limited to conservators exercising traditional conservator powers. Second, plaintiffs argue that the FHFA has not shed its government status, even if it has stepped into the Enterprises' shoes, when it acts as conservator. Specifically, plaintiffs assert that the FHFA-C retains the FHFA's government status because (1) the FHFA-C has acted beyond the traditional conservator powers and (2) Congress expressed its intention for that result by precluding the conservator from being subject to the supervision of "any other agency." 12 U.S.C. § 4617 (emphasis added). Third, plaintiffs argue that their claims are against the United States, even if the FHFA-C steps into the shoes of the Enterprises, because the Enterprises are government instrumentalities.[17]

In short, the parties disagree over the government status of the FHFA-C. The FHFA is indisputably the United States, see 12 U.S.C. § 4511(a) (establishing the FHFA as an "independent agency of the Federal Government"), and so the only question is whether the FHFA sheds that status when it acts as conservator. In other jurisdictions, courts have held (with near unanimity) that the FHFA loses its government status pursuant to O'Melveny. In O'Melveny, the United States Supreme Court ("Supreme Court") explained that the FDIC "steps

---

[17] The court notes that, with respect to the derivative claims, the parties fail to address a critical implication of plaintiffs' government instrumentality argument: there is only one party if the Enterprises are government instrumentalities. The defendant would be the United States because the FHFA-C, according to plaintiffs, stepped into the shoes of government instrumentalities—the Enterprises. The plaintiffs would also be the United States because the Enterprises are the real plaintiffs for any derivative claims. Simply stated, if the Enterprises are government instrumentalities, the defendant and derivative plaintiffs would both be the United States, which could pose justiciability issues. The court, however, does not consider such issues because it concludes that the Enterprises are not government instrumentalities.

into [the] shoes" of a private company when acting as receiver and sheds its government character because the FDIC "succeed[s] to . . . all rights, titles, powers, and privileges of the [entity in receivership] . . . ." 512 U.S. at 86 (quoting 12 U.S.C. § 1821(d)(2)(A)(i)); see also AG Route Seven P'ship v. United States, 57 Fed. Cl. 521, 534 (2003) (citing O'Melveny for the proposition that the FDIC as receiver is a "private party, and not the government per se" because it "is merely standing in the shoes . . . of the defunct thrift"). The courts drawing from O'Melveny have concluded that the FHFA steps into the shoes of the Enterprises and sheds its government character when acting as conservator because Congress provided that the FHFA-C exercises the same rights with respect to the Enterprises as Congress granted to the FDIC as receiver. See, e.g., Herron v. Fannie Mae, 861 F.3d 160, 169 (D.C. Cir. 2017); cf. Ameristar Fin. Servicing Co. v. United States, 75 Fed. Cl. 807, 811 (2007) (concluding, with respect to the FDIC, that the step-into-the-shoes principle set forth in O'Melveny also applies in the conservator context).

### a. The FHFA-C is not the United States if the FHFA steps into the Enterprises' shoes when acting as conservator.

Plaintiffs initially contend that defendant's reliance on O'Melveny is a red herring because, assuming that O'Melveny applies, the FHFA-C is the United States even though it steps into the Enterprises' shoes. Specifically, plaintiffs assert that the FHFA-C is the United States under the facts alleged because (1) the FHFA-C exercises nontraditional conservator powers, (2) Congress intended that the FHFA-C retain the FHFA's government status, and (3) the FHFA-C steps into the shoes of a government instrumentality. The court addresses each assertion in turn.

First, the FHFA-C did not become a government actor by exercising powers beyond those traditionally afforded to a conservator. As a threshold matter, plaintiffs have not alleged facts reflecting that the FHFA-C used such powers; the execution of the PSPA Amendments was a "quintessential conservatorship" function. Perry II, 864 F.3d at 607; see also supra Section IV.B.2 (discussing the FHFA-C's exercise of its powers). More importantly, however, plaintiffs would not prevail even if the FHFA-C exercised nontraditional conservatorship powers in agreeing to the PSPA Amendments. When this argument was pressed in other jurisdictions, it was rejected:

> It may well be true that FHFA's actions would not be allowed under traditional principles of corporate or conservatorship law, but it does not follow that those actions are therefore governmental. Legislatures can expand conservatorship and similar powers without transforming conservators into agents of the government. Cf. Pegram v. Herdrich, 530 U.S. 211, 225-26 (2000) (explaining that the Employee Retirement Income Security Act altered the common law of trusts to permit certain actions that would otherwise violate the trustee's fiduciary duties).

Bhatti v. Fed. Hous. Fin. Agency, 332 F. Supp. 3d 1206, 1226 (D. Minn. 2018) (footnote omitted). The court agrees with that reasoning, and plaintiffs provide no authority that supports a contrary result. Although plaintiffs state that the United States Court of Appeals for the

District of Columbia Circuit ("D.C. Circuit") decision in <u>Waterview Management Co. v. FDIC</u>, 105 F.3d 696 (D.C. Cir. 1997), supports their position, they are mistaken. <u>Waterview</u> is not on point because the D.C. Circuit did not hold that a conservator is <u>per se</u> the United States when acting pursuant to a congressional grant of broad powers. Rather, it held that, as a matter of statutory interpretation, the existence of a receivership did not preempt a prereceivership contract. <u>Id.</u> at 699-702.

Second, Congress's instruction that the FHFA-C is not subject to the supervision of any other agency does not reflect congressional intent for the FHFA to retain its government status when acting as conservator even if it steps into the shoes of the Enterprises. Because the court only reaches this issue by assuming that <u>O'Melveny</u> is instructive, the statutory language concerning supervision of the FHFA-C does not support a finding of jurisdiction because the same language is present in the statute that the Supreme Court addressed in <u>O'Melveny</u>. <u>See</u> 512 U.S. at 85-86 (discussing 12 U.S.C. § 1821). <u>Compare</u> 12 U.S.C. § 1821(c)(3)(C) ("When acting as conservator or receiver . . . , [the FDIC] shall not be subject to the direction or supervision of any other agency or department of the United States or any State in the exercise of the [FDIC's] rights, powers, and privileges."), <u>with id.</u> § 4617(a)(7) ("When acting as conservator or receiver, the [FHFA] shall not be subject to the direction or supervision of any other agency of the United States or any State in the exercise of the rights, powers, and privileges of the [FHFA].").

The third argument advanced by plaintiffs—that the FHFA-C is the United States because it steps into the shoes of a government instrumentality—also is not meritorious. A government instrumentality's actions are attributable to the United States for purposes of the Tucker Act. <u>See</u> <u>Corr v. Metro. Wash. Airports Auth.</u>, 702 F.3d 1334, 1336 (Fed. Cir. 2012) (noting that a claim against a government instrumentality is a claim against the United States for purposes of the Little Tucker Act, 28 U.S.C. § 1346(a)(2)). The Supreme Court established in <u>Lebron v. National Railroad Passenger Corp.</u> that a company is a government instrumentality when (1) it is created by "special law," (2) it is established "for the furtherance of governmental objectives," and (3) the federal government "retains for itself permanent authority to appoint a majority of the [company's] directors . . . ." 513 U.S. 374, 400 (1995). After <u>Lebron</u>, the Supreme Court clarified that, for purposes of the instrumentality test, "the practical reality of federal control and supervision prevails over Congress' disclaimer of the [the entity's] governmental status." <u>Dep't of Transp. v. Ass'n of Am. R.Rs.</u>, 135 S. Ct. 1225, 1233 (2015).

There is no dispute that the Enterprises satisfy the first two prongs of the <u>Lebron</u> test; Congress created the Enterprises by special law to achieve governmental objectives related to the housing market. <u>See</u> 12 U.S.C. § 4501; <u>see also</u> <u>Herron</u>, 861 F.3d at 167 (addressing claims involving Fannie and noting that "[t]his case satisfies the first two <u>Lebron</u> criteria"); <u>Am. Bankers Mortg. Corp. v. Fed. Home Loan Mortg. Corp.</u>, 75 F.3d 1401, 1406-07 (9th Cir. 1996) (reaching same conclusion for Freddie). The status of the Enterprises, therefore, turns on the third prong: whether the government retains permanent authority to appoint a majority of the Enterprises' directors.

The Federal Circuit has not addressed the government-control prong with respect to the Enterprises, but courts in other jurisdictions have done so. Those decisions provide a starting point for the court. It appears that every court to consider the issue, with the exception of one

district court, has held that the government does not exercise permanent control over the Enterprises.  Sisti v. Fed. Hous. Fin. Agency, 324 F. Supp. 3d 273, 279 (D.R.I. 2018) (concluding that the government retains permanent authority to control the Enterprises after noting that "[t]he non-controlling precedent to date" has reached the opposite conclusion).  Most of the courts that concluded that the government lacks permanent control over the Enterprises issued their decisions before the Supreme Court in Association of American Railroads emphasized the importance of evaluating the practical reality over nomenclature, and the other courts focused on the statutory purpose for the conservatorships rather than the Enterprises' actual situation.  E.g., Herron, 861 F.3d at 169 (relying on the notion that a conservatorship is fundamentally temporary).  In other words, the courts adopting the prevailing view considered the issue of control without regard for the Supreme Court's instruction to focus on the practical reality.  The court, therefore, does not find those decisions persuasive.

The crux of the inquiry, as the Supreme Court mandates, is on the practical reality of the government's control over the Enterprises.  Ass'n of Am. R.Rs., 135 S. Ct. at 1233.  It is of no import that Congress nominally authorized a facially temporary conservatorship, see 12 U.S.C. § 4617(a) (permitting the FHFA to act as conservator to "reorganiz[e]" or "rehabilitat[e]" the Enterprises), because Congress's disclaimers are no substitute for the court's obligation to assess the government's actual control, Ass'n of Am. R.Rs., 135 S. Ct. at 1233.  The court focuses on the length of the conservatorship because the FHFA-C wields complete control over the Enterprises so long as they are in conservatorship.  See generally 12 U.S.C. § 4617.

Plaintiffs allege that the Enterprises will remain undercapitalized—and thus subject to conservatorship pursuant to 12 U.S.C. § 4617(a)(3)(J)—until the PSPAs, in their current form, are changed because the Enterprises cannot accumulate any capital under the existing terms of the PSPAs.  Although the PSPAs could be further amended, plaintiffs' allegations reflect that Treasury and the FHFA-C will not do so because the purpose of the PSPA Amendments is to prevent the Enterprises from accumulating the necessary capital to become independent companies.  Plaintiffs, in short, have alleged that the government intended, and has taken steps to ensure, that the conservatorships never end.  Those facts, viewed in isolation, would support a conclusion that the practical reality is that the Enterprises are under permanent government control.  The court's inquiry, however, is not limited to plaintiffs' allegations because it has taken judicial notice of relevant facts reflecting that the status quo has changed:  the Treasury Secretary and the FHFA Director are now both committed to ending the conservatorships.  Moreover, the idea that the Enterprises are permanently subject to government control because they can never accumulate the capital needed to exit the conservatorships is undermined by recent developments.  Indeed, Treasury proposed amending the Net Worth Sweep to allow the Enterprises to retain more capital, and the FHFA Director testified during his confirmation hearing that, if confirmed, he would seek to increase the amount of capital that the Enterprises retain.  Simply stated, the practical reality is that the Enterprises are not subject to permanent government control because the relevant parties are working to terminate the conservatorships.[18]

_____

[18]  Plaintiffs may disagree with the court's conclusion that events occurring after the PSPA Amendments are relevant to determining whether the Enterprises were under permanent government control during the events discussed in plaintiffs' complaint.  Even if the court agreed that events occurring after the PSPA Amendments are not germane, plaintiffs still would not

In sum, the FHFA-C does not become the United States if the FHFA steps into the Enterprises' shoes when serving as conservator.

**b. The FHFA-C retains the FHFA's government character because the FHFA-C does not step into the Enterprises' shoes.**

The key inquiry, therefore, is whether the FHFA steps into the shoes of the Enterprises when acting as conservator. Defendant argues that the FHFA-C sheds its government character and assumes the identity of the Enterprises based on the reasoning in O'Melveny. Defendant's reliance on O'Melveny is misplaced. O'Melveny concerns a receiver stepping into the shoes of a failed bank. 512 U.S. at 86. The roles of a conservator and receiver are meaningfully different. In a recent decision, the United States District Court for the District of Rhode Island artfully explained the differences and their import for assessing whether the FHFA-C is the government:

> The O'Melveny Court held that FDIC, when acting as a receiver for a private entity, steps into the shoes of that private entity for state law claims. This holding makes sense given the purpose of receivership: "to preserve a company's assets, for the benefit of creditors, in the face of bankruptcy." When FDIC is appointed receiver, it must dispose of the received entity's assets, resolving obligations and claims made against the entity. Notably, "[i]n receivership, the receiver owes fiduciary duties to the creditors, which the corporation would otherwise owe to creditors during a period of insolvency." It logically follows, then, that the receiver steps into the shoes of the private entity, because it assumes the fiduciary duties of that entity.

> Conservatorship, in contrast, serves a different function. FHFA has described the purpose of conservatorship is "to establish control and oversight of a company to put it in a sound and solvent condition." Conservators, unlike receivers, have a fiduciary duty running to the corporation itself.

> This is "critically distinct" from the fiduciary duties owed as a receiver—the receiver does indeed "step into the shoes" of the entity by assuming the fiduciary duties of the entity, but the conservator does not: it remains distinct, and rather owes a duty to the entity. Given the difference in fiduciary duties, O'Melveny's "steps into the shoes" holding makes sense in the context of receivership, but not in the context of conservatorship.

---

prevail because they allege that the conservatorships began as temporary measures. See 2d Am. Compl. ¶¶ 66 ("FHFA also emphasized that the conservatorship was temporary: 'Upon the [FHFA] Director's determination that the [FHFA-C's] plan to restore the [Enterprises] to safe and solvent condition has been completed, the Director will issue an order terminating the conservatorships'" (quoting FHFA publication)), 110 (noting that, when the conservatorships were imposed, the FHFA Director "vowed" that the Enterprises would "exit conservatorship" and "return to normal business operations"). Thus, the Enterprises were not under permanent government control before the PSPA Amendments.

<u>Sisti</u>, 324 F. Supp. 3d at 282-83 (citations and footnotes omitted).  <u>See generally</u> Brian Taylor Goldman, <u>The Indefinite Conservatorship of Fannie Mae and Freddie Mac Is State-Action</u>, 17 J. Bus. & Sec. L. 11, 23-30 (2016).  The district court, relying on the above analysis, declined to treat the FHFA-C as a private actor.  <u>Sisti</u>, 324 F. Supp. 3d at 284.  This court agrees with the reasoning and conclusion in <u>Sisti</u>:  the FHFA does not shed its government character when acting as conservator because it does not step into the shoes of the Enterprises.  Otherwise stated, the FHFA-C is the United States because it retains the FHFA's government character.  Plaintiffs' claims, therefore, are against the United States for purposes of the Tucker Act.

## C.  The court has jurisdiction over takings claims.

The court next addresses, as instructed by the Federal Circuit, whether the Court of Federal Claims lacks jurisdiction to entertain takings claims because it is not an Article III tribunal.  <u>See</u> <u>Fairholme Funds</u>, 681 F. App'x at 949-50.

### 1.  The judges on this court do not exercise Article III power.

Article III, § 1, of the Constitution states that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  Article III judges "hold their Offices during good Behaviour" and receive compensation "for their Services, . . . which shall not be diminished during their Continuance in Office."  U.S. Const. art. III, § 1; <u>see also</u> <u>Ortiz v. United States</u>, 138 S. Ct. 2165, 2176 (2018) (noting that the United States Court of Appeals for the Armed Forces is not an Article III court because, among other reasons, "its members lack the tenure and salary protections that are the hallmarks of the Article III judiciary" (citing 10 U.S.C. § 942 (2018)); <u>Wellness Int'l Network, Ltd. v. Sharif</u>, 135 S. Ct. 1932, 1938 (2015) (observing that "bankruptcy and magistrate judges . . . do not enjoy the protections of Article III," namely, "life tenure and pay that cannot be diminished").  It is well settled that Congress cannot confer the Article III judicial power on non-Article III courts.  <u>See</u> <u>Oil States Energy Servs., LLC v. Greene's Energy Grp., LLC</u>, 138 S. Ct. 1365, 1372-73 (2018); <u>Stern v. Marshall</u>, 564 U.S. 462, 484 (2011); <u>see also</u> <u>Stern</u>, 564 U.S. at 484 ("[I]n general, Congress may not 'withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty.'"  564 U.S. at 484 (quoting <u>Murray's Lessee v. Hoboken Land & Improvement Co.</u>, 59 U.S. 272, 284 (1855))).

Congress expressly established the Court of Federal Claims "under article I of the Constitution of the United States."  28 U.S.C. § 171(a).  And, although judges of the Court of Federal Claims enjoy the salary protections of Article III judges, <u>see</u> <u>id.</u> § 172(b) ("Each judge shall receive a salary at the rate of pay, and in the same manner, as judges of the district courts of the United States."), they do not enjoy the life tenure of Article III judges, <u>see</u> <u>id.</u> §§ 172(a) ("Each judge . . . shall be appointed for a term of fifteen years."), 176 (allowing for the removal from office by the Federal Circuit).  Consequently, the court's judges do not exercise Article III judicial power.

## 2. Court of Federal Claims judges can adjudicate public rights.

Although Court of Federal Claims judges cannot adjudicate the same panoply of issues as Article III judges, the judges on this court may adjudicate a category of cases involving what the Supreme Court has denominated "public rights." <u>See</u> <u>Oil States</u>, 138 S. Ct. at 1373. "When determining whether a proceeding involves an exercise of Article III judicial power, [the Supreme Court's] precedents have distinguished between 'public rights' and 'private rights.' Those precedents have given Congress significant latitude to assign adjudication of public rights to entities other than Article III courts." <u>Id.</u>; <u>accord</u> <u>N. Pipeline Constr. Co. v. Marathon Pipe Line Co.</u>, 458 U.S. 50, 67-68 (1982) (plurality opinion) ("[T]his Court has upheld the constitutionality of legislative courts and administrative agencies created by Congress to adjudicate cases involving 'public rights.'").

While the Supreme Court "has not 'definitively explained' the distinction between public and private rights," <u>Oil States</u>, 138 S. Ct. at 1373 (quoting <u>N. Pipeline</u>, 458 U.S. at 69), "and its precedents applying the public-rights doctrine have 'not been entirely consistent,'" <u>id.</u> (quoting <u>Stern</u>, 564 U.S. at 488), public rights include, at a minimum, those "matters 'which arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments,'" <u>id.</u> (quoting <u>Crowell v. Benson</u>, 285 U.S. 22, 50 (1932)). "In other words, the public-rights doctrine applies to matters 'arising between the government and others, which from their nature do not require judicial determination and yet are susceptible of it.'" <u>Id.</u> (quoting <u>Crowell</u>, 285 U.S. at 50).

In addition, if an action cannot be brought absent the government's waiver of sovereign immunity, then the case involves a public right. <u>See</u> <u>Stern</u>, 564 U.S. at 489 ("The challenge in <u>Murray's Lessee</u> . . . fell within the 'public rights' category of cases, because it could only be brought if the Federal Government chose to allow it by waiving sovereign immunity."). In other words, "Congress may set the terms of adjudicating a suit when the suit could not otherwise proceed at all." <u>Id.</u>; <u>see</u> <u>N. Pipeline</u>, 458 U.S. at 67 (explaining that the rationale for the public rights exception stems in part from "the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued").

## 3. The right to compensation for a taking is a public right subject to adjudication in the Court of Federal Claims.

The right to just compensation enshrined in the Takings Clause of the Fifth Amendment is a public right for three reasons. The court addresses each reason in turn.

The first reason a takings claim concerns a public right relates to the parties involved. A takings claim is an allegation, by a private party, that the government is liable to it for just compensation. In other words, a takings claim necessarily "arise[s] between the Government and persons subject to its authority." <u>Oil States</u>, 138 S. Ct. at 1373 (quoting <u>Crowell</u>, 285 U.S. at 50). To this court's knowledge, the Supreme Court has never held that such a dispute between private persons and the United States must be heard in an Article III court. Instead, it has implied that such disputes fall squarely within the public rights exception. <u>See</u> <u>Stern</u>, 564 U.S. at 490 (noting that it has "rejected the limitation of the public rights exception to actions involving

the Government as a party"); see also N. Pipeline, 458 U.S. at 70 ("[C]ontroversies [between the government and others] may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination.").

The second reason a takings claim concerns a public right relates to the nature of the alleged liability—namely, just compensation. The Takings Clause requires that the government pay "just compensation" for "private property" that is "taken for public use." U.S. Const. amend. V. When the federal government takes private property for public use, the payment of just compensation is authorized by Congress in its exercise of its Article I power to pay the United States' debts. See Ex parte Bakelite Corp., 279 U.S. 438, 452 (1929) ("[E]xamining and determin[ing] claims for money against the United States . . . is a function [that] belongs primarily to Congress as an incident of its power to pay the debts of the United States."); see also U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power . . . to pay the Debts . . . of the United States . . . ."). Only Article III courts may exercise the judicial power, but Congress may exercise its Article I powers "through judicial as well as non-judicial agencies." Sherwood, 312 U.S. at 587. Therefore, takings claims "arise between the Government and persons subject to its authority in connection with the performance of the constitutional functions of the . . . legislative department[]," Crowell, 285 U.S. at 50, i.e., the payment of a debt with money from the United States treasury. Accord Brott v. United States, 858 F.3d 425, 435 (6th Cir. 2017) (holding that plaintiffs pursuing takings claims are not constitutionally entitled to have those claims adjudicated in an Article III forum, and providing that compensation "claims are made by private individuals against the government in connection with the performance of a historical and constitutional function of the legislative branch, namely, the control and payment of money from the treasury"), cert. denied, 138 S. Ct. 1324 (2018).

The third reason a takings claim concerns a public right relates to the nature of the defendant. "It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction." United States v. Mitchell, 463 U.S. 206, 212 (1983). In other words, the United States must waive its sovereign immunity for suits against it to proceed. Id.

"[T]he Fifth Amendment does not provide a self-executing waiver of sovereign immunity" for takings claims. Sammons v. United States, 860 F.3d 296, 300 (5th Cir. 2017); accord Brott v. United States, No. 1:15-CV-38, 2016 WL 5922412, at *4 (W.D. Mich. Mar. 28, 2016) ("Plaintiffs' argument that the Fifth Amendment's guarantee of just compensation is 'self-executing' and not dependent on a congressional waiver of sovereign immunity is contrary to long-standing clear precedent, by which this Court is bound."), aff'd, 858 F.3d at 425. Indeed, the self-executing character of the Takings Clause relates to the right it provides, not the means to enforce that right:[19]

---

[19] Mr. Sammons relied on footnote nine in First English Evangelical Lutheran Church of Glendale v. County of Los Angeles, 482 U.S. 304 (1987), to argue that the principle of sovereign immunity is inapplicable to claims brought under the "self-executing" Takings Clause. The Supreme Court's comments in this footnote, however, merely reinforce the understanding that the Takings Clause is self-executing in providing a right to a remedy. See id. at 316 n.9 ("[I]t is

> The suits [on appeal] were based on the right to recover just compensation for property taken by the United States for public use in the exercise of its power of eminent domain. That right was guaranteed by the Constitution. The fact that condemnation proceedings were not instituted and that the right was asserted in suits by the owners did not change the essential nature of the claim. The form of the remedy did not qualify the right. It rested upon the Fifth Amendment. Statutory recognition was not necessary. A promise to pay was not necessary. Such a promise was implied because of the duty to pay imposed by the amendment. The suits were thus founded upon the Constitution of the United States.

Jacobs v. United States, 290 U.S. 13, 16 (1933); accord First English, 482 U.S. 315 ("[A] landowner is entitled to bring an action in inverse condemnation as a result of "the self-executing character of the constitutional provision with respect to compensation . . . ." (quoting United States v. Clarke, 445 U.S. 253, 257 (1980))). In other words, the Takings Clause is self-executing in providing a remedy, but is not self-executing in providing a means to enforce that remedy. See Lynch v. United States, 292 U.S. 571, 581 (1934) ("The sovereign's immunity from suit exists whatever the character of the proceeding or the source of the right sought to be enforced. It applies alike to causes of action arising under acts of Congress, and to those arising from some violation of rights conferred upon the citizen by the Constitution. The character of the cause of action . . . may be important in determining (as under the Tucker Act (24 Stat. 505)) whether consent to sue was given. Otherwise it is of no significance." (citations omitted)); see also Webster v. Doe, 486 U.S. 592, 613 (1988) (Scalia, J., dissenting) ("The doctrine of sovereign immunity . . . is a monument to the principle that some constitutional claims can go unheard. No one would suggest that, if Congress had not passed the Tucker Act, . . . courts would be able to order disbursements from the Treasury to pay for property taken under lawful authority (and subsequently destroyed) without just compensation.").

The Tucker Act provides a means to enforce the remedy set forth in the Takings Clause.[20] See 28 U.S.C. § 1491(a)(1). As noted above, the Tucker Act allows plaintiffs to bring monetary claims against the United States founded upon the Constitution, including Fifth Amendment takings claims. See id. ("The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded . . . upon the Constitution . . . ."); Knick v. Twp. of Scott, 139 S. Ct. 2162, 2170 (2019) ("We have held that '[i]f there is a taking, the claim is "founded upon the Constitution" and within the jurisdiction of the Court of Claims to hear and determine.'" (quoting United States v. Causby, 328 U.S. 256, 267 (1946))). This allowance constitutes a waiver of sovereign immunity. See Mitchell, 463 U.S. at 212

_____

the Constitution that dictates the remedy for interference with property rights amounting to a taking." (emphasis added)).

[20] The remedy can also be enforced under the Little Tucker Act, which provides federal district courts with jurisdiction concurrent with that of the Court of Federal Claims for claims not exceeding $10,000, 28 U.S.C. § 1346(a)(2), and the Indian Tucker Act, which provides the Court of Federal Claims with jurisdiction to adjudicate claims brought by American Indian tribes, bands, or groups, id. § 1505. Neither statute is applicable in this case.

("[B]y giving the Court of Claims jurisdiction over specified types of claims against the United States, the Tucker Act constitutes a waiver of sovereign immunity with respect to those claims."). In short, because this waiver of sovereign immunity over takings claims is necessary for suits against the United States to proceed, such claims implicate public rights that can be adjudicated in a non-Article III forum.

This conclusion is confirmed by historical practice. Prior to 1855, persons seeking to enforce claims for money damages against the United States were not able to obtain judicial redress. See United States v. Bormes, 568 U.S. 6, 12 (2012) (describing "[t]he Tucker Act's jurisdictional grant[] and accompanying immunity waiver" as a "missing ingredient for an action against the United States for the breach of monetary obligations not otherwise judicially enforceable"). Instead, "claimants routinely petitioned Congress for private bills to recover money owed." Id. at 11. If the Fifth Amendment waives sovereign immunity, those claimants could have instead proceeded in Article III courts, even in the absence of any statutory authorization. Mr. Sammons did not identify, and the court has not located, any example of such a case being filed between 1791 and 1855.

In sum, a takings claim implicates a public right because such a claim consists of a dispute between a private party and the United States, involves Congress's obligation to pay a debt, and requires the waiver of sovereign immunity. Accordingly, the Court of Federal Claims constitutionally can adjudicate claims under the Takings Clause.[21]

### D. The court lacks jurisdiction over plaintiffs' claim that sounds in tort.

#### 1. Plaintiffs' direct fiduciary duty claim sounds in tort.

Turning back to the parties' contentions, defendant argues that the court lacks jurisdiction over plaintiffs' direct fiduciary duty claims because the United States does not owe to each Enterprise's shareholders a fiduciary duty that is grounded in a statute or contract.[22] Defendant asserts that such a fiduciary duty cannot be based on (1) HERA because, pursuant to the statute, the FHFA-C is only required to act in the government's and the Enterprises' best interests; or (2) the PSPAs because plaintiffs are not parties to those contracts. Plaintiffs counter that their claim is based on a fiduciary duty rooted in both HERA and the PSPAs. As to HERA, plaintiffs

---

[21] Mr. Sammons did not argue that plaintiffs are entitled to a jury trial but, for the sake of completeness, the court notes that the Supreme Court has held that "when Congress properly assigns a matter to adjudication in a non-Article III tribunal, 'the Seventh Amendment poses no independent bar to the adjudication of that action by a nonjury factfinder.'" Oil States, 138 S. Ct. at 1379 (quoting Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 53-54 (1989)). Therefore, the rejection of Mr. Sammons's Article III challenge would also resolve a Seventh Amendment challenge. See id.

[22] In its notice of arguments, defendant explains that it is arguing in its motion to dismiss for the dismissal of plaintiffs' direct and derivative fiduciary duty claims. After reviewing the motion, it is apparent that defendant only presented argument concerning the direct claim. The court, therefore, reserves judgment on whether it has jurisdiction over the derivative claims.

assert that Congress made the FHFA-C a fiduciary by authorizing it to control the Enterprises, entrusting it with duties that are at the core of what it means to be a fiduciary, and using terminology—"conservator"—associated with a fiduciary.  Additionally, plaintiffs contend that recognizing that Treasury owes a fiduciary duty to shareholders is the only way to give meaning to Congress's mandate in HERA that Treasury protect taxpayers by considering, before purchasing securities, the need to maintain the Enterprises as privately owned entities.  With respect to the PSPAs, plaintiffs argue that Treasury owes a fiduciary duty to the shareholders because it acquired control rights under the contract.[23]

The court, pursuant to the Tucker Act, lacks jurisdiction over tort claims.  28 U.S.C. § 1491(a)(1).  A breach of fiduciary duty is generally classified as a tort.  Newby v. United States, 57 Fed. Cl. 382, 294 (2003).  A fiduciary duty claim, however, does not sound in tort for purposes of the Tucker Act when the fiduciary relationship is founded on a money-mandating statute or a contractual provision between the claimant and United States.  See Hopi Tribe v. United States, 782 F.3d 662, 667 (Fed. Cir. 2015) (statute); Cleveland Chair Co. v. United States, 557 F.2d 244, 246 (Ct. Cl. 1977) (contract); see also 28 U.S.C. § 1491(a)(1) (providing jurisdiction over claims "founded upon . . . any Act of Congress . . . or contract with the United States").

The initial issue is whether HERA establishes a fiduciary relationship between the FHFA-C and the Enterprises' shareholders.  The court begins with the language of the statute.  Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 438 (1999).  "If Congress has expressed its intention by clear statutory language, that intention controls and must be given effect."  Rosete v. Office of Pers. Mgmt., 48 F.3d 514, 517 (Fed. Cir. 1995); accord Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  Congress provided in HERA that the FHFA-C is only required to act in the interests of itself or the Enterprises.  12 U.S.C. § 4617(b)(2)(J).  That statement reflects a clear intent:  the FHFA-C does not owe a fiduciary duty to shareholders because the conservator is not required to consider shareholders' interests.[24]  See id.; see also Collins, 938 F.3d at 580 (noting that HERA "may permit" the FHFA-C to pursue actions that are "inconsistent with fiduciary duties").  The plain language controls, and therefore the court does not consider the peripheral considerations urged by plaintiffs such as the implications of the

---

[23] Plaintiffs' contention that Treasury owes them a fiduciary duty does not appear in the second amended complaint.

[24] The court's interpretation of HERA's plain language is buttressed by the fact that Congress seemingly made a deliberate decision to exclude shareholder interests from the FHFA-C's considerations.  Congress modeled HERA on the Financial Institutions Reform, Recovery, and Enforcement Act ("FIRREA").  Jacobs, 908 F.3d at 893.  Under FIRREA, Congress permitted the FDIC as conservator to consider the best interests of a bank, its depositors, or the FDIC.  12 U.S.C. § 1821(d)(2)(J)(ii).  Although Congress permitted the FDIC to take into consideration the interests of its depositors, Congress omitted the analogue of depositors—shareholders—from the list of germane interests that the conservator can consider when acting pursuant to HERA.  Compare id. (FIRREA), with 12 U.S.C. 4617(b)(2)(J) (HERA).  The omission is telling.

word "conservator," the FHFA-C's control over the Enterprises, or the FHFA-C's other powers. In sum, plaintiffs cannot establish jurisdiction for their direct fiduciary duty claim by relying on HERA.

The next issue is whether Treasury owes a fiduciary duty to shareholders because it purchased securities pursuant to HERA.[25]  Plaintiffs contend that Treasury assumed such a duty when it agreed to the PSPAs because of the determinations that Congress required the Treasury Secretary to make prior to buying the securities.  Before purchasing securities pursuant to HERA, the Secretary is required to determine that the purchase is necessary to protect taxpayers and evaluate various considerations in connection with protecting the taxpayers.  12 U.S.C. §§ 1455($l$)(1)(B)-(C), 1719(g)(1)(B)-(C).  One of those considerations is the need to maintain the Enterprises as privately owned companies.  Id. §§ 1455($l$)(1)(C), 1719(g)(1)(C).  At no point, however, did Congress direct (or even suggest) that the Secretary must protect the shareholders. The court declines to stretch the statutory language to support a fiduciary relationship based on any incidental benefit shareholders may derive from the Secretary considering the need to keep the Enterprises privately owned in the context of protecting taxpayers.  Simply stated, Treasury did not assume any fiduciary obligations to the Enterprises' shareholders by virtue of HERA.

Finally, the court turns to whether Treasury owed a fiduciary duty to the Enterprises' other shareholders because it acquired control rights by agreeing to the PSPAs.  Plaintiffs' argument is premised on the state-law principle (which they term "general corporate law") that a controlling shareholder owes a fiduciary duty to the minority shareholders.  The court is not convinced.  First, plaintiffs' allegation of a fiduciary relationship is not founded on a contract within the meaning of the Tucker Act.  Plaintiffs are not attempting to enforce any duty imposed on Treasury that is specified in the PSPAs.  They invoke the contracts solely to establish that Treasury is a controlling shareholder and rely on that conclusion to argue that it has a fiduciary duty based on state law.  The contract, otherwise stated, is one step removed from the purported genesis of the fiduciary duty—the application of state-law principles.  That gap is too much in light of the court's obligation to narrowly construe the Tucker Act's waiver of sovereign immunity.  See Smith, 855 F.2d at 1552 (noting that the Tucker Act is narrowly construed); see also Perry II, 864 F.3d at 619-20 (rejecting the legal theory that the Enterprises' shareholders' need to reference the PSPAs for their fiduciary duty claim was enough to conclude that the claim was rooted in a contract for purposes of the Tucker Act).

---

[25]  The gravamen of plaintiffs' direct fiduciary duty claim is that the FHFA-C owed a fiduciary duty to plaintiffs.  See 2d Am. Compl. ¶¶ 223-33.  Indeed, plaintiffs state in their complaint that the "FHFA violated its fiduciary duty," id. ¶¶ 233, and make no similar allegation with regard to Treasury.  Although plaintiffs have not alleged that their direct fiduciary duty claim is premised on Treasury's actions, the court nonetheless considers the parties' arguments on whether such a claim would be within the court's jurisdiction for two reasons.  First, the parties have fully briefed the issue without noting the discrepancy between plaintiffs' arguments and the allegations in their complaint.  Second, the court's resolution of the issue is immaterial to the ultimate outcome because, as discussed below, plaintiffs lack standing to pursue their direct claims.

Second, plaintiffs fail to demonstrate the applicability of the state-law principles underlying their theory for why Treasury assumed fiduciary duties. Federal law governs the obligations Treasury incurred by entering into the PSPAs. See Boyle v. United Techs. Corp., 487 U.S. 500, 519 (1988) ("The proposition that federal common law continues to govern the 'obligations to and rights of the United States under its contracts' is nearly as old as Erie [v. Tompkins, 304 U.S. 64 (1938),] itself."). Although courts may shape federal law by drawing from state-law principles, plaintiffs do not explain why doing so is appropriate in this instance.

Third, plaintiffs do not prevail even if their fiduciary duty claim could be founded on a contract and federal common law incorporates the state-law principles regarding controlling shareholders' fiduciary obligations. Under Delaware and Virginia law, a controlling shareholder owes a fiduciary duty to the minority shareholders. See Ivanhoe Partners v. Newmont Min. Corp., 535 A.2d 1334, 1344 (Del. 1987); Parsch v. Massey, 79 Va. Cir. 446 (2009); see also Quadrant Structured Prod. Co. v. Vertin, 102 A.3d 155, 183 (Del. Ch. 2014) (acknowledging that those "who effectively control a corporation" owe a fiduciary duty to others).[26] To have the requisite level of control, the controlling shareholder must (1) be able to exercise a majority of the corporation's voting power or (2) direct the corporation without owning a majority of stock. Kahn v. Lynch Commc'n Sys., 638 A.2d 1110, 1113 (Del. 1994). The latter, effective exercise of control, "is not an easy test to satisfy; the individual or group must be, "as a practical matter, . . . no differently situated than if they had majority voting control." In re PNB Holding Co. S'holders Litig., No. CIV.A. 28-N, 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006). Plaintiffs have not established that Treasury meets either control test. First, plaintiffs do not allege that Treasury owns any of the Enterprises' voting stock. Treasury purchased preferred stock and acquired the right to buy common (i.e., voting) stock, but there is no indication that Treasury exercised its warrants or otherwise acquired common stock.[27] Second, plaintiffs do not demonstrate that Treasury exercised effective control over the Enterprises. Although Treasury acquired the right to preclude the Enterprises from taking certain actions, Treasury did not control the Enterprises because it could not direct any action—it could only respond to certain requests made by the Enterprises. As a practical matter, therefore, Treasury is situated differently than if it had majority voting power.

In sum, plaintiffs' direct fiduciary duty claim is a tort claim because plaintiffs have not established that the FHFA-C or Treasury owed shareholders a fiduciary duty based on a statute

_____

[26] The court refers to Delaware and Virginia law because Fannie is a Delaware corporation, and Freddie is a Virginia corporation. When evaluating Virginia law, the court also looks to Delaware state court decisions because Virginia courts do so to resolve unsettled issues in the Commonwealth. E.g., U.S. Inspect Inc. v. McGreevy, No. 160966, 2000 WL 33232337, at *4 (Va. Cir. Ct. Nov. 27, 2000).

[27] Even if Treasury had exercised its option to buy a majority of the voting stock, it would not be a controlling shareholder because the FHFA-C succeeded to all of the shareholders' rights. See 12 U.S.C. § 4617(b)(2)(A) (noting that the FHFA-C, by operation of law, succeeds to all rights and powers of any Enterprise shareholder). Treasury, therefore, would have no voting power.

or contract. The court, therefore, dismisses count VII—breach of fiduciary duty—because it lacks jurisdiction over tort claims.

## 2. Plaintiffs' takings and illegal-exaction claims do not sound in tort.

Defendant also argues that plaintiffs' Fifth Amendment takings and illegal-exaction claims sound in tort because they are premised on purported misconduct by the FHFA-C. Plaintiffs counter that they have pleaded the predicates for takings and illegal-exaction claims, which means that it is irrelevant whether they also alleged facts that are germane to tortious actions.

When a party pleads the predicates for a takings claim or illegal-exaction claim, the court possesses jurisdiction to entertain such claims. See Hansen v. United States, 65 Fed. Cl. 76, 80-81 (2005) ("[S]o long as there is some material evidence in the record that establishes the predicates for a [claim covered by the Tucker Act,] . . . a plaintiff succeeds in demonstrating subject matter jurisdiction in this court . . . ."). Those claims, at a basic level, are contentions that the government expropriated private property lawfully (takings) or unlawfully (illegal exaction). See Orient Overseas Container Line (UK) Ltd. v. United States, 48 Fed. Cl. 284, 289 (2000) ("Takings claims arise because of a deprivation of property that is authorized by law. Illegal exactions arise when the government requires payment in violation of the Constitution, a statute, or a regulation." (citation omitted)). If a party alleges the necessary predicates for these claims, the court is not deprived of jurisdiction even if the complaint contains allegations that could support a tort claim. See El-Shifa Pharm. Indus. Co. v. United States, 378 F.3d 1346, 1353 (Fed. Cir. 2004) ("That the complaint suggests the United States may have acted tortiously towards the appellants does not remove it from the jurisdiction of the Court of Federal Claims."); Rith Energy, Inc. v. United States, 247 F.3d 1355, 1365 (Fed. Cir. 2001) (explaining that this court has jurisdiction over a takings claim "even if the government's action was subject to legal challenge on some other ground"). Here, plaintiffs plead the predicates for takings and illegal-exaction claims by alleging, in essence, that they were forced to give their property to the government because of lawful or unlawful government conduct. Therefore, it is of no import to the court's jurisdiction whether plaintiffs have alleged facts that would also support a tort claim.

## E. The court lacks jurisdiction over plaintiffs' direct implied-in-fact-contract claim because plaintiffs are not third-party beneficiaries of such a contract.

Defendant argues next that the court lacks jurisdiction to entertain plaintiffs' direct implied-in-fact-contract claim because plaintiffs are not third-party beneficiaries of such a contract.[28] Specifically, defendant asserts that plaintiffs have not established that they are intended beneficiaries independent of their status as shareholders and that any benefit that is related to their status as shareholders is insufficient for jurisdiction. Plaintiffs counter that they

---

[28] In its notice of arguments, defendant explains that it is arguing in its motion to dismiss that plaintiffs' direct and derivative contract claims should be dismissed. But, after a review of that motion, it is apparent that defendant limited its argument to plaintiffs' direct contract claim, count X. The court, therefore, only considers that issue and reserves judgment on whether it has jurisdiction over the derivative contract claims.

are intended third-party beneficiaries of implied contracts, between the FHFA and each Enterprise's board, in which the boards consented to the conservatorships in exchange for the FHFA-C operating the Enterprises as a fiduciary and returning them to sound condition. Specifically, plaintiffs assert that the intent to benefit the shareholders is evident from (1) the boards' consent to the conservatorships because shareholders would benefit from a conservator focused on returning the Enterprises to a better condition, and (2) the government acknowledging that the Enterprises' stock would remain outstanding while the Enterprises were in conservatorship.

The court's jurisdiction over contract claims is limited by the Tucker Act. Ransom v. United States, 900 F.2d 242, 244 (Fed. Cir. 1990). Of particular import here, ordinarily, a plaintiff must be in privity of contract with the United States to invoke this court's jurisdiction over a contract claim against the government. Fid. & Guar. Ins. Underwriters, Inc. v. United States, 805 F.3d 1082, 1087 (Fed. Cir. 2015). But privity is not required if "the plaintiff can demonstrate that it was an intended third-party beneficiary under the contract." Pac. Gas & Elec. Co. v. United States, 838 F.3d 1341, 1361 (Fed. Cir. 2016).

"Third party beneficiary status is an 'exceptional privilege.'" Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) (quoting German All. Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)). The conditions for attaining such status are "stringent." Anderson v. United States, 344 F.3d 1343, 1352 (Fed. Cir. 2003). "[S]hareholders seeking status to sue as third-party beneficiaries of an allegedly breached contract must 'demonstrate that the contract not only reflects the express or implied intention to benefit the party, but that it reflects an intention to benefit the party directly.'" Castle v. United States, 301 F.3d 1328, 1338 (Fed. Cir. 2002) (quoting Glass, 258 F.3d at 1354). Specifically, "the contract must express the intent of the promissor to benefit the shareholder personally, independently of his or her status as shareholder." Glass, 258 F.3d at 1353-54. As a practical matter, the shareholder does not personally benefit independent of its status as a shareholder when the contractual promises pertain only to the treatment of the company. See FDIC v. United States, 342 F.3d 1313, 1320 (Fed. Cir. 2003) (noting that the broken promises concerned the treatment of the company such that the plaintiffs did not benefit independent of their status as shareholders); accord Maher v. United States, 314 F.3d 600, 605 (Fed. Cir. 2002) (concluding that the plaintiffs were not third-party beneficiaries when they failed to "establish[] that the government took on any obligations in the merger agreement for [the plaintiffs'] personal benefit, or even that the merger agreement contains any provisions pertaining to [the plaintiffs] personally").

As plaintiffs are not parties to the alleged implied contracts between the FHFA and the Enterprises, the relevant issue is whether plaintiffs are third-party beneficiaries of those agreements. They are not. First, it is of no import that the Enterprises, as plaintiffs argue, purportedly agreed to the conservatorships because that would serve the interests of shareholders. Indeed, "every action of a corporation is supposed to benefit its shareholders," but the "law has not viewed this general benefit as making every shareholder a third-party beneficiary." Suess v. United States, 33 Fed. Cl. 89, 94 (1995). Second, plaintiffs' allegations reflect that they only benefit from the alleged implied contracts by virtue of their shareholder status. The relevant promises concerned how the FHFA-C would operate the Enterprises; the crux of the purported agreements was the FHFA-C promising to operate the Enterprises as a

fiduciary to preserve their assets and return them to sound condition. Because the promises in the alleged implied contracts were directed at the Enterprises, plaintiffs cannot be third-party beneficiaries of the alleged contract. See FDIC, 342 F.3d at 1320. Third, plaintiffs have not demonstrated that the FHFA intended that plaintiffs benefit independently of their status as shareholders even if they did so benefit. Plaintiffs rely on the FHFA's statements that private stock would remain outstanding and shareholders would continue to hold an economic interests in their stock. Those factual statements, however, do not reflect that the FHFA intended to confer any specific benefit on plaintiffs independent of their role as shareholders. Because plaintiffs have not alleged facts reflecting that the FHFA intended to confer a personal benefit on them, they are not third-party beneficiaries. See Glass, 258 F.3d at 1353-54. In sum, the court lacks jurisdiction to entertain plaintiffs' direct implied-contract claim because plaintiffs are neither parties to a contact with the government nor third-party beneficiaries of any such agreement. Therefore, the court dismisses count X.

# V. STANDING

In addition to asserting that the court lacks subject-matter jurisdiction to entertain plaintiffs' claims, defendant challenges plaintiffs' standing to pursue their claims. A plaintiff bears the burden of demonstrating that it has standing for each claim. Starr Int'l Co. v. United States, 856 F.3d 953, 964 (Fed. Cir. 2017). It must establish, among other things, that it is "assert[ing its] own legal rights and interests, and cannot rest [its] claim[s] to relief on the legal rights or interests of third parties." Kowalski v. Tesmer, 543 U.S. 125, 129 (2004). Further, the label assigned to a claim is irrelevant; it is the substance of the allegations that control. See Allen v. Wright, 468 U.S. 737, 752 (1984) ("[T]he standing inquiry requires careful examination of a complaint's allegations to ascertain whether the particular plaintiff is entitled to an adjudication of the particular claim asserted."), abrogated on other grounds by Lexmark Int'l, Inc. v. Static Control Components, Inc., 572 U.S. 118 (2014). Thus, in a suit brought by shareholders, it is the substance of the allegations and not the label assigned to the allegations— i.e., direct or derivative—that matters. See Starr, 856 F.3d at 966-67; see also In re Sunrise Sec. Litig., 916 F.2d 874, 882 (3d Cir. 1990) ("Whether a claim is [direct] or derivative is determined from the body of the complaint rather than from the label employed by the parties."). A shareholder lacks standing to litigate nominally direct claims that are substantively derivative in nature because its personal request for relief would be based on the rights of the company. See Starr, 856 F.3d at 966-67; see also Weir v. Stagg, No. 09-21745-CIV, 2011 WL 13174531, at *9 (S.D. Fla. Feb. 7, 2011) ("Shareholders do not have standing to bring a direct action for injuries suffered by a corporation, but rather, must bring a derivative action."). A shareholder, therefore, must establish that the claims it labeled as direct are substantively direct in nature—i.e., premised on its injuries rather than the corporation's injuries—to have standing to litigate those claims. See Starr, 856 F.3d at 966-67.

The parties disagree on whether plaintiffs have standing to litigate any of their claims. Defendant argues that plaintiffs who purchased stock after the PSPA Amendments lack standing to litigate their Fifth Amendment takings claims, all plaintiffs lack standing to litigate what they assert as direct claims because the underlying rights belong to the Enterprises, and Mr. Barrett lacks standing for his derivative claims because the right to bring such claims was transferred to the FHFA-C. The court addresses each argument in turn.

## A. Plaintiffs who purchased stock after the PSPA Amendments lack standing to litigate their direct takings claim.

Defendant first argues that plaintiffs who did not own stock in the Enterprises at the time of the PSPA Amendments lack standing to pursue direct or derivative takings claims.[29] Plaintiffs counter that the court does not need to resolve the standing issue now because a case can proceed if one of the claimants has standing, and some of the plaintiffs indisputably have standing by virtue of buying stock before the execution of the PSPA Amendments. Plaintiffs also argue that they all have standing regardless of when they bought the shares. Relying on Bailey v. United States, 78 Fed. Cl. 239 (2007), plaintiffs contend that postamendment purchasers have standing because the government effectuated a permanent regulatory taking that it can transform into a temporary taking by changing the terms of the PSPAs. Plaintiffs also assert that they have standing regardless of the stock purchase date because each payment under the PSPA Amendments constitutes a new taking. In its reply, defendant asserts that the court should address standing now to conserve judicial resources, read Bailey as limited to regulatory takings of real property, and conclude that the only potential taking occurred on the date of the PSPA Amendments.

As an initial matter, it is appropriate to address at this time whether plaintiffs who purchased stock after the PSPA Amendments have standing even if those who purchased stock before the PSPA Amendments have standing. Although courts occasionally reserve judgment on standing issues when at least one claimant has standing, they only do so when each plaintiff is seeking the same relief. See, e.g., Rumsfeld v. Forum for Acad. & Institutional Rights, Inc., 547 U.S. 47, 52 & n.2 (2006) (seeking invalidation of a statute); Bowsher v. Synar, 478 U.S. 714, 721 (1986) (same); Doe v. Bolton, 410 U.S. 179, 189 (1973) (same); Bachelder v. Am. W. Airlines, Inc., 259 F.3d 1112, 1118 n. 1 (9th Cir. 2001) (holding that the question of a husband's standing to sue based on his community property interest was irrelevant because his wife "unquestionably has standing to sue, and [his] presence as a plaintiff has no effect on the relief available"). Otherwise stated, the existence of one party with standing is sufficient when the standing of the other parties has no effect on the merits of the claims. See Ry. Labor Executives' Ass'n v. United States, 987 F.2d 806, 810 (D.C. Cir. 1993) ("[T]he Supreme Court has repeatedly held that if one party has standing in an action, a court need not reach the issue of the

---

[29] Defendant also purports to argue that plaintiffs lack standing to pursue illegal-exaction and breach-of-contract claims if they did not own stock in the Enterprises at the time of the PSPA Amendments. But defendant presents no argument with respect to the illegal-exaction claims and fails to substantively develop an argument as to the breach-of-contract claims. Indeed, defendant merely asserts with respect to the contract claim that a plaintiff cannot bring such a claim until it is a party to a contract. This single sentence in defendant's motion to dismiss, coupled with its failure to address the issue in its reply, is not enough to form a substantive argument given that plaintiffs allege that they are parties to a contract. Simply stated, defendant fails to develop any argument as to why plaintiffs who acquired stock after the PSPA Amendments lack standing to pursue illegal-exaction or breach-of-contract claims. The court, therefore, declines to consider the nominal arguments. See SmithKline Beecham Corp. v. Apotex Corp., 439 F.3d 1312, 1320 & n.9 (Fed. Cir. 2006) (noting that the court has discretion on whether to consider undeveloped arguments).

standing of other parties when it makes no difference to the merits of the case."). Here, a determination of standing affects the merits of plaintiffs' claims because each plaintiff is seeking its own monetary relief, and a plaintiff is not entitled to such relief if it lacks standing. Therefore, the court will address the standing dispute.

The court begins with the derivative takings claims. A derivative claim, as noted above, is a claim that is brought on behalf of the corporation. It is of no import, therefore, when a shareholder asserting a derivative claim bought the stock so long as the real party in interest—the corporation—had a property interest at the time of the alleged taking. Thus, in this case, so long as the Enterprises had a property interest in their net worth on the date of the PSPA Amendments (and there is no suggestion they did not), then any shareholder could have standing to pursue a derivative claim. Moreover, plaintiffs have alleged that Mr. Barrett—the plaintiff asserting the derivative claims—owned stock at the time of the alleged taking.

The court next turns to plaintiffs' direct takings claim. Assuming that plaintiffs have properly asserted a direct takings claim, the issue is whether those plaintiffs who acquired stock after the date of the alleged taking have standing to pursue a takings claim. Plaintiffs acknowledge that a claimant must ordinarily own the property at the time of a taking to have standing. They assert, however, that the court should follow the conclusion in Bailey that a different standard applies in the context of a regulatory taking. Plaintiffs' reliance on Bailey, a decision issued by another judge on this court, is ill-considered. The Federal Circuit, when presented, post-Bailey, with an alleged regulatory taking, explained that "[i]t is axiomatic that only persons with a valid property interest at the time of the taking are entitled to compensation." Reoforce, Inc. v. United States, 853 F.3d 1249, 1263 (Fed. Cir. 2017) (quoting Wyatt v. United States, 271 F.3d 1090, 1096 (Fed. Cir. 2001)); accord id. ("[P]recedent requires that the property owner prove its ownership at the time of the alleged taking . . . ."); Wyatt, 271 F.3d at 1096 (addressing regulatory takings). It follows that a "plaintiff [who] own[s] no shares of the subject stock on the date of taking . . . maintains no standing to sue." Maniere v. United States, 31 Fed. Cl. 410, 421 (1994); cf. Reoforce, 853 F.3d at 1263 (concluding that the plaintiff had standing for a takings claim despite relinquishing property owned on the date of the purported taking before filing the lawsuit). Applying that principle, the court concludes that any plaintiff who did not own stock at the time of the alleged taking lacks standing to assert a direct takings claim.[30]

Having concluded that plaintiffs only have standing to pursue a direct takings claim if they owned stock at the time of the purported taking, the next issue is determining when the taking occurred. Plaintiffs contend that a new takings claim accrues with each payment under the PSPA Amendments, and defendant counters that a takings claim accrued only when the FHFA-C agreed to the PSPA Amendments.[31] The court agrees with defendant. There is only

_____

[30] Plaintiffs' approach would provide them with a windfall: They would acquire the stock at a price that reflects a discount for the property taken by the government and then obtain compensation from the government for the diminishment in value of their stock. That result is incompatible with the notion of just compensation that underlies the Fifth Amendment's Takings Clause.

[31] Although plaintiffs argue in response to defendant's motion to dismiss that each payment under the PSPA Amendments constitutes a taking, their allegations in the second

one taking when a "single governmental action causes a series of deleterious effects, even though those effects may extend long after the initial governmental [action]."[32] Boling v. United States, 220 F.3d 1365, 1373 (Fed. Cir. 2000). Here, there is one event that caused all of plaintiffs' purported losses: the execution of the PSPA Amendments. It is of no import to the accrual of plaintiffs' direct takings claim that, based on the PSPA Amendments, the Enterprises make regular payments to Treasury because those payments are just the consequences of the PSPA Amendments. Simply stated, plaintiffs' direct takings claim accrued on the date of the PSPA Amendments—August 17, 2012—and new claims do not accrue for each payment under those agreements.

In sum, Mr. Barrett's standing to litigate his derivative taking claim is not affected by when he first purchased stock in the Enterprises, and plaintiffs who did not own stock in the Enterprises on August 17, 2012, lack standing to litigate their direct takings claim. The parties, however, have not provided the court with sufficient information for it to determine which plaintiffs did not own stock in the Enterprises as of that date. Ordinarily, the court would seek additional information from the parties to resolve that issue. But the court does not do so here because, for the reasons stated below, each plaintiff's direct takings claim is subject to dismissal for another reason.

### B. Plaintiffs lack standing to litigate their nominally direct claims because those claims are substantively derivative in nature.

Defendant further argues that plaintiffs lack standing to litigate the claims they styled as direct claims because, notwithstanding the labels, the claims are actually derivative in nature. Defendant contends that plaintiffs' "direct" claims are actually derivative because, to prevail, plaintiffs would need to establish an injury to the Enterprises and any relief would accrue to the Enterprises. Plaintiffs counter that they assert direct claims because the government (1) targeted private shareholders and (2) discriminated against them by rearranging the Enterprises' capital structure to plaintiffs' detriment, which renders the claims for such conduct both direct and derivative under the dual-nature exception.[33] Defendant replies that the Federal Circuit rejected the notion that a plaintiff states a direct claim by alleging it was targeted by the challenged

---

amended complaint reflect a theory of taking premised on the execution of the PSPA Amendments. See 2d Am. Compl. ¶¶ 166-74. Nonetheless, the court considers their argument for standing as if they did allege that each payment constitutes a taking.

[32] For example, in Fallini v. United States, landowners asserted a taking based on a statute that required them to allow wild horses to drink water that was kept on their property. 56 F.3d 1378, 1383 (Fed. Cir. 1995). The landowners argued that each drink taken by a horse on their property amounted to a new taking. Id. The Federal Circuit disagreed; it held that the takings claim accrued once, when the relevant statute was enacted. Id.

[33] Plaintiffs also assert that their claims must be construed as direct claims to vindicate important federal policies if shareholders cannot assert derivative claims because of HERA. The court does not consider this argument because, as explained below, plaintiffs can assert derivative claims.

action.  Defendant also contends that the dual-nature exception is not applicable because Treasury was not a controlling shareholder, the Enterprises did not issue new shares, and the PSPA Amendments did not involve the reallocation of power.

Plaintiffs do not satisfy their burden of establishing standing for the claims that they are pursuing on their own behalf (their "direct" claims).  Neither theory they advance for why those claims are substantively direct, rather than derivative, is persuasive.  First, it is of no import whether the government targeted shareholders with the PSPA Amendments.  See Starr, 856 F.3d at 973 (noting that plaintiffs did not "sufficiently explain why the Government's subjective motivations are relevant to the inquiry into direct standing").  The direct-versus-derivative inquiry "turns on the plaintiff's injury, not the defendant's motive."  Pagan v. Calderon, 448 F.3d 16, 30 (1st Cir. 2006).  Second, plaintiffs have not asserted claims that qualify as both direct and derivative based on the dual-nature exception.  The Federal Circuit explained that, pursuant to this exception, shareholder claims may be both direct and derivative "when a 'reduction in [the] economic value and voting power affected the minority stockholders uniquely . . . ."  Starr, 856 F.3d at 968 (quoting Gentile v. Rossette, 906 A.2d 91, 99 (Del. 2006)).  Specifically, shareholder claims are both direct and derivative if

"(1) a stockholder having majority or effective control causes the corporation to issue 'excessive' shares of its stock in exchange for assets of the controlling stockholder that have a lesser value," and "(2) the exchange causes an increase in the percentage of the outstanding shares owned by the controlling stockholder, and a corresponding decrease in the share percentage owned by the public (minority) shareholders."

Id. (quoting Gentile, 906 A.2d at 100).  The exception does not apply here because Treasury was not a controlling shareholder at the time the PSPA Amendments were executed,[34] the PSPA Amendments did not involve the issuance of new shares, and shareholder voting power was not reallocated under the PSPA Amendments.  It is not enough, contrary to plaintiffs' contention, that the government allegedly exacted economic value from the other shareholders by rearranging the corporate structure.  See El Paso Pipeline GP Co. v. Brinckerhoff, 152 A.3d 1248, 1264 (Del. 2016) (applying Gentile and holding a plaintiff does not state a direct claim under the dual-nature exception by pleading the "extraction of solely economic value from the minority by a controlling stockholder").  Because plaintiffs have not established that their "direct" claims are substantively direct in nature, they cannot demonstrate that they have standing to litigate those claims.

Plaintiffs fare no better if the court moves beyond their arguments for why their "direct" claims are substantively direct in nature.  Federal law governs whether plaintiffs' claims are direct or derivative.  See Starr, 856 F.3d at 965.  But, as the parties acknowledge, federal law in this area is informed by Delaware law.  Id.; see also Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 97 (1991) (noting the "presumption that state law should be incorporated into federal common law").  Under Delaware law, the test for whether a shareholder's claim is derivative or

_____

[34] Treasury is not a controlling shareholder for the reasons set forth in Section IV.D.1, supra.

direct depends on the answers to two questions: "(1) who suffered the alleged harm (the corporation or the suing stockholders, individually); and (2) who would receive the benefit of any recovery or other remedy (the corporation or the stockholders, individually)?" Tooley v. Donaldson, Lufkin & Jenrette, Inc., 845 A.2d 1031, 1033 (Del. 2004) (en banc). "Normally, claims of corporate overpayment are . . . regarded as derivative [because] . . . the corporation is both the party that suffers the injury (a reduction in its assets or their value) as well as the party to whom the remedy (a restoration of the improperly reduced value) would flow." Gentile, 906 A.2d at 99, discussed in Starr, 856 F.3d at 965. Such claims are derivative even "though the overpayment may diminish the value of the corporation's stock or deplete corporate assets that might otherwise be used to benefit the stockholders, such as through a dividend." Protas v. Cavanagh, No. CIV.A. 6555-VCG, 2012 WL 1580969, at *6 (Del. Ch. May 4, 2012); see also Hometown Fin. Inc. v. United States, 56 Fed. Cl. 477, 486 (2003) ("[C]ourts have consistently held that shareholders lack standing to bring cases on their own behalf where their losses from the alleged injury to the corporation amount to nothing more than a diminution in stock value or a loss of dividends.").

In their complaint, plaintiffs focus on the expropriation of the Enterprises' assets via compulsory payments of all profits. The gravamen of each claim is the same: The government, via the PSPA Amendments, compelled the Enterprises to overpay Treasury. Regardless of plaintiffs' label (direct or derivative) or theory (taking, illegal exaction, breach of fiduciary duty, or breach of implied contract) for their claims, the claims are substantively derivative in nature because they are premised on allegations of overpayment.[35] See Gentile, 906 A.2d at 99; see also Roberts, 889 F.3d at 409 (explaining that the plaintiffs asserted "classic derivative claims" when they alleged that "the [PSPA Amendments] illegally dissipated corporate assets by transferring them to Treasury"). Plaintiffs cannot transform their substantively derivative claims into direct claims by merely alleging that, as a result of overpayments, they were deprived of their stockholder rights to receive dividends or liquidation payments. The claims remain derivative because plaintiffs' purported "harms are 'merely the unavoidable result . . . of the reduction in the value of the entire corporate entity.'" Protas, 2012 WL 1580969, at *6 (quoting Gentile, 906 A.2d at 99); see also Agostino v. Hicks, 845 A.2d 1110, 1122 (Del. Ch. 2004) ("[T]he inquiry should focus on whether an injury is suffered by the shareholder that is not dependent on a prior injury to the corporation."). Because plaintiffs' claims are derivative in nature, plaintiffs lack standing to pursue those claims on their own behalf.

_____

[35] Plaintiffs would remain unsuccessful if their allegations of waste and mismanagement (styled as self dealing, overreach, or abuse of discretion) were construed to be indicative of some action other than overpayment. Any claims premised on waste and mismanagement are derivative in nature. Kramer v. W. Pac. Indus., Inc., 546 A.2d 348, 353 (Del. 1988) (noting that "mismanagement resulting in corporate waste, if proven represents a direct wrong to the corporation . . . [that] is entirely derivative in nature"). Plaintiffs' claims are also derivative in nature to the extent that they are premised on (1) a purported reduction in share price as a consequence of the Enterprises losing assets or (2) the FHFA-C acting unfairly by agreeing to transfer profits pursuant to the PSPA Amendments. See Hometown, 56 Fed. Cl. at 486 (stock prices); In re Straight Path Commc'ns Inc. Consol. S'holder Litig., No. CV 2017-0486-SG, 2017 WL 5565264, at *4 (Del. Ch. Nov. 20, 2017) ("Sale of corporate assets to a controller for an unfair price states perhaps the quintessential derivative claim . . . .").

In sum, plaintiffs have not established that they have standing to litigate the claims they label as direct because they do not, and cannot, demonstrate that those claims are substantively direct claims. Therefore, the court dismisses plaintiffs' nominally direct claims on standing grounds to the extent that it has subject-matter jurisdiction over those claims.[36]

### C. Mr. Barrett has standing to litigate derivative claims.

#### 1. Mr. Barrett is not collaterally estopped from litigating whether he has standing to litigate derivative claims.

Defendant also argues that Mr. Barrett, the lone plaintiff asserting derivative claims, is collaterally estopped from litigating whether shareholders have standing to bring derivative claims because shareholders of each Enterprise previously litigated and lost that issue in Perry I.[37] Plaintiffs disagree. First, plaintiffs assert that the issue here is different than the issue in Perry I because Mr. Barrett is asserting constitutional claims (which were not pleaded in Perry I), and the district court was not bound by this jurisdiction's binding precedent. Second, plaintiffs contend that Mr. Barrett lacks privity with the Perry I plaintiffs because the district court concluded those litigants lacked capacity to sue on behalf of the Enterprises. Third, plaintiffs assert that two exceptions to collateral estoppel apply: The standing issue is a matter of general interest that has not been resolved by the Supreme Court, and there is no preclusion if the prior decision conflicts with binding precedent.

A party can be collaterally estopped from litigating "an issue if an identical issue was actually litigated and necessarily decided in a prior case where the interests of the party to be precluded were fully represented." Simmons v. Small Bus. Admin., 475 F.3d 1372, 1374 (Fed. Cir. 2007); see also In re Freeman, 30 F.3d 1459, 1467 (Fed. Cir. 1994) (acknowledging that a court may decline to apply issue preclusion when doing so would be unfair). "The party asserting issue preclusion bears the burden to establish each of these elements." Jones v. United States, 846 F.3d 1343, 1361 (Fed. Cir. 2017). As germane to the instant case, a shareholder's interests are fully represented by another shareholder litigating a derivative suit on behalf of the corporation because the corporation is the real party in interest. See, e.g., Arduini v. Hart, 774 F.3d 622, 634 (9th Cir. 2014) ("Shareholders bringing derivative suits are in privity for the purposes of issue preclusion."). A shareholder's interests, however, are not fully represented by the litigant in the earlier case if that litigant lacked capacity to sue on the corporation's behalf.[38]

---

[36] As explained above, the court lacks jurisdiction over plaintiffs' self-styled direct claims for breach of fiduciary duty and breach of implied contract. See supra Sections IV.D.1 (fiduciary duty), IV.E (contract).

[37] The court uses "collateral estoppel" and "issue preclusion" to refer to the same principle. See Jet, Inc. v. Sewage Aeration Sys., 223 F.3d 1360, 1366 (Fed. Cir. 2000) (noting that the terms are used interchangeably).

[38] Defendant challenges this framing of the law by relying on decisions in which courts addressed the preclusive effect of dismissals in derivative suits for litigants' failure to satisfy the requirement for demand futility. See, e.g., In re Sonus Networks, Inc, S'holder Derivative Litig., 499 F.3d 47, 64 (1st Cir. 2007). But those decisions involved litigants who, notwithstanding

See 7C Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1840 (3d. ed. 2019) ("[A]ny dismissal or judgment that is not on the merits but that relates to the representative's capacity to bring the suit . . . will not bar other stockholders from bringing a derivative action."); see also Sonus Networks, 499 F.3d at 64 (allowing preclusion "[i]f the shareholder can sue on the corporation's behalf").

In Perry I, shareholders of both Enterprises asserted derivative, nonconstitutional claims on behalf of the Enterprises. 70 F. Supp. 3d at 229. The district court explained that Congress, via HERA, transferred shareholders' rights to bring derivative suits to the FHFA-C and an exception to the bar on shareholders bringing such suits would contravene the plain language of the statute. Id. at 230-32. Therefore, the district court concluded that the Perry I plaintiffs lacked capacity to pursue derivative claims on behalf of the Enterprises and dismissed those claims. Id. at 233.

Defendant is correct that Mr. Barrett is attempting to litigate the same issue that was actually litigated and necessarily decided in Perry I. First, the issue here is the same as the one presented in Perry I: whether, in light of HERA, shareholders of an Enterprise can litigate a derivative a claim on an Enterprise's behalf. It is of no import that Perry I concerned nonconstitutional claims, while Mr. Barrett asserts both constitutional and nonconstitutional claims. See Taylor v. Sturgell, 553 U.S. 880, 892 (2008) (noting that preclusion applies "even if the issue recurs in the context of a different claim"). Plaintiffs fare no better by arguing that the issue is different because the district court was not bound by the same precedent that applies in this court. This exception, if accepted, would swallow the rule by limiting preclusion to courts within the same circuit. Such a limitation runs contrary to the goals of collateral estoppel: "protect[ing parties] from the expense and vexation attending multiple lawsuits, conserving judicial resources, and foster[ing] reliance on judicial action by minimizing the possibility of inconsistent decisions." Montana v. United States, 440 U.S. 147, 153-54 (1979). Second, the issue here was actually decided in Perry I. See 70 F. Supp. 3d at 230-33. Third, the resolution of a shareholder's capacity to sue was a necessary part of that decision because defendant had moved to dismiss for lack of standing. Id. at 219.

Although defendant has established the first three elements of issue preclusion, it has not established the fourth element: whether Mr. Barrett's interests were adequately represented in the prior case.[39] As noted above, shareholders' interests are adequately represented by other

their failure to comply with the specific procedural requirements, had the capacity to sue. See generally id. at 47-71. In contrast, the district court in Perry I concluded that the shareholders in that case lacked the capacity to bring the derivative claims they asserted. 70 F. Supp. 3d at 233.

[39] The court's conclusion is buttressed by the fact that, following Perry I, other courts have adjudicated derivative claims brought by Fannie and Freddie shareholders without relying on issue preclusion. See, e.g., Saxton v. Fed. Hous. Fin. Agency, 245 F. Supp. 3d 1063, 1075 (N.D. Iowa 2017) (determining whether the plaintiffs had standing after rejecting defendant's argument to apply issue preclusion), aff'd, 901 F.3d at 954; cf. Roberts v. Fed. Hous. Fin. Agency, 243 F. Supp. 3d 950, 957-58 (N.D. Ill. 2017) (addressing the merits of plaintiffs' claims despite defendant's argument that plaintiffs lacked standing), aff'd, 889 F.3d at 397.

shareholders litigating a derivative claim when the litigating shareholders can and do sue on behalf of the company. Such litigation did not occur in Perry I; the district court concluded that the shareholders lacked capacity to litigate derivative claims on behalf of the Enterprises. Because the Perry I plaintiffs lacked capacity to represent the Enterprises, the decision affecting those litigants has no bearing on the Enterprises or the rights of the other shareholders who were not parties to that suit. Therefore, Mr. Barrett is not collaterally estopped from litigating standing in this case by the decision in Perry I.[40]

## 2. Mr. Barrett has standing to litigate derivative claims because the FHFA-C has a conflict of interest.

Independent of any issue preclusion, defendant argues that Mr. Barrett lacks standing to litigate derivative claims because Congress transferred to the FHFA-C the right to bring derivative claims on behalf of the Enterprises. Defendant asserts that Congress stripped the shareholders of the right to bring derivative suits by including in HERA a succession clause—a provision stating that the FHFA-C succeeds to all shareholder rights with respect to the Enterprises. Defendant further contends that the court should not recognize an exception to that rule when the FHFA-C has a conflict of interest because an exception is not supported by HERA's language and would frustrate Congress's intent to insulate the conservator from judicial scrutiny by allowing shareholders to challenge the FHFA-C's decisions. Defendant avers that the Federal Circuit's decision in First Hartford Corp. Pension Plan & Trust v. United States, 194 F.3d 1279, 1282 (Fed. Cir. 1999), which recognized a conflict-of-interest exception in a similar statute, is inapplicable because the Federal Circuit limited its ruling to receiverships and claims that predated the receivership.

Plaintiffs counter that Mr. Barrett can maintain derivative claims on behalf of the Enterprises despite the apparent prohibition in HERA. They argue that the court cannot interpret HERA to preclude Mr. Barrett's derivative takings and illegal-exaction claims because eliminating a remedy for constitutional transgressions violates due process. They also argue, relying on First Hartford, that Mr. Barrett can assert derivative claims because the FHFA-C has a manifest conflict of interest. Plaintiffs assert that First Hartford is controlling because the Federal Circuit recognized the conflict exception in the context of a succession clause identical to the one in HERA. Plaintiffs also contend that First Hartford is not limited to (1) receivers because the Federal Circuit did not rely on any particular aspect of receivership or (2) prereceivership claims because the court's focus was on the receiver's conflict of interest.

The initial consideration here—the import of HERA's succession clause—is matter of statutory interpretation. As noted above, the court begins with the language of the statute, and if the statutory language is clear, the court's inquiry is complete. Hughes Aircraft, 525 U.S at 438. In the succession clause, Congress provided that the FHFA-C "immediately succeed[s] to" every shareholder's "rights, titles, powers and privileges . . . with respect to the [Enterprise] and the assets of the [Enterprise]." 12 U.S.C. § 4617(b)(2)(A). One of the shareholders' rights with respect to an Enterprise is the right to bring a derivative suit. See Perry II, 864 F.3d at 624; see

---

[40] Because defendant did not establish every element of issue preclusion, there is no need to address plaintiffs' arguments that an exception to the doctrine is applicable.

also RCFC 23.1 (limiting derivative suits to shareholders).  Therefore, it is apparent that HERA contains a prohibition on shareholder derivative suits because the right to assert such claims is transferred to the FHFA-C.  Indeed, other courts considering the issue have concluded that there is such a prohibition.  E.g., Kellmer v. Raines, 674 F.3d 848, 850 (D.C. Cir. 2012) (concluding that Congress "plainly transfer[red] shareholders' ability to bring derivative suits . . . to FHFA"); La. Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency, 434 F. App'x 188, 191 (4th Cir. 2011) (per curiam) (same).  If the court were writing on a blank slate, it would also conclude that Congress foreclosed shareholders from asserting derivative claims while the Enterprises are in conservatorship.

The court, however, is not writing on a blank slate.  Rather, it must render a decision in light of existing precedent—specifically, First Hartford.  In First Hartford, the FDIC was serving as the receiver for Dollar Dry Dock Bank of New York ("Dollar"), and a Dollar shareholder filed a derivative claim on the bank's behalf asserting that the FDIC breached a contract with Dollar before the receivership.  194 F.3d at 1282.  A judge on this court dismissed the claim for lack of standing after explaining that the FDIC was the only entity that could bring derivative claims for Dollar because, under the relevant statute, the FDIC as receiver succeeded to all shareholder rights.  Id. at 1294.  The Federal Circuit disagreed.  Id.  It acknowledged "that, as a general proposition, the FDIC's statutory receivership authority includes the right to control the prosecution of legal claims on behalf of the [bank] now in its receivership."  Id. at 1295.  But the Federal Circuit, without addressing the statutory language, focused on the purpose of derivative suits:  "permit[ting] shareholders to file suit on behalf of a corporation when the managers or directors of the corporation, perhaps due a conflict of interest, are unable or unwilling to do so, despite it being in the best interests of the corporation."  Id.  The Federal Circuit reasoned that the plaintiff had standing because, "most significantly," of "the conflict of interest faced by the FDIC in determining whether to bring suit."  Id.  Indeed, "the FDIC was asked to decide on behalf of [Dollar] whether [the FDIC] should sue the federal government based upon a breach of contract, which if proven was caused by the FDIC itself."  Id.  Simply stated, the Federal Circuit held that a shareholder of a company could bring a derivative claim, notwithstanding a succession clause, if the company was controlled by an entity with a conflict of interest.  Id. at 1283.

First Hartford is instructive because the Federal Circuit was addressing the same issue that is present in this case:  whether shareholders can assert a derivative claim when there is a succession clause transferring shareholders' rights to another entity.  See id. at 1294-95.  First Hartford is also informative because Congress, after that case was decided, included in HERA the same succession clause that was at issue in the Federal Circuit's decision, compare 12 U.S.C. § 1821(d)(2)(A)(i) (1994) (succession clause at issue in First Hartford), with 12 U.S.C. § 4617(b)(2)(A)(i) (succession clause promulgated in HERA), and "when judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, Congress' intent to incorporate such interpretations as well,"[41] Bragdon v. Abbott, 524 U.S. 624, 626 (1998).  But see Perry II, 864 F.3d at 625

_____

[41]  Before Congress enacted HERA, at least one other appellate court recognized a conflict-of-interest exception to the limitation on derivative suits resulting from a succession

(declining to conclude that Congress intended <u>sub silentio</u> to incorporate into HERA the conflict-of-interest exception recognized by two appellate courts).

The court is not swayed by defendant's arguments that <u>First Hartford</u> is distinguishable because it involved a receiver or claims predating the receivership.  The Federal Circuit did not premise its decision on the unique attributes of receiverships or the timing of the claims; it concluded that the plaintiffs had standing "only . . . because of the FDIC's conflict of interest." <u>Id.</u> at 1283; <u>accord id.</u> at 1295 (explaining that it held that the plaintiffs had standing based on the FDIC's refusal to sue and, "most significantly, upon the conflict of interest faced by the FDIC"). Defendant fares no better with its argument that <u>First Hartford</u> is not instructive because the Federal Circuit limited its holding "to the situation . . . in which a government contractor with a putative claim of breach by a federal agency is being operated by that very same agency." <u>Id.</u> at 1295.  Read in context, the Federal Circuit merely acknowledged that it was "neither infer[ring] nor express[ing] an opinion" on what other circumstances would involve the necessary conflict for a shareholder to acquire standing when there is a succession clause.  <u>Id.</u>  The Federal Circuit was not stating that the conflict-of-interest exception does not apply in other situations.  Indeed, the court recognized that the exception would apply outside of the circumstance presented in <u>First Hartford</u>.  <u>See id.</u> ("We stress that such standing could only occur in a narrow range of circumstances.").  The court, therefore, is guided by <u>First Hartford</u> insofar as the necessary conflict of interest exists.

The court, having identified the relevant framework, returns its focus to Mr. Barrett's derivative claims.  Those claims are premised, at least in part, on the FHFA-C's purported conduct.  Similar to <u>First Hartford</u>, the FHFA-C would need to decide on behalf of the Enterprises whether it should sue the federal government based on claims, which, if proven, are rooted in the FHFA-C's actions.  <u>See</u> 194 F.3d at 1295.  That decision presents a conflict of interest for the FHFA-C such that Mr. Barrett has standing to litigate his derivative claims on behalf of the Enterprises.

## VI.  MERITS

In addition to seeking the dismissal of plaintiffs' claims for lack of subject-matter jurisdiction and standing, defendant also moves to dismiss plaintiffs' claims for failure to state a claim on which relief can be granted.  Most of those arguments, however, only concern plaintiffs' direct claims.  <u>See, e.g.</u>, Def.'s Am. Omnibus Mot. to Dismiss 51 (disputing that shareholders' economic interest in their stock is a cognizable property right); 55 (contending that the government did not take shareholders' rights under their stock certificates); 59 (arguing that there was no taking because plaintiffs still own the stock at issue); 70 (asserting that the government did not illegally exact funds because shareholders did not bear any costs that the government would otherwise be obligated to pay); 72 (disagreeing with plaintiffs' theory that the FHFA owed a fiduciary duty to shareholders).  But those claims are no longer at issue; the only

---

clause identical to the one that Congress ultimately incorporated into HERA.  <u>See</u> <u>Delta Sav. Bank v. United States</u>, 265 F.3d 1017, 1022-23 (9th Cir. 2001).

claims that remain for adjudication are plaintiffs' derivative claims. Thus, the court limits its consideration to defendant's three contentions concerning plaintiffs' derivative claims.[42]

**A. Plaintiffs' allegations of illegal conduct do not defeat their derivative takings claims.**

Defendant first argues that plaintiffs fail to state plausible takings claims because they allege that the FHFA-C acted illegally. Specifically, defendant asserts that the claims fail because unauthorized government conduct cannot effect a taking. Plaintiffs counter that they merely pleaded in the alternative by alleging that the government is either liable for a taking (because its actions were lawful) or an illegal exaction (because it acted illegally). Notably, defendant did not return to this argument in its reply.

The court is not swayed by defendant's argument. When the government expropriates property, a plaintiff can obtain relief under either a takings theory or an illegal-exaction theory. See Orient Overseas Container Line, 48 Fed. Cl. at 289. Not both. Figueroa v. United States, 57 Fed. Cl. 488, 496 (2003), aff'd, 466 F.3d 1023 (Fed. Cir. 2006). The winning claim depends on the facts established; a takings claim requires lawful conduct, while an illegal-exaction claim is premised on unauthorized conduct. Id. Although those claims are mutually exclusive, a plaintiff can assert both and proceed past the pleading stage because a complaint can contain inconsistent claims. Id.; accord RCFC 8(d)(3) ("A party may state as many separate claims . . . as it has, regardless of consistency."). Having asserted both derivative takings and illegal-exaction claims, plaintiffs' allegations of unlawful conduct are insufficient to defeat their derivative takings claims at this stage.[43]

---

[42] As discussed in Part II, supra, defendant filed an omnibus motion to dismiss the claims raised by plaintiffs in this case and those raised by other plaintiffs in the related cases. The plaintiffs in the related cases raised some claims that plaintiffs in this case did not assert in their complaint. Thus, the court does not address defendant's arguments concerning those claims that are only asserted in the related cases.

[43] The court finds further support for its conclusion in the fact that plaintiffs labeled their illegal-exaction claims as "alternative" claims in the complaint. Although plaintiffs did not state in their complaint what the claims are "alternative" to, the "pleading must be construed so as to do justice." RCFC 8(e). The court affords justice here by reading the illegal-exaction claims as an alternative to the takings claims, which appears to be plaintiffs' intended result given that they asserted the illegal-exaction claims immediately after the takings claims. Cf. Figueroa, 57 Fed. Cl. at 496 (construing a takings and illegal-exaction claim as being pleaded in the alternative even though the plaintiff "did not expressly delineate its taking claim as being advanced 'in the alternative'"). That is to say, plaintiffs' decision to assert both takings claims and illegal-exaction claims is a textbook example of pleading inconsistent claims—a strategy that is explicitly contemplated by the court's rules.

**B. Plaintiffs' derivative illegal-exaction claims survive because defendant does not address each theory plaintiffs proffer for why the PSPA Amendments were not authorized.**

Next, defendant frames plaintiffs' illegal-exaction claims as premised on a violation of HERA and argues that plaintiffs have not alleged any unauthorized conduct because the FHFA-C and Treasury acted within their authority under HERA when they approved the PSPA Amendments. Plaintiffs counter that they identified three reasons why the revisions to the PSPAs were illegal. Specifically, plaintiffs argue that they allege that (1) the FHFA-C and Treasury exceeded their authority under HERA, (2) the FHFA-C violated its own regulations, and (3) the FHFA-C's approval of the PSPA Amendments was unconstitutional because the FHFA is structured in a manner that violates separation-of-powers principles. Plaintiffs also note that defendant failed to even address the allegations of unconstitutional conduct. Defendant uses its reply brief to double down on its argument that the FHFA-C and Treasury acted within their statutory authority and to add a contention that the FHFA-C did not violate the applicable regulations. Notably, however, defendant remains silent on the alleged constitutional violation.

An illegal-exaction claim is a demand for "money that was 'improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" Norman v. United States, 429 F.3d 1081, 1095 (Fed. Cir. 2005) (quoting Eastport S.S. Corp. v. United States, 372 F.2d 1002, 1007 (Ct. Cl. 1967)). Defendant takes aim at a core tenant of such a claim: the requirement for an unauthorized action. But defendant presses no argument on why plaintiffs' allegations that the FHFA is unconstitutionally structured are insufficient to sustain their illegal-exaction claims. Defendant also does not present any argument recognized by the court on why the FHFA-C's purported violation of its own regulations is not sufficient to establish the necessary illegality for an illegal-exaction claim. Although defendant addresses that issue in its reply brief, it had already waived the argument by not addressing the purported regulatory violation in its motion to dismiss. See United States v. Ford Motor Co., 463 F.3d 1267, 1277 (Fed. Cir. 2006) (explaining that "[a]rguments raised for the first time in a reply brief are not properly before this court"); Ironclad/EEI v. United States, 78 Fed. Cl. 351, 358 (2007) (noting that "under the law of this circuit, arguments not presented in a party's principal brief to the court are typically deemed to have been waived"). Thus, defendant has not met its burden of establishing that plaintiffs fail to state a plausible illegal-exaction claim for each Enterprise.

**C. Plaintiffs' derivative breach-of-implied-contract claims survive because defendant fails to establish that plaintiffs inadequately pleaded mutuality of intent to contract.**

Finally, defendant turns to plaintiffs' breach-of-implied-contract claims, which are premised on the FHFA-C purportedly agreeing to operate the Enterprises for the benefit of the shareholders in exchange for the Enterprises' boards consenting to conservatorship. A party alleging an implied-in-fact contract with the government must plead four elements: "(1) 'mutuality of intent to contract,' (2) 'consideration,' (3) 'lack of ambiguity in offer and acceptance,' and (4) 'actual authority' of the government representative whose conduct is relied upon to bind the government." Moda Health Plan, Inc. v. United States, 892 F.3d 1311, 1329 (Fed. Cir. 2018) (quoting Lewis v. United States, 70 F.3d 597, 600 (Fed. Cir. 1995)), cert.

granted, 139 S. Ct. 2743 (2019).  Defendant focuses both of its arguments on the first element, mutuality of intent to contract.[44]

Defendant first argues that plaintiffs fail to adequately allege that the FHFA intended to contract because the FHFA had authority to place the Enterprises into conservatorship without their consent.  This argument is grounded in the principle that "[a]n agency's performance of its regulatory or sovereign functions does not create contractual obligations."  D & N Bank v. United States, 331 F.3d 1374, 1378-79 (Fed. Cir. 2003).  For a contract to exist, "[s]omething more is necessary" than just the agency exercising its powers.  Id. at 1379.  Of particular import here, the FHFA Director could appoint the agency as conservator if the Enterprises consented or if other conditions were satisfied.  12 U.S.C. § 4617(a)(3).  Although the FHFA had the authority to place the Enterprises into conservatorship without their consent, plaintiffs allege that the FHFA did not rely on that authority but instead sought to bargain for the Enterprises' boards' consent to place the Enterprises into conservatorship.[45]  This alleged bargaining for consent is the "something more" that can support the existence of a contract.  See Mola Dev. Corp. v. United States, 516 F.3d 1370, 1378 (Fed. Cir. 2008) (explaining that evidence of negotiations supports the existence of an agency intending to contract rather than exercising regulatory powers).  That is to say, the fact that the FHFA had statutory authority to impose a conservatorship without the boards' consent is of no import at this juncture.

Defendant also argues that the FHFA's intent to contract cannot be inferred from plaintiffs' allegations that the FHFA encouraged or convinced the Enterprises' boards to consent.  Defendant's contention is premised on the principle espoused in Suess v. United States that a government agency encouraging another entity to act is not enough to establish intent to contract.  535 F.3d 1348, 1364 (Fed. Cir. 2008).  Defendant, however, proffers no analysis for why that principle concerning encouragement should be extended to an agency convincing another to act.  The court, therefore, limits its inquiry to the issue of encouragement.  The thrust of plaintiffs' complaint, however, is not that the FHFA encouraged the boards to consent but rather that the FHFA bargained for the boards' consent.  The focus on bargaining is important because, as the Federal Circuit suggested in Suess, an agency negotiating with another entity is evidence of an intent to contract.  See id.; see also Mola, 516 F.3d at 1378.  Simply stated, defendant's

---

[44]  Defendant nominally presents a third argument for why plaintiffs have not adequately alleged mutuality of intent.  In that argument, between an introductory sentence and a summation sentence, defendant highlights that Congress insulated directors from liability for consenting to the conservatorship and recounts plaintiffs' allegation that the Enterprises' boards faced a Hobson's choice.  Defendant, however, proffers no analysis as to why those considerations reflect that the FHFA and the boards lacked the requisite intent to contract.  The court, therefore, deems waived any contentions defendant intended to raise in its third argument.  See SmithKline Beecham, 439 F.3d at 1320 (declining to consider undeveloped arguments).

[45]  Plaintiffs do not explain why the FHFA decided to seek the Enterprises' boards' consent, but the FHFA had a strong incentive to pursue consent because that method was less likely to lead to litigation concerning the appointment of the conservator.  See 12 U.S.C. § 4617(a)(5) (permitting an Enterprise to litigate the imposition of a conservatorship).

-48-

contention is unpersuasive because it is not grounded in the relevant allegations. Accordingly, the court declines to dismiss plaintiffs' derivative breach-of-implied-contract claims.

## VII. CONCLUSION

For the reasons stated above, the court dismisses plaintiffs' direct claims: the court lacks jurisdiction to entertain the direct fiduciary duty and direct implied-in-fact contract claims, and plaintiffs lack standing to pursue any of their direct claims. Further, the court declines to dismiss plaintiffs' derivative claims. The court therefore **GRANTS IN PART** defendant's motion to dismiss with respect to the claims plaintiffs label as direct (counts I, IV, VII, and X), and **DENIES IN PART** the motion with respect to the derivative claims (counts II, III, V, VI, VIII, IX, XI, XII). By no later than **Friday, January 10, 2020,** the parties shall file a joint status report proposing further proceedings and, if appropriate, a schedule for such proceedings.

The court has filed this ruling under seal. The parties shall confer to determine proposed redactions to which all the parties agree. Then, **by no later than Monday, December 16, 2019,** the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

## VIII. CERTIFICATION FOR INTERLOCUTORY APPEAL

On March 6, 2020, the court granted the parties' motions to certify this opinion for interlocutory appeal. As stated in that order, the court is appending the following language to this opinion:

The court finds that this opinion involves the following controlling questions of law with respect to which there is a substantial ground for difference of opinion and that an immediate appeal from the opinion may materially advance the ultimate termination of the litigation:

(1) Whether the court lacks subject-matter jurisdiction over plaintiffs' direct claims for breach of fiduciary duty and breach of implied-in-fact contracts.

(2) Whether plaintiffs who purchased stock in Fannie and Freddie after the PSPA Amendments lack standing to pursue their direct takings claims.

(3) Whether plaintiffs lack standing to pursue their self-styled direct claims because those claims are substantively derivative in nature.

(4) Whether plaintiffs have standing to assert derivative claims notwithstanding HERA's succession clause.

(5) Whether the FHFA-C's actions are attributable to the United States such that the court possesses subject-matter jurisdiction to entertain plaintiffs' derivative takings and illegal exaction claims.

(6) Whether plaintiffs' allegations that the FHFA entered into an implied-in-fact contract with the Enterprises to operate the conservatorships for shareholder benefit fail as a matter of law.

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Chief Judge